**No. 23-2232**

In the

# United States Court of Appeals
## For the Fourth Circuit

———————

GERT JANNES KUIPER,

*Plaintiff-Appellee,*

v.

MARIO ADALBERTO REYES MENA,

*Defendant-Appellant.*

———————

On Appeal from the U.S. District Court for the
Eastern District of Virginia
Honorable Rossie D. Alston, Jr.
Case No. 1:24-cv-01785-RDA-LRV

———————

**OPENING BRIEF OF APPELLANT**

———————

Jonathan Y. Ellis
H. Brent McKnight, Jr.
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
T: (919) 755-6600
jellis@mcguirewoods.com
bmcknight@mcguirewoods.com

Kang He
Caroline G. Amarant
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
T: (703) 712-5068
khe@mcguirewoods.com
camarant@mcguirewoods.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-2232__      Caption: __Gert Kuiper v. Mario Reyes Mena__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Mario Adalberto Reyes Mena__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                                      ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                                    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                        - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kang He _____     Date: 10/29/2025 _____

Counsel for: Mario Adalberto Reyes Mena _____

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION .............................................................3

STATEMENT OF ISSUES ...........................................................................3

STATEMENT OF THE CASE ......................................................................3

    A.   El Salvador Endures a Protracted Civil War................................3

    B.   Plaintiff's Brother Travels to El Salvador as a Journalist and
        Is Killed During a Skirmish.................................................................5

    C.   Post-War Developments ....................................................................8

    D.   Plaintiff Sues Reyes Mena in Federal Court in Virginia Over
        Alleged Misconduct in El Salvador...............................................10

STANDARD OF REVIEW ...........................................................................10

SUMMARY OF ARGUMENT......................................................................10

ARGUMENT ...................................................................................................13

    A.   Federal Common Law Grants Immunity to Foreign Officials
        for Acts Taken in Their Official Capacity ....................................14

    B.   Each Element of Foreign Official Immunity Is Met ....................18

        1.   Reyes Mena is a former foreign official ..............................18

        2.   Reyes Mena allegedly acted in his official capacity...........18

        3.   Exercising jurisdiction would enforce a rule of law on
            El Salvador .................................................................................20

    C.   No *Jus Cogens* Exception to Immunity Applies ..........................22

        1.   There is no general *jus cogens* exception to sovereign
            immunity in civil cases............................................................23

            a.   International law does not recognize a general
               *jus cogens* exception to official-acts immunity..........23

            b.   All three branches of the U.S. government reject
               a general *jus cogens* exception to conduct-based
               immunity..................................................................................27

i

2. *Yousuf* does not require a *jus cogens* exception that extends to this case ..............................................................37

D. If *Yousuf* is held to have adopted a general *jus cogens* exception, it should be overruled *en banc* ......................................43

CONCLUSION.................................................................................................44

REQUEST FOR ORAL ARGUMENT.................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976)......................................................................21, 37

*Belhas v. Ya'alon,*
    515 F.3d 1279 (D.C. Cir. 2008)..........................................19, 30, 37

*Bouzari v. Islamic Rep. of Iran,*
    [2004] 71 O.R. (3d) 675 (C.A.) ...................................................25

*Doe 1 v. Buratai,*
    318 F. Supp. 3d 218 (D.D.C. 2018) ..............................20, 27, 36, 37

*Does v. Obiano,*
    138 F.4th 955 (5th Cir. 2025) ...................................................21, 40

*Does v. Obiano,*
    No. 4:23-cv-813, 2024 WL 185642 (S.D. Tex. Jan. 17, 2024) ......20, 27, 36, 37

*Does v. Obiano,*
    No. 4:23-cv-813, 2024 WL 420901 (S.D. Tex. Feb. 5, 2024).........................21

*Doğan v. Barak,*
    932 F.3d 888 (9th Cir. 2019)............................. 18, 19, 20, 35, 40, 41

*Dogan v. Barak,*
    No. 2:15-cv-8130, 2016 WL 6024416 (C.D. Cal. Oct. 13, 2016).........20, 36, 37

*Elhady v. Kable,*
    993 F.3d 208 (4th Cir. 2021).......................................................41

*Fang v. Jiang,*
    [2007] NZAR 420 .......................................................................25

*Federal Republic of Germany v. Philip,*
    592 U.S. 169 (2021).....................................................................33

*France.com, Inc. v. French Republic,*
    992 F.3d 248 (4th Cir. 2021)........................................................3

*Giraldo v. Drummond Co.,*
   493 Fed. App'x 106 (D.C. Cir. 2012) ..............................................36

*Giraldo v. Drummond Co.,*
   808 F. Supp. 2d 247 (D.D.C. 2011) ...........................................36, 37

*Hebb v. City of Asheville,*
   145 F.4th 421 (4th Cir. 2025) ....................................................3

*Jones v. Saudi Arabia,*
   [2006] UKHL 26................................................... 24, 25-27

*Kerns v. United States,*
   585 F.3d 187 (4th Cir. 2009)....................................................4

*Matar v. Dichter,*
   563 F.3d 9 (2d Cir. 2009) ...............................................34, 35, 39

*Permanent Mission of India to the United Nations v. City of*
   *New York,* 551 U.S. 193 (2007) ...........................................16, 29

*Princz v. Fed. Republic of Germany,*
   26 F.3d 1166 (D.C. Cir. 1994)..................................................30

*Regina v. Bartle, ex parte Pinochet,*
   38 I.L.M. 581 (H.L. 1999)......................................................26

*Republic of Hungary v. Simon,*
   604 U.S. 115 (2025)...........................................................14

*Republic of Philippines v. Pimentel,*
   553 U.S. 851 (2008)........................................................22, 42

*Rogers v. Tennessee,*
   532 U.S. 451 (2001)...........................................................41

*Samantar v. Yousuf,*
   560 U.S. 305 (2010)................................................. 14-17, 29

*Sarei v. Rio Tinto, PLC,*
   487 F.3d 1193 (9th Cir. 2007)..................................................40

iv

*Sarei v. Rio Tinto, PLC,*
    499 F.3d 923 (9th Cir. 2007)........................................................40

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993)........................................................27, 32, 33

*Schooner Exch. v. McFaddon,*
    11 U.S. 116 (1812)........................................................14

*Siderman de Blake v. Republic of Argentina,*
    965 F.2d 699 (9th Cir. 1992)........................................................30, 31

*Smith v. Socialist People's Libyan Arab Jamahiriya,*
    101 F.3d 239 (2d Cir. 1996)........................................................30, 34

*Underhill v. Hernandez,*
    168 U.S. 250 (1897)........................................................16, 19, 21

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983)........................................................14-16, 22, 27, 31

*Warfaa v. Ali,*
    811 F.3d 653 (4th Cir. 2016)........................................................10, 44

*Williams v. Taylor,*
    529 U.S. 362 (2000)........................................................40, 41

*Yousuf v. Samantar,*
    699 F.3d 763 (4th Cir. 2012)........................................................*passim*

**Statutes**

28 U.S.C. § 1331 ........................................................3

28 U.S.C. § 1350 note ........................................................3

28 U.S.C. § 1602 ........................................................15

28 U.S.C. § 1604 ........................................................15

28 U.S.C. § 1605 ........................................................30

28 U.S.C. § 1605(a)(5) ........................................................31

28 U.S.C. § 1605A.................................................................................30

28 U.S.C. § 1605A(a)(1) .......................................................................31

28 U.S.C. § 1605A(a)(2)(A)(i)(I)..........................................................31

28 U.S.C. § 1605B.................................................................................30

28 U.S.C. § 1605B(b)(1) .......................................................................31

**Other Authorities**

Br. of United States as Amicus Curiae, *Doğan v. Barak*,
No. 16-56704, 2017 WL 3331682 (9th Cir. July 26, 2017) ............................27

Br. of United States as Amicus Curiae, *Matar v. Dichter*, 2007
WL 6931924 (2d Cir. Dec. 19, 2007)................................................25, 27, 28, 35

Curtis A. Bradley & Laurence R. Helfer, *Int'l Law & the U.S.
Common Law of Foreign Official Immunity*, 2010 Sup. Ct.
Rev. 213 (2010) ........................................................................ 24-26

Draft Article 7, *Immunity of State Officials from Foreign
Criminal Jurisdiction*, United Nations (May 12, 2025),
available at https://docs.un.org/en/A/CN.4/L.1017......................................25

Hazel Fox, *The Law of State Immunity* (2d ed. 2008)....................................33

*Jurisdictional Immunities of the State* (*Germany* v. *Italy*), 2012
I.C.J. 99 (Judgt. of Feb. 3)............................................................33

Restatement (Second) of Foreign Relations Law § 66(f) (1965) .................17, 24

U.S. Statement of Interest, *Matar v. Dichter*,
No. 1:05-cv-10270 (S.D.N.Y. Nov. 17, 2006), ECF No. 36.....................24, 25

**INTRODUCTION**

This case concerns a Dutch citizen's claim for damages against a former Salvadoran military official for claims arising from official acts allegedly committed decades ago during the Salvadoran civil war.  The district court rejected Defendant Mario Adalberto Reyes Mena's assertion of common-law foreign official immunity, not on the ground that any element of conduct-based foreign official immunity is not met, but by applying a blanket exception to such an immunity for any claim that a defendant violated so-called *jus cogens* norms.

The district court was incorrect.  There is no general *jus cogens* exception to conduct-based foreign official immunity.  International law provides no support for such a blanket exception in civil cases.  The Executive Branch has declined to adopt such an exception and urged domestic courts to do the same.  Congress has declined to adopt such an exception in its codification of foreign sovereign immunity for foreign States.  And domestic courts have repeatedly declined to adopt such an exception.

The district court found support for its ruling in this Court's decision in *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012).  But while *Yousuf* did affirm a denial of conduct-based foreign official immunity for alleged violations of *jus*

1

*cogens* norms, that decision does not apply here. The defendant in *Yousuf* was a former official of an *un*recognized government to whom the United States owes no comity or immunity. The State Department—that otherwise rejects a general *jus cogens* exception—highlighted that fact in its suggestion of non-immunity in that case. And this Court did too.

The circumstances alleged in this case thus warrant a different result. Reyes Mena was a military official for a foreign State, El Salvador, a U.S. ally to whom comity and immunity are owed. Reyes Mena's alleged actions were authorized by the Salvadoran government as part of a military strategy to win a civil war. And exercising jurisdiction in this case would offend El Salvador's comity interest and prerogative to resolve claims over alleged military operations occurring on its own soil through the use of its own courts. It would also open courts in this Circuit to civil claims for alleged misconduct carried out on behalf of recognized foreign States in a way that other U.S. courts are not. Neither international law, domestic law, or even *Yousuf* compels that result. The order of the district court denying Reyes Mena conduct-based foreign official immunity should be reversed, and this case should be remanded with instructions to dismiss Plaintiff's claim with prejudice.

2

## STATEMENT OF JURISDICTION

The district court asserted federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under the Torture Victim Protection Act of 1991 (TVPA), 28 U.S.C. § 1350 note. Under the collateral order doctrine, this Court has appellate jurisdiction to review the district court's denial of foreign sovereign immunity. *See, e.g.*, *Yousuf*, 699 F.3d at 768 n.1; *France.com, Inc. v. French Republic*, 992 F.3d 248, 251 (4th Cir. 2021).

## STATEMENT OF ISSUES

Whether the district court erred by denying Reyes Mena, a former foreign official of a recognized foreign State, conduct-based foreign official immunity based on the court's adoption of a general *jus cogens* exception to immunity that all three branches of the U.S. government have rejected and is contrary to international law.

## STATEMENT OF THE CASE

### A.    El Salvador Endures a Protracted Civil War.[1]

From 1980 to 1992, El Salvador was enmeshed in a brutal civil war between the Salvadoran government and the Farabundo Martí National

---

[1] Because this appeal arises from the denial of Reyes Mena's motion to dismiss, Reyes Mena accepts as true the nonconclusory allegations in the Complaint solely for purposes of this appeal. *See Hebb v. City of Asheville*, 145 F.4th 421,

Liberation Front (FMLN), now a left-wing political party but then a communist guerilla rebel group. JA16. The conflict was a proxy for the Cold War. The United States sided with the incumbent Salvadoran government and provided it with financial and military aid to help defeat the FMLN and stifle the spread of communism. JA16-17, JA23. The Soviet Union and Fidel Castro backed the FMLN.

During the war, Reyes Mena was a colonel in the Salvadoran army and commanded the Fourth Infantry Brigade. JA15, JA23. The Fourth Brigade was stationed in El Paraíso in El Salvador's Chalatenango department. JA15. Also stationed at the El Paraíso base were members of the Atonal Battalion, a "highly trained specialized anti-guerrilla combat unit[]," JA23, receiving training from U.S. military advisors. *Id.*

According to Plaintiff, the Salvadoran government and the FMLN controlled different parts of Chalatenango. JA22. The Salvadoran government controlled El Paraíso and the area immediately around it, while the FMLN controlled the broader surrounding areas. *Id.* Salvadoran soldiers

---

432 (4th Cir. 2025); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Reyes Mena does not admit the allegations in the Complaint.

4

could not travel even just a few miles outside of El Paraíso before entering areas of contested control.  JA22-23.

The war was widely covered by the local and international press.  At one point leading up to national elections, "hundreds of foreign journalists" were allegedly in the country.  JA18.  The Complaint alleges that, as part of its war effort, the Salvadoran government adopted a strategy of intimidating and targeting journalists and media outlets, using military force to "systematically target[] Salvadoran journalists and news outlets that did not report favorably on the government."  JA17.  And the Salvadoran government viewed foreign journalists with particular suspicion because they were seen as "siding with the FMLN."  *Id.*

## B.    Plaintiff's Brother Travels to El Salvador as a Journalist and Is Killed During a Skirmish.

Plaintiff's brother, Jan Kuiper, was a Dutch journalist that covered issues in the Netherlands and abroad.  JA14.  In 1982, Kuiper and three other Dutch journalists traveled to El Salvador to report on the war, including "planned reports from San Salvador … and from FMLN-controlled areas" and a planned "film sympathetic to guerillas."  JA18-19.

After the journalists' arrival, the Treasury Police—a Salvadoran intelligence agency—allegedly began surveilling them.  JA19-20.  The

5

Treasury Police arrested one of the journalists, Koos Koster, for his "supposed links to the FMLN" given that his "contact information was among the possessions of a captured FMLN member." JA20. All four journalists were questioned at the Treasury Police headquarters by the agency's head, Colonel Francisco Antonio Morán. *Id.* The journalists were released four hours later, and Koster signed a statement affirming that "he was not mistreated" during the encounter. *Id.*

Plaintiff alleges that, after ignoring warnings from fellow journalists to leave the country, JA21-22, the four Dutch journalists travelled by bus from San Salvador to Chalatenango with an escort of FMLN guerrillas. JA22, JA24. Upon arriving in Chalatenango, the journalists and their escorts allegedly proceeded on foot through the countryside in a disputed area just a few miles from the El Paraíso base. JA10-11, JA24-25. The group proceeded in a single-file formation, with the journalists embedded in the middle. JA25.

The parties dispute what happened next. According to Plaintiff, members of the Fourth Brigade and the Atonal Battalion lied in wait for the journalists with heavy "crew-serviced" M-60 machine guns, ambushed the journalists from two hills overlooking a hollow through which the journalists and their guerilla escorts were walking, and allegedly killed the journalists and

all but one of their guides. JA24-25. By contrast, the Salvadoran government and military claimed that Salvadoran forces were already patrolling that area and were in fact waiting for a truck to pick them up on the side of the road after investigating FMLN activity, JA25-26; while the Salvadoran soldiers were waiting for their transport, FMLN guerillas opened fire and, as the Salvadoran soldiers defended themselves, the journalists were killed in the crossfire. JA25-26. Both sides agree that Reyes Mena was not present at the scene. JA24.

Plaintiff alleges that the morning after the incident, the U.S. Embassy sent Colonel John McKay, then-Assistant Defense Attaché at the U.S. Embassy in San Salvador, to the El Paraíso base to investigate. JA27. McKay examined the scene and the bodies, and he conducted witness interviews. JA28-29. The U.S. government sent additional embassy officials to assist in the investigation. JA28. The Dutch government also sent officials to investigate. JA30.

As the war continued, the Salvadoran government allegedly sustained its strategy of intimidating Salvadoran and foreign journalists, resulting in some journalists leaving the country. JA26-27, JA32. The Treasury Police allegedly told certain of their prisoners, "we've just killed some Dutch

journalist guerrillas and you are going to get the same when you leave." JA26. The point of this strategy, Plaintiff alleges, was to "sen[d] a clear message [to foreign journalists]: stop covering the guerrillas." JA31. Eventually, due to the Salvadoran government's strategy, "the percentage of television reports from El Salvador devoted to the FMLN dropped from 30 percent to under 5 percent." J.A31-32.

In 1984, Reyes Mena moved to the United States "as a military attaché for the Salvadoran government based in Washington, D.C.," JA15, and remained in the United States after the civil war ended in 1992, JA15-16.

### C.    Post-War Developments.

In the peace agreement that ended the war, the Salvadoran government and the FMLN authorized the United Nations to form a "truth commission" to investigate alleged crimes committed by both sides. JA16. The U.N. commission's report allegedly accuses Reyes Mena, who was not interviewed for the report, of ordering soldiers under his command to ambush and kill the four Dutch journalists. JA31. According to Plaintiff's description of the report, it states that the alleged ambush was planned at "a meeting" that included "officers of the General Staff of the Fourth Brigade," Reyes Mena, and "officers of the Atonal Rapid Deployment Infantry Battalion." JA23. The

8

planning was purportedly enabled by "precise intelligence data" received from some unknown source, *id.*, perhaps higher-ranking officials in San Salvador.

Initially, in March 1993, the Salvadoran government enacted an amnesty law that shielded individuals from both sides of the civil war from prosecution and civil liability under Salvadoran law. JA34. In 2016, however, the Salvadoran Supreme Court declared that law unconstitutional and held it invalid as to all the alleged crimes described by the U.N. commission's report, including the events at issue here. JA34-35.

In 2018, Plaintiff filed a criminal complaint with the Salvadoran Attorney General's Office requesting an investigation into Kuiper's death. JA35. The Salvadoran government agreed and began prosecuting criminal charges related to the military operation. JA35. In 2021, Plaintiff filed a renewed criminal complaint naming Reyes Mena, then-Minister of Defense General José Guillermo García, and Col. Morán of the Treasury Police as defendants. JA35-36. All three officials were criminally indicted, and García and Morán have been arrested. JA36. The Salvadoran government has requested Reyes Mena's extradition. *Id.* But the State Department has not acted on that request.

9

### D.    Plaintiff Sues Reyes Mena in Federal Court in Virginia Over Alleged Misconduct in El Salvador.

In October 2024, more than four decades after the military operation that resulted in his brother's death, Plaintiff sued Reyes Mena in the U.S. District Court for the Eastern District of Virginia, alleging a single claim under the TVPA. JA39-40. Reyes Mena moved to dismiss based on, among other defenses, conduct-based foreign official immunity. JA61.

The district court denied Reyes Mena's motion in its entirety. JA82. In doing so, the court did not dispute that Reyes Mena satisfies the standard for conduct-based foreign official immunity. JA71-72. But the court held that because "the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*," Reyes Mena was "not entitled to conduct-based official immunity under the common law." JA71 (citing *Yousuf*, 699 F.3d at 778). Reyes Mena timely appealed that ruling under the collateral-order doctrine. JA84.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of foreign official immunity. *See Warfaa v. Ali*, 811 F.3d 653, 658 (4th Cir. 2016).

## SUMMARY OF ARGUMENT

The district court's order should be reversed and this case remanded with instructions to dismiss the case with prejudice. Conduct-based foreign

10

official immunity is a federal common-law doctrine that shields current and former foreign officials from suit. It applies when a defendant (1) was a public official or agent of the State, (2) the defendant's actions were carried out in an official capacity, and (3) the effect of the federal court exercising jurisdiction would be to enforce a rule of law against the State.

All three elements of conduct-based foreign official immunity are satisfied here. Reyes Mena was a Salvadoran military colonel who commanded a brigade of the Salvadoran army and oversaw certain soldiers stationed at a military base. Plaintiff's allegations involve only alleged acts taken in his official capacity—purportedly coordinating among high-ranking members of the Salvadoran military and intelligence to carry out a government-sanctioned military strategy. And a judgment condemning Reyes Mena's alleged conduct would condemn the legality of El Salvador's conduct and strategy during a more than decade-long civil war. Because each element is satisfied, Reyes Mena is eligible for conduct-based foreign official immunity.

The district court erred by rejecting Reyes Mena's assertion of immunity, not on the requirements of the doctrine but on a general *jus cogens* exception to it. No such blanket exception exists. International law provides no support for a general *jus cogens* exception—indeed, many jurisdictions

11

have declined to apply a *jus cogens* exception in civil cases. And all three branches of the federal government have declined to recognize a general *jus cogens* exception. The Executive Branch has opposed a general *jus cogens* exception as out of step with international law and harmful to U.S. foreign relations and U.S. officials abroad. In the Foreign Sovereign Immunities Act of 1976 (FSIA), Congress has enumerated exceptions to foreign sovereign immunity for foreign States but declined to adopt one for alleged violations of *jus cogens* norms. The Supreme Court has twice concluded that conduct amounting to a *jus cogens* violation is still an immune sovereign act by a foreign State, and the Second and Ninth Circuits have declined to adopt a general *jus cogens* exception.

Contrary to the district court's reasoning, this Court's decision in *Yousuf* does not compel a different result. *Yousuf* denied foreign official immunity for alleged violations of *jus cogens* norms to an official from a foreign State without a recognized government to whom comity and immunity could be owed. Although *Yousuf* discussed the *jus cogens* exception it applied in broad terms, it had no reason to decide whether such an exception should apply to alleged conduct by an official of a foreign State with a recognized

12

foreign government. Particularly in this common-law context, the Court should not lightly apply *Yousuf* to a materially different set of facts.

The distinction here matters. El Salvador is a U.S. ally and a State with a recognized government to whom comity and immunity are owed. Denying comity and immunity to the current and former officials of such a recognized foreign State would implicate all the concerns that the Executive Branch and other courts share in rejecting a general *jus cogens* exception. The Salvadoran courts have initiated proceedings concerning the allegations here, including specifically the allegations against Reyes Mena—proceedings that would allow Plaintiff the opportunity to recover damages, if warranted. U.S. courts should not attempt to supersede those domestic proceedings and deny El Salvador the comity interest of using its courts to resolve this dispute.

## ARGUMENT

The district court erred by not dismissing Plaintiff's Complaint under the common-law doctrine of foreign official immunity. Reyes Mena qualifies for such immunity, and no exception applies. This Court should reverse with instructions to dismiss Plaintiff's Complaint with prejudice.

13

## A.    Federal Common Law Grants Immunity to Foreign Officials for Acts Taken in Their Official Capacity.

1.    The jurisdiction of the United States "within its own territory is necessarily exclusive and absolute"; it is "susceptible of no limitation not imposed by itself." *Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812). For more than two centuries, however, the United States has "generally granted foreign sovereigns complete immunity from suit." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see Yousuf*, 699 F.3d at 770 ("[T]he doctrine of foreign sovereign immunity has well-established roots in American jurisprudence…."). This immunity exists as a "matter of grace and comity," rather than as "a restriction imposed by the Constitution," and courts apply it with deference to the political branches (particularly the Executive) over "whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486; *see Republic of Hungary v. Simon*, 604 U.S. 115, 118-19 (2025).

The doctrine of foreign sovereign immunity developed "as a matter of common law." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). Historically, foreign States and their officials performing official acts were typically granted absolute immunity. "[T]he State Department followed a general practice of requesting immunity in all actions against friendly sovereigns," *id.*

14

at 312; *see id.* at 321-22, and after receiving such a request, "the district court surrendered its jurisdiction," *id.* at 311. Then in 1952, the State Department narrowed its view of foreign sovereign immunity and adopted "the 'restrictive' theory of sovereign immunity," which confines immunity to "'suits involving the foreign sovereign's public acts'" but not its "'strictly commercial acts.'" *Id.* at 312 (quoting *Verlinden*, 461 U.S. at 487). And the courts followed suit.

Even after the change in theory, however, the State Department still requested immunity in some cases for political reasons where immunity was not otherwise available under the restrictive theory. *Id.* This change in theory, combined with inconsistent application, "threw immunity determinations into some disarray." *Id.* (internal quotation marks omitted). Eventually, Congress enacted the FSIA to provide consistent application of immunity to foreign States, while immunity for foreign officials remained a matter of the common law.

2. Today, foreign sovereign immunity retains statutory and common-law aspects. Statutorily, the FSIA provides a framework for "determination[s] by United States courts of claims of foreign states to immunity from the jurisdiction of such courts," 28 U.S.C. § 1602, and makes foreign States "presumptively immune from suit unless a specific exception

15

applies." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007); *see* 28 U.S.C. § 1604. The statute "contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities." *Verlinden*, 461 U.S. at 488. Those standards "codifi[ed] … international law at the time of the FSIA's enactment." *Permanent Mission of India*, 551 U.S. at 199.

Separately, the common law continues to provide the basis for granting foreign officials immunity from suit. *See Samantar*, 560 U.S. at 325. Under the common law, the immunity of the State continues to extend to its agents. *See Yousuf*, 699 F.3d at 774 ("[S]overeign immunity, which belongs to the foreign *state*, extends to an individual *official* acting on behalf of that foreign state."); *see also Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). As with the FSIA, "international law has shaped the development" of that immunity. *Yousuf*, 699 F.3d at 773.

3. Although common-law foreign official immunity has several strands, the one relevant here is "conduct-based foreign official immunity." That immunity shields foreign officials from liability in U.S. courts "for official acts performed within the scope of his duty, but not for private acts where the

16

officer purports to act as an individual and not as an official." *Yousuf*, 699 F.3d at 775 (internal quotation marks omitted); *see* Restatement (Second) of Foreign Relations Law § 66(f) (1965). Official acts are "impute[d] … solely to the state, who alone is responsible for its consequence," and thus "any act performed by the individual as an act of the State enjoys the immunity which the State enjoys." *Yousuf*, 699 F.3d at 774 (internal quotation marks omitted). Such conduct-based immunity "stands on the foreign official's actions, not his or her status," and thus it "applies to current and former foreign officials" alike. *Id.* at 769, 774.

Where, as here, the State Department has not provided the court with its views on the application of immunity to a given case, the district court "decide[s] for itself whether all the requisites for such immunity exist[]." *Samantar*, 560 U.S. at 311. The court makes that decision using a three-part test, "stemming from international law," *Yousuf*, 699 F.3d at 774, that examines whether: (1) the defendant was a "public minister, official, or agent of the state"; (2) whether the defendant's actions were "performed in his official capacity"; and (3) whether "the effect of exercising jurisdiction would be to enforce a rule of law against the state." Restatement (Second) of Foreign Relations Law § 66(f); *see Yousuf*, 699 F.3d at 774 (quoting the same).

17

### B.    Each Element of Foreign Official Immunity Is Met.

The district court did not dispute that, absent an applicable exception, Reyes Mena meets the requirements for conduct-based foreign official immunity from this civil suit.  JA71-72.  That is for good reason.  All three elements for conduct-based foreign official immunity are plainly satisfied here.

### 1.    Reyes Mena is a former foreign official.

Even a cursory review of the Complaint shows that the first element of conduct-based immunity is satisfied.  Plaintiff alleges that Reyes Mena "was a colonel and the commander of the Fourth Infantry Brigade of the Salvadoran Army," JA15, and allegedly "had command over all Salvadoran soldiers stationed at the El Paraíso base," JA23.  As military officer, Reyes Mena was an official or agent of El Salvador at the time of the military operation at issue. *See Doğan v. Barak*, 932 F.3d 888, 891, 897 (9th Cir. 2019) (granting common-law immunity to defense minister who had allegedly planned and directed the challenged military operation).

### 2.    Reyes Mena allegedly acted in his official capacity.

The second element is likewise satisfied.  The Complaint focuses exclusively on Reyes Mena's alleged official acts in furtherance of the Salvadoran government's alleged wartime strategy of "regularly intimidat[ing] and target[ing] domestic and foreign journalists whose

18

independent reporting they viewed as a threat." JA9, JA31. And accepting *arguendo* Plaintiff's view of events, the alleged ambush of the Dutch journalists was planned and backed by high-ranking officials in the Salvadoran government, including "officers of the General Staff of the Fourth Brigade," "officers of the Atonal Rapid Deployment Infantry Battalion," the head of the Treasury Police, and the Minister of Defense. JA12-13, JA23, JA35-36. The Complaint identifies nothing that Reyes Mena did in a personal capacity. *Cf. Yousuf*, 699 F.3d at 775 (explaining "drug possession or fraud" could be examples of actions taken in a personal capacity).

Plaintiff thus concedes that Reyes Mena acted, if at all, in an official capacity as a "state actor" under the Salvadoran government's authorization. JA30-31; *see Doğan*, 932 F.3d at 894 (concluding defense minister's act to "plan, order, and control" an "operation and troops" was official action warranting common law immunity); *Belhas v. Ya'alon*, 515 F.3d 1279, 1284 (D.C. Cir. 2008) (concluding that "a military operation which was rather plainly on behalf of the state" alleged no action taken "in an individual capacity"); *cf. Underhill*, 168 U.S. at 254 (defendant "carrying on military operations in support of the revolutionary party" during a civil war were "the acts of a military commander representing the authority of the revolutionary party as

19

a government, which afterwards succeeded," such that the defendant's actions "were the actions of the government of Venezuela" and "not properly the subject of adjudication in the courts of another government").

### 3.    Exercising jurisdiction would enforce a rule of law on El Salvador.

Finally, the third element of conduct-based foreign official immunity is satisfied because exercising jurisdiction over this case would enforce a rule of law on El Salvador. Because Plaintiff alleges that Reyes Mena was an official acting in his official capacity, "a decision by [the district court] on the legality of [Reyes Mena's] actions would amount to a decision on the legality of [El Salvador's] actions." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 233 (D.D.C. 2018); *see Yousuf*, 699 F.3d at 774-75 (foreign official immunity exists because "actions against those individuals are the practical equivalent of a suit against the sovereign directly" (internal quotation marks omitted)); *Dogan v. Barak*, No. 2:15-cv-8130, 2016 WL 6024416, at *9 (C.D. Cal. Oct. 13, 2016) ("If this Court passed judgment on the legality of the [military] operation, it would likely affect our diplomatic relationship[s]."), *aff'd*, 932 F.3d 888 (9th Cir. 2019); *Does v. Obiano*, No. 4:23-cv-813, 2024 WL 185642, at *3 (S.D. Tex. Jan. 17, 2024) (concluding that exercising jurisdiction "would affect how Nigeria's government, military, and police function, regardless [of] whether the

20

damages come from [the official's] own wallet[] or Nigeria's coffers"), *report and recommendation adopted*, 2024 WL 420901 (S.D. Tex. Feb. 5, 2024), *aff'd*, 138 F.4th 955 (5th Cir. 2025).

After all, this action is not really about Reyes Mena. It is about a military operation that Plaintiff alleges the Salvadoran government authorized and conducted through officials like Reyes Mena. Adjudicating this dispute would require U.S. courts to sit in judgment over the Salvadoran government's military operations and strategy during its civil war. Foreign sovereign immunity is designed to prevent that result. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n.7 (1976) ("[T]he courts of one country will not sit in judgment on the acts of the government of another done within its own territory."); *Underhill*, 168 U.S. at 253-54 ("Where a civil war prevails … generally speaking, foreign nations do not assume to judge of the merits of the quarrel.").

\*    \*    \*

Stepping back, this case is exactly the type of case that warrants immunity. Just as the United States certainly would not want foreign governments to exercise jurisdiction over former and current U.S. officials abroad to answer for American military operations, so then U.S. courts should

21

exercise great caution before entertaining suits against former and current foreign officials. *See Verlinden*, 461 U.S. at 486 (explaining "foreign sovereign immunity is a matter of … comity").

The Salvadoran courts have already taken up Plaintiff's cause in criminal proceedings through which Plaintiff admits he seeks damages. JA35-36. El Salvador "has a comity interest in using its courts for a dispute if it has a right to do so," particularly when the claims "arise from events of historical and political significance for the [country] and its people." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008). El Salvador's "dignity" simply "is not enhanced if other nations bypass its courts without right or good cause." *Id.* There is no right or good cause here.

### C.     No *Jus Cogens* Exception to Immunity Applies.

The district court rejected Reyes Mena's assertion of immunity based not on the requirements of the doctrine, but on a general *jus cogens* exception to it. JA71-72. *Jus cogens* refers to conduct "accepted and recognized by the international community … as a norm from which no derogation is permitted." *Yousuf*, 699 F.3d at 775. *Jus cogens* norms include human rights violations such as torture, summary execution, and genocide. *Id.* at 775, 777. The district court read this Court's decision in *Yousuf* to adopt a categorical exception to

immunity for alleged violations of *jus cogens* norms.  JA71-72 (citing *Yousuf*, 699 F.3d at 777).  And it reasoned that "the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*" that defeats Reyes Mena's claim to conduct-based immunity.  JA71.  Properly understood, however, there is no general *jus cogens* exception to common-law, conduct-based foreign official immunity, and *Yousuf* does not apply.  The district court thus reversibly erred in denying Reyes Mena the benefit of conduct-based immunity.

> **1.    There is no general *jus cogens* exception to sovereign immunity in civil cases.**

As a matter of both international and U.S. law, there is no general *jus cogens* exception to conduct-based immunity.  International law recognizes no such blanket exception.  And all three branches of the U.S. government have rejected the idea that a general *jus cogens* exception to foreign sovereign immunity exists.  This Court should not recognize one either.

> **a.    *International law does not recognize a general* jus cogens *exception to official-acts immunity.***

Dating back to the Supreme Court's 1812 decision in *The Schooner Exchange*, "international law has shaped the development of the common law of foreign sovereign immunity."  *Yousuf*, 699 F.3d at 773.  And it still provides instructive guidance on the scope and application of conduct-based foreign

official immunity, particularly because that doctrine is grounded in comity with other nations that apply similar standards in their own courts. International law provides no support for a general *jus cogens* exception to foreign official immunity. While a *jus cogens* exception has been recognized in certain contexts, there is not a categorical exemption from immunity like the district court recognized.

To the contrary, many foreign jurisdictions "have rejected a *jus cogens* exception to foreign official immunity in civil cases." Curtis A. Bradley & Laurence R. Helfer, *Int'l Law & the U.S. Common Law of Foreign Official Immunity*, 2010 Sup. Ct. Rev. 213, 240-241 (2010) (citing cases in Australia, New Zealand, the United Kingdom, Canada, and Greece). As those courts have recognized, a civil suit "indirectly implead[s] the state since [the official's] acts are attributable to it," *Jones v. Saudi Arabia*, [2006] UKHL 26, ¶ 31, and thus a judgment in that case at least indirectly "enforce[s] a rule of law against the state," Restatement (Second) of Foreign Relations § 66(f); *see* U.S. Statement of Interest at 30, *Matar v. Dichter*, No. 1:05-cv-10270 (S.D.N.Y. Nov. 17, 2006), ECF No. 36 (explaining "officials are afforded immunity in part because states themselves are responsible for their officials' acts"). The federal government has therefore previously explained that a general

24

exception "for civil suits alleging a *jus cogens* violations … would be out of step with international law and could prompt reciprocal limitations by foreign jurisdictions." Br. of United States as Amicus Curiae at 4, *Matar v. Dichter*, 2007 WL 6931924 (2d Cir. Dec. 19, 2007) (*Matar* Amicus Br.).

To be sure, in the criminal context, some foreign courts have abrogated conduct-based immunity for *jus cogens* violations. *See* Bradley & Helfer, *supra* at 238; *see* Draft Article 7, *Immunity of State Officials from Foreign Criminal Jurisdiction*, United Nations (May 12, 2025).[2] But that provides no basis for a categorical exception in civil cases. In criminal proceedings, there is no risk of subjecting a foreign State to the jurisdiction of another foreign State's courts because "[i]nternational law … does not recognize the concept of state criminal responsibility"—only individual responsibility. U.S. Statement of Interest at 30, *Matar*, *supra*. Criminal sanction thus "can be imposed on the individual without subjecting one state to the jurisdiction of another." *Bouzari v. Islamic Rep. of Iran*, [2004] 71 O.R. (3d) 675, 695 (C.A.); *see Jones*, UKHL, ¶ 31 (similar). Moreover, criminal proceedings have robust procedural guardrails not used in civil cases. *See* U.S. Statement of Interest at 30, *Matar*, *supra*; *see also Fang v. Jiang*, [2007] NZAR 420, 433 (noting an

---

[2] Available at https://docs.un.org/en/A/CN.4/L.1017.

"obvious ground for distinction between criminal and civil proceedings" is that criminal proceedings are "ordinarily brought by the state" while civil actions "may be brought by private persons").

Two cases from the British House of Lords are instructive. In *Regina v. Bartle, ex parte Pinochet*, 38 I.L.M. 581 (H.L. 1999), the British House of Lords denied official-acts immunity for alleged *jus cogens* violations in a criminal prosecution. As this Court has described it, the *Pinochet* decision held that immunity was "unavailable to shield foreign officials from prosecution for international crimes." *Yousuf*, 699 F.3d at 776; *see* Bradley & Helfer, *supra* at 238-39 (discussing *Pinochet*).

But *Pinochet* does not stand for the proposition that a general *jus cogens* exception exists. In *Jones v. Saudi Arabia*, the same court rejected the application of a *jus cogens* exception in a civil case against Saudi officials for alleged torture—a general *jus cogens* exception would not have permitted that result. *See* Bradley & Helfer, *supra* at 241-42. By recognizing the defendants' immunity, the court acknowledged that "[t]he foreign state's right to immunity cannot be circumvented by suing its servants or agents." *Id.* at 242 (quoting *Jones*, 129 Int'l L. Rep. 713). Granting immunity did not "justif[y] the use of

26

torture" but simply "divert[ed] any breach of [*jus cogens*] to a different method of settlement." *Id.* (quoting *Jones*, 129 Int'l L. Rep. at 726, 732).

### b. All three branches of the U.S. government reject a general jus cogens *exception to conduct-based immunity.*

Turning from the international to the domestic, all three branches of the U.S. government reject a general *jus cogens* exception to foreign sovereign immunity. Such rejection provides strong support that the decision below is incorrect and should be reversed.

**Executive Branch.** The Executive Branch has voiced strong opposition to a general *jus cogens* exception to foreign official immunity. *See, e.g., Obiano*, 2024 WL 185642, at *6 (noting "the Executive Branch opposes a *jus cogens* exception"); *Buratai*, 318 F. Supp. 2d at 235 (explaining it was "significant that the executive branch has not recognized a blanket *jus cogens* exception"); *Matar* Amicus at 21; Br. of United States as Amicus Curiae, *Doğan v. Barak*, No. 16-56704, 2017 WL 3331682, at *25 (9th Cir. July 26, 2017). Federal courts "consistently [have] deferred to the decisions of the political branches," and "in particular, those of the Executive Branch," as to the application of foreign sovereign immunity. *Verlinden*, 461 U.S. at 486. The State Department's past practice has "recognized immunity with respect to claims involving the exercise of the power of the police or military of a foreign

27

state," *Saudi Arabia v. Nelson*, 507 U.S. 349, 362 n.5 (1993), even when the alleged conduct would violate *jus cogens* norms. This counsels strongly against this Court recognizing a general *jus cogen* exception.

The *Matar* Amicus Brief well explains why. There, the Executive set out "principles to which future courts may refer in making immunity determinations in suits against foreign officials in which the Executive does not appear." *Matar* Amicus at 21. The brief "stress[es] that [these] principles are susceptible to general application by the judiciary without the need for recurring intervention by the Executive, particularly in the form of suggestions of immunity filed on a case-by-case basis." *Id.* at 21 n.*.

Under those principles, "the Executive generally recognizes foreign officials to enjoy immunity from civil suit with respect to their official acts." *Id.* at 21. No general *jus cogens* exception can undermine that immunity because "customary international law does not recognize any *jus cogens* exception to foreign official immunity." *Id.* at 22. And the Executive did "not wish to disturb this international consensus—particularly by recognizing a *jus cogens* exception in a civil suit" that "essentially challeng[ed] a military targeting decision made by a high-ranking foreign official." *Id.* at 24.

28

As the government explained, recognizing such an exception could have far-reaching and deleterious consequences. Allowing a civil suit to go forward with "the potential for discovery and passing of judgment concerning the foreign state's … political and military decision-making of its top officials … would intrude on core aspects of the foreign state's sovereignty and give rise to serious diplomatic tensions." *Id.* at 24-25. It would inappropriately expand Article III jurisdiction "into a forum for challenging the proportionality of military actions throughout the world." *Id.* at 25. And it would disproportionately prejudice U.S. interests: "[g]iven the global leadership role of the United States, our own officials are at special risk of being subjected to politically driven lawsuits abroad in connection with controversial U.S. military operations." *Id.* These same concerns are still relevant today.

**Legislative Branch.** Congress has similarly rejected a general *jus cogens* exception to foreign sovereign immunity. As noted, before the enactment of the FSIA, all foreign sovereign immunity "developed as a matter of common law." *Samantar*, 560 U.S. at 311. In enacting the FSIA, Congress "codif[ied] … international law" existing "at the time." *Permanent Mission of India*, 551 U.S. at 199. Whether the FSIA contains a general *jus cogens* exception to foreign sovereign immunity is thus instructive to whether such

29

exception exists in common-law immunity afforded to officials that "derives from the immunity of the State." *Yousuf*, 699 F.3d at 774.

The FSIA contains no general *jus cogens* exception. Congress has enacted many exceptions to foreign sovereign immunity in the FSIA, both at the time of the statute's original enactment and in subsequent amendments. *See* 28 U.S.C. §§ 1605, 1605A, 1605B. But *none* of these exceptions creates a general *jus cogens* exception that overrides a foreign State's presumptive immunity. There exists no express exception. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718 (9th Cir. 1992) ("Nothing in the text or legislative history of the FSIA explicitly addresses the effect violations of *jus cogens* might have on the FSIA's cloak of immunity."). Nor is there any implied or "unenumerated exception for violations of *jus cogens* norms" either. *Belhas*, 515 F.3d at 1287; *see Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 245 (2d Cir. 1996) (concluding the FSIA contains no "implied waiver" based on a "*jus cogens* violation"); *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) (same).

A close look at the FSIA's enumerated exceptions, in fact, confirms that Congress has considered and rejected any general *jus cogens* exception. For example, Congress has provided an exception to immunity for "personal injury

30

or death … occurring in the United States and caused by the tortious act or omission" of a foreign State or its officials. 28 U.S.C. § 1605(a)(5). Congress has also enacted an exception for "injury or death" caused by "torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" when committed by "a state sponsor of terrorism." *Id.* § 1605A(a)(1), (a)(2)(A)(i)(I). And Congress has additionally provided an exception for injury or death in the United States caused by "an act of international terrorism." *Id.* § 1605B(b)(1). Each of these exceptions, which would encompass some violations of *jus cogens* norms in specific circumstances, is inconsistent with the recognition of a general or blanket *jus cogens* exception.

As a codification of common and international law, the absence of any general *jus cogens* exception in the FSIA is strong evidence that no such exception exists for foreign States or (at common law) for the officials acting on their behalf. In enacting the FSIA, Congress had no intention of transforming federal courts into "international courts of claims." *Verlinden*, 461 U.S. at 490. And this Court should not use federal common law to do what Congress has not. *Cf. Siderman de Blake*, 965 F.2d at 719 (explaining that, as for the FSIA, "if violations of *jus cogens* committed outside the United States are to be exceptions to immunity, Congress must make them so").

31

Recognizing a general *jus cogens* exception would allow an end-run against the FSIA by incentivizing private plaintiffs to sue foreign officials rather than the foreign States that they serve.

**Judicial Branch.**   Finally, federal jurisprudence from the Supreme Court as well as circuit and district courts around the country also does not support the adoption of a general *jus cogens* exception for conduct-based foreign official immunity.

i.  To begin, the Supreme Court has rejected a key premise that would undergird any general *jus cogens* exception.  A *jus cogens* exception to conduct-based immunity assumes "that *jus cogens* violations are not legitimate official acts and therefore do not merit foreign official immunity." *Yousuf*, 699 F.3d at 776.  But the Supreme Court has twice concluded that conduct amounting to a *jus cogens* violation is still an immune sovereign act by the foreign State.  In *Nelson*, the Court concluded that the "wrongful arrest, imprisonment, and torture" of the plaintiff, "however monstrous," was still "a foreign state's exercise of the power of its police" and thus "peculiarly sovereign in nature."  507 U.S. at 361.

Likewise, in *Federal Republic of Germany v. Philip*, the Court held that the FSIA's exception for property taken in violation of international law did

32

not encompass human rights abuse writ large, including the genocide perpetrated by Germany's Third Reich. 592 U.S. 169, 180-82 (2021). A contrary holding, the Court explained, would "derogat[e] international law's preservation of sovereign immunity for violations of human rights law." *Id.* at 182. Even for "claims brought by descendants of Nazi-occupied countries, 'a State is not deprived of immunity by reason of the fact that it is accused of serious violations of international human rights law.'" *Id.* (quoting *Jurisdictional Immunities of the State* (*Germany* v. *Italy*), 2012 I.C.J. 99, 139 (Judgt. of Feb. 3)).

Although *Nelson* and *Philip* dealt with FSIA immunity, their reasoning logically applies to foreign officials who allegedly commit *jus cogens* violations at a State's behest. After all, "any act performed by the individual as an act of the State enjoys the immunity which the State enjoys." *Yousuf*, 699 F.3d at 774 (quoting Hazel Fox, *The Law of State Immunity* at 455 (2d ed. 2008)). When a foreign State authorizes its agents to conduct a military operation within its own borders in violation of *jus cogens* norms, the State would be entitled to immunity in U.S. courts. So too should the agents who allegedly plan or conduct the operation. *See id.* ("[T]he acts of the individual to the State … imputes the act solely to the [S]tate, who alone is responsible for its

33

consequence.'" (quoting Fox, *The Law of State Immunity* at 455)).  A *jus cogens* violation that constitutes a sovereign act when the State is sued cannot suddenly lose its sovereign nature when the officials who acted under the State's authorization are sued instead.  A contrary rule would allow too easy an end-run around foreign sovereign immunity.

ii.  Beyond the Supreme Court's jurisprudence, the Second and Ninth Circuits have specifically declined to adopt a general *jus cogens* exception to foreign official immunity of the sort that the district court applied here.

In *Matar v. Dichter*, the Second Circuit held that a former Israeli military official enjoyed common law immunity for alleged war crimes committed in his official capacity.  563 F.3d 9, 11, 14 (2d Cir. 2009).  In so holding, the Second Circuit rejected the argument "that there can be no immunity … for violations of *jus cogens*."  *Id.* at 14.  The court had previously rejected, in the FSIA context, "that a foreign state should be deemed to have forfeited its sovereign immunity whenever it engages in conduct that violates fundamental humanitarian standards."  *Id.* at 14-15 (quoting *Smith*, 101 F.3d

34

at 242) (emphasis omitted).  The Second Circuit in *Matar* found the same reasoning persuasive for common law immunity.[3]

Similarly, in *Doğan v. Barak*, the Ninth Circuit upheld the immunity of the Israeli Defense Minister against claims that he allegedly planned and directed a military operation that resulted in the death of the plaintiffs' son. 932 F.3d at 890-91.  Resisting that conclusion, the plaintiffs argued "that foreign officials are not immune from suit for violations of *jus cogens* norms." *Id.* at 896.  But the Ninth Circuit did not credit that argument.  As the court explained, "no court has ever carved out an exception to foreign official immunity under the circumstances presented" in the case, and it distinguished *Yousuf* on the ground that because a foreign sovereign had not ratified the defendant's conduct, "the defendant was never given immunity in the first place." *Id.* at 897.

The Ninth Circuit explained that "[i]f immunity did not extend to officials whose governments acknowledge that their acts were officially

---

[3] The Executive's Statement of Interest in *Matar* also carried weight with the court.  *See Matar*, 563 F.3d at 13.  As discussed, the Executive's Amicus Brief in that case, which echoed the Statement of Interest in important respects, set out general principles that the Executive intended to be applied beyond *Matar*, including that there is no categorical *jus cogens* exception.  *See Matar* Amicus at 21.

authorized, it would open a Pandora's box of liability for foreign military officials" because "any military operation that results in injury or death could be characterized at the pleading stage as torture or an extrajudicial killing." *Id.* at 895 (internal quotation marks omitted). And because the immunity frees the official "from *suit* rather than" merely "liability," adopting the plaintiff's theory "would effectively extinguish the common law doctrine of foreign official immunity." *Id.* (internal quotation marks omitted). To routinely adjudicate claims against foreign officials haled into federal courts would require "resolving any number of sensitive foreign policy questions which might arise in the context of such lawsuits." *Id.*

iii. Finally, numerous district courts have rejected a general *jus cogens* exception to foreign official immunity. *See, e.g.*, *Obiano*, 2024 WL 185642, at *4-6; *Buratai*, 318 F. Supp. 3d at 233-35; *Dogan*, 2016 WL 6024416, at *10-11; *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 249-52 (D.D.C. 2011), *aff'd*, 493 Fed. App'x 106 (D.C. Cir. 2012).

In addition to articulating many of the same reasons discussed above, these courts also reasoned that recognizing a general *jus cogens* exception would improperly "merge[] the merits of the underlying claim with the issue of immunity" because the court would have to decide whether a *jus cogens*

36

norm was violated to resolve whether an official has immunity. *Giraldo*, 808 F. Supp. 2d at 250 (quoting *Belhas*, 515 F.3d at 1292 (Williams, J., concurring)); *see Obiano*, 2024 WL 185642, at *5; *Buratai*, 318 F. Supp.3d at 234-35; *Dogan*, 2016 WL 6024416, at *10. Because foreign official immunity is "an immunity from trial and the attendant burdens of litigation," a decision passing on the merits at an early stage of litigation would effectively defeat the immunity's purpose. *Id.* at 250-51 (internal quotation marks omitted). Moreover, it would "affront[] the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity.'" *Id.* (internal quotation marks omitted); *see Alfred Dunhill*, 425 U.S. at 691 n.7. Granting immunity without merging the merits with the immunity determination avoids doing so.

### 2. *Yousuf* does not require a *jus cogens* exception that extends to this case.

Despite the overwhelming disapproval of a general *jus cogens* exception, the district court denied Reyes Mena's assertion of conduct-based foreign official immunity on precisely that ground, relying on this Court's decision in *Yousuf* as support. JA71-72. But the district court's reliance on *Yousuf* was misplaced. *Yousuf* denied foreign official immunity for alleged violations of *jus cogens* norms to an official from a State without a recognized government

37

to whom comity and immunity could be owed. Because Reyes Mena is a former official that allegedly acted on behalf of a recognized government—indeed, a U.S. ally—*Yousuf* does not apply here.

a. In *Yousuf*, the plaintiffs brought claims under the TVPA and the Alien Tort Statute against Mohamed Ali Samantar, a Somalian who "was a high-ranking government official in Somalia" during a military regime. 699 F.3d at 766. Plaintiffs alleged that "they, or members of their families, were subjected to torture, arbitrary detention and extrajudicial killing by government agents under the command and control of Samantar" while he was Minister of Defense and then Prime Minister. *Id.* (internal quotation marks omitted). When the regime ultimately collapsed, Samantar fled to the United States and took up residence in Virginia. *Id.*

Initially, the district court dismissed the case under the FSIA. *Id.* But this Court reversed, concluding that the FSIA does not apply to foreign officials, and the Supreme Court affirmed. *Id.* at 766-67. The case was remanded "for the district court to consider whether Samantar could successfully invoke an immunity doctrine arising under pre-FSIA common law." *Id.* at 767 (internal quotation marks omitted).

38

On remand, the State Department "expressly oppos[ed] immunity." *Id.* Relevant here, the State Department concluded "that Samantar's claim for immunity was undermined by the fact that he is a former official of a state with no currently recognized government" that could assert immunity on his behalf or confirm whether his actions were taken in an official capacity. *Id.* Samantar could not receive immunity, the State Department explained, because the "immunity protecting foreign officials for their official actions ultimately belongs to the sovereign," and there was no "recognized government" that was the source of Samantar's immunity. *Id.* Relying on the Executive Branch's views, the district court denied Samantar's motion to dismiss. *Id.* at 767-68.

This Court affirmed. It explained that, "[i]n considering the contours of foreign official immunity," this Court "must draw from the relevant principles found in both international and domestic immunity law, as well as the experience and judgment of the State Department." *Id.* at 773. It observed that the Supreme Court and numerous lower courts had "embraced the international law principle that sovereign immunity, which belongs to a foreign *state*, extends to an individual *official* acting on behalf of that foreign state." *Id.* at 774-75 (citing, *e.g.*, *Matar*, 563 F.3d at 14). And it accepted that those cases "sketch out the general contours of official-act immunity." *Id.* at 775.

39

The Court concluded, however, that Samantar could not claim foreign official immunity. The Court reasoned that a "trend" of international and domestic cases supported the conclusion that "officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Id.* at 776-77.[4] The Court also observed, relying on the State Department's statement, that "[b]ecause the State Department ha[d] not officially recognized a Somali government," the Court did not "face the usual risk of offending a foreign nation by exercising jurisdiction over plaintiffs' claims." *Id.* at 777.[5]

b. The Court should not extend *Yousuf* to this case. Just as this case requires, *Yousuf* was applying federal common law to the specific facts before the Court in that case. "[I]n the common law, rules of law often develop

---

[4] Notably, the court recognized that, despite the trend, any *jus cogens* exception was "less settled in the civil context," *Yousuf*, 699 F.3d at 776, and the only decision applying a *jus cogens* exception in a civil case is no longer good law. *Compare id.* (citing *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1209 (9th Cir. 2007)), *with Sarei v. Rio Tinto, PLC*, 499 F.3d 923 (9th Cir. 2007) (granting rehearing en banc and withdrawing panel opinion).

[5] The Court also found that Congress's enactment of the TVPA was "consistent with" its denial of foreign official immunity. *Yousuf*, 699 F.3d at 777. The Court did not find, however, that the TVPA abrogates common-law conduct-based immunity. As multiple courts have recognized, it does not. *See Does v. Obiano*, 138 F.4th 955, 960 (5th Cir. 2025); *Doğan*, 932 F.3d at 895-96.

40

incrementally as earlier decisions are applied to new factual situations." *Williams v. Taylor*, 529 U.S. 362, 384-85 (2000) (opinion of Stevens, J.). Thus, as the doctrine evolves from case to case, "there often arises a need to clarify or even to reevaluate prior opinions as new circumstances and fact patterns present themselves." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001). Common law thus "presupposes a measure of evolution" based on "incremental and reasoned development of precedent." *Id.* at 461; *see Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) ("Incrementalism and individualization are important to the common-law method.").

The facts of this case—as alleged by Plaintiff—distinguish it from *Yousuf*. That case involved a foreign official from a State lacking a recognized government to whom comity and immunity could be owed. That fact was raised by the Executive in suggesting that Samantar had no immunity, and this Court gave it "substantial weight." *Yousuf*, 699 F.3d at 773. So while this Court might have broadly stated "that foreign officials are not immune for *jus cogens* violations," as the Ninth Circuit has observed, the *Yousuf* Court had "no occasion to consider whether that should be the case" in all circumstances—*i.e.*, to recognize a general or categorical *jus cogens* exception. *Doğan*, 932 F.3d at 897 (rejecting such a broad reading of *Yousuf*).

41

In contrast, Reyes Mena is from a State with a recognized government to whom comity and immunity are owed.  JA15, JA16-17.  That difference matters.  While a general *jus cogens* exception may not offend comity when applied to governments not recognized by the State Department, the inverse is true for recognized governments, where applying such an exception would implicate the concerns that other courts and the Executive Branch share in rejecting a general *jus cogens* exception.  *See Yousuf*, 699 F.3d at 777 (reasoning that "[b]ecause the State Department has not officially recognized a Somali government, the court does not face the usual risk of offending a foreign nation by exercising jurisdiction").

Those concerns apply with full force here.  As Plaintiff concedes, Reyes Mena's alleged acts were wholly authorized by the Salvadoran government as part of a military strategy to win its civil war. *See, e.g.*, JA17, 23.  The United States backed the Salvadoran government with financial aid and sent "American military advisors" to the El Paraíso base to train soldiers.  JA16-17, 23.  El Salvador is currently allied with United States.  Its government is addressing this dispute under its own judicial system.  JA35-36; *see Pimentel*, 553 U.S. at 866 (identifying the "comity interest" that a foreign State has "in using its courts for a dispute if it has the right to do so").  Plaintiff and his

42

brother, Dutch citizens and residents, have no substantial connection to the United States. JA14-15. And yet they ask U.S. courts to supersede the judicial process of an allied government to scrutinize alleged military conduct of that government and its former official.

On these facts, *Yousuf* should not control. Foreign official immunity is a significant U.S. foreign policy issue but also one that is subject to incremental evolution under federal common law. In addressing immunity in the context of Plaintiff's allegations here, this Court has an opportunity to align with the Second and Ninth Circuits, consistent with international law, in maintaining conduct-based immunity in civil cases for officials acting on behalf of recognized governments. Doing so ensures that courts in the Fourth Circuit are not transformed into international courts or military tribunals for plaintiffs from all over the world seeking an avenue for civil relief, not afforded elsewhere, based on military operations conducted abroad. This Court should hold that Reyes Mena is immune from this suit and let the Salvadoran judicial system or the U.S. political branches resolve this dispute.

### D. If *Yousuf* is held to have adopted a general *jus cogens* exception, it should be overruled *en banc*.

This Court can and should reverse without questioning or departing from this Court's precedent in *Yousuf*. But if the Court interprets *Yousuf*

broadly as adopting a general *jus cogens* exception to immunity that would apply even to this case, *Yousuf* should be overruled. Because a prior panel's decision is binding on future panels "unless and until it is reconsidered *en banc*," *Warfaa*, 811 F.3d at 661, Reyes Mena respectfully preserves this argument should seeking further review be necessary.

## CONCLUSION

For the foregoing reasons, the order of the district court denying Reyes Mena's motion to dismiss should be reversed, and this Court should remand with instructions to dismiss this case with prejudice.

Dated: December 19, 2025

Respectfully submitted,

/s/ *Jonathan Y. Ellis*

Jonathan Y. Ellis
H. Brent McKnight, Jr.
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
T: (919) 755-6600
jellis@mcguirewoods.com
bmcknight@mcguirewoods.com

- and -

44

Kang He
Caroline G. Amarant
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
T: (703) 712-5068
khe@mcguirewoods.com
camarant@mcguirewoods.com

*Counsel for Mario Adalberto Reyes Mena*

45

## REQUEST FOR ORAL ARGUMENT

This case presents complex questions of federal law of significant importance not only for the parties to this case but for future cases raising the same issues, and the question presented implicates whether the Fourth Circuit is split with at least the Second and Ninth Circuits and out of step with relevant international law.  Accordingly, Reyes Mena respectfully submits that oral argument would aid the Court in its decisional process.

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 9,173 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced CenturyExpd BT typeface using Microsoft Word, in 14-point size.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

47

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the system.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis