**No. 25-2232**

## In the

# United States Court of Appeals
## For the Fourth Circuit

_____

GERT JANNES KUIPER,

*Plaintiff-Appellee,*

v.

MARIO ADALBERTO REYES MENA,

*Defendant-Appellant.*

_____

On Appeal from the U.S. District Court for the
Eastern District of Virginia
Honorable Rossie D. Alston, Jr.
Case No. 1:24-cv-01785-RDA-LRV

_____

**JOINT APPENDIX VOLUME 1 OF 1**

_____

Jason P. Hipp
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
T: 212-407-1784
jhipp@jenner.com

*Counsel for Appellee*

Jonathan Y. Ellis
H. Brent McKnight, Jr.
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
T: (919) 755-6600
jellis@mcguirewoods.com
bmcknight@mcguirewoods.com

*Counsel for Appellant*

*Additional Counsel Listed Inside Cover*

Lawrence W. McMahon
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 312-840-7444
lmcmahon@jenner.com

Daniel McLaughlin
CENTER FOR JUSTICE &
ACCOUNTABILITY
268 Bush Street
San Francisco, CA 94104
T: 415-544-0444
dmclaughlin@cja.org

*Counsel for Appellee*

Kang He
Caroline G. Amarant
MCGUIREWOODS LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
T: (703) 712-5000
khe@mcguirewoods.com
camarant@mcguirewoods.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

**Volume I (pages JA1–JA84)**

E.D. Va Docket Sheet (Case No. 1:24-cv-01785-RDA-LRV) .........................JA1

Dkt. 1:
      Complaint (Oct. 9, 2024).........................................................................JA8

Dkt. 22:
      Defendant's Motion to Dismiss (Nov. 22, 2024) ...................................JA42

Dkt. 39:
      Memorandum Opinion and Order Denying Defendant's
      Motion to Dismiss (Sept. 10, 2025) ........................................................JA44

Dkt. 50:
      Notice of Appeal (Oct. 9, 2025)...............................................................JA84

APPEAL,JURY,STAYED

# U.S. District Court
## Eastern District of Virginia – (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:24–cv–01785–RDA–LRV

| | |
|---|---|
| Kuiper v. Mena<br>Assigned to: District Judge Rossie D. Alston, Jr<br>Referred to: Magistrate Judge Lindsey R. Vaala<br>Case in other court:  4CCA, case manager R. Phillips,,<br>25–02232<br>Cause: 28:1350 Alien Tort Claims Act | Date Filed: 10/09/2024<br>Jury Demand: Plaintiff<br>Nature of Suit: 890 Other Statutory<br>Actions<br>Jurisdiction: Federal Question |

**Plaintiff**

**Gert Jannes Kuiper**                    represented by    **Andrew Balland**
Jenner & Block, LLP
1099 New York Ave.
Ste 900
Washington, DC 20001
202–639–6050
Email: aballand@hirschlerlaw.com
*TERMINATED: 04/25/2025*

**Carmen Ka Man Cheung**
Center for Justice and Accountability
(CA–NA)
268 Bush St
#3432
San Francisco, CA 94104
**NA**
415–544–0444
Fax: 415–544–0456
Email: ccheung@cja.org *(Inactive)*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christina Isnardi**
Jenner & Block LLP (NY–NA)
1155 Avenue of the Americas
New York, NY 10036
**NA**
212–891–1600
Fax: 212–891–1699
Email: cisnardi@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claret Vargas**
Center for Justice and Accountability
(CA–NA)
268 Bush St
#3432
San Francisco, CA 94104
**NA**
415–544–0444
Fax: 415–544–0456
Email: cvargas@cja.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel William McLaughlin**
Center for Justice and Accountability
(CA–NA)
268 Bush St

JA1

#3432
San Francisco, CA 94104
**NA**
415–544–0444
Fax: 415–544–0456
Email: dmclaughlin@cja.org
*ATTORNEY TO BE NOTICED*

**Jason Hipp**
Jenner & Block LLP (NY–NA)
1155 6th Ave
New York, NY 10036
** NA **
212–891–1600
Fax: 212–891–1699
Email: jhipp@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence William McMahon**
Jenner & Block LLP (DC–NA)
1099 New York Avenue NW
Suite 900
Washington, DC 20001–4412
**NA**
202–639–6000
Fax: 202–239–6066
Email: lmcmahon@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Lloyd Haws**
Jenner & Block LLP
1099 New York Ave, NW
Suite 900
Washington, DC 20001–4412
202–639–6065
Email: MHaws@jenner.com
*ATTORNEY TO BE NOTICED*

**Michelle Shane Kallen**
Steptoe LLP
1330 Connecticut Ave., NW
Washington, DC 20036
202–429–6415
Fax: 202–429–3902
Email: mkallen@steptoe.com
*TERMINATED: 11/21/2024*

**Zoe Reinstein**
Jenner & Block LLP (IL–NA)
353 N Clark Street
Chicago, IL 60654
**NA**
312–222–9350
Fax: 312–527–0484
Email: zreinstein@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mario Adalberto Reyes Mena**          represented by **Kang He**
McGuireWoods LLP (McLean)
1750 Tysons Blvd

JA2

Suite 1800
McLean, VA 22102–4215
703–712–5000
Fax: 703–712–5268
Email: khe@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Amarant**
McGuirewoods LLP
1750 Tysons Blvd.
Ste 1800
Tysons, VA 22102
703–712–5025
Email: camarant@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/09/2024 | 1 | Complaint ( Filing fee $ 405, receipt number AVAEDC–9784111.), filed by Gert Jannes Kuiper. (Attachments: # 1 Civil Cover Sheet)(Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 2 | Proposed Summons re 1 Complaint by Gert Jannes Kuiper (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 3 | NOTICE of Appearance by Michelle Shane Kallen on behalf of Gert Jannes Kuiper (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 4 | Motion to appear Pro Hac Vice by Jason Hipp and Certification of Local Counsel Michelle S. Kallen Filing fee $ 75, receipt number AVAEDC–9784173. by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 5 | Motion to appear Pro Hac Vice by Zoe Reinstein and Certification of Local Counsel Michelle S. Kallen Filing fee $ 75, receipt number AVAEDC–9784214. by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 6 | Motion to appear Pro Hac Vice by Claret Vargas and Certification of Local Counsel Michelle S. Kallen Filing fee $ 75, receipt number AVAEDC–9784235. by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 7 | Motion to appear Pro Hac Vice by Daniel McLaughlin and Certification of Local Counsel Michelle S. Kallen Filing fee $ 75, receipt number AVAEDC–9784262. by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | 8 | Motion to appear Pro Hac Vice by Carmen Ka–Man Cheung and Certification of Local Counsel Michelle S. Kallen Filing fee $ 75, receipt number AVAEDC–9784272. by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 10/09/2024) |
| 10/09/2024 | | Initial Case Assignment to District Judge Rossie D. Alston, Jr and Magistrate Judge Lindsey R. Vaala. (Cwel) (Entered: 10/10/2024) |
| 10/10/2024 | 9 | Summons Issued as to Mario Adalberto Reyes Mena, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice to Attorney)(Cwel) (Entered: 10/10/2024) |
| 10/16/2024 | 10 | SUMMONS Returned Executed by Gert Jannes Kuiper Mario Adalberto Reyes Mena served on 10/11/2024, answer due 11/1/2024 (Kallen, Michelle) (Entered: 10/16/2024) |
| 10/16/2024 | 11 | ORDER granting 4 Motion for Pro hac vice Appointed Jason Hipp for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/16/2024. (swil) (Entered: 10/16/2024) |

JA3

| 10/16/2024 | 12 | ORDER granting 5 Motion for Pro hac vice Appointed Zoe Reinstein for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/16/2024. (swil) (Entered: 10/16/2024) |
|---|---|---|
| 10/16/2024 | 13 | ORDER granting 6 Motion for Pro hac vice Appointed Claret Vargas for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/16/2024. (swil) (Entered: 10/16/2024) |
| 10/16/2024 | 14 | ORDER granting 7 Motion for Pro hac vice Appointed Daniel William McLaughlin for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/16/2024. (swil) (Entered: 10/16/2024) |
| 10/16/2024 | 15 | ORDER granting 8 Motion for Pro hac vice Appointed Carmen Ka Man Cheung for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/16/2024. (swil) (Entered: 10/16/2024) |
| 10/22/2024 | 16 | First MOTION for Extension of Time to File Answer */Responsive Pleadings* by Mario Adalberto Reyes Mena. (Attachments: # 1 Proposed Order Proposed Order)(He, Kang) (Entered: 10/22/2024) |
| 10/23/2024 | 17 | ORDERED that Defendant's Unopposed Motion for an Extension of Time to File Responsive Pleadings (Dkt. No. 16) is GRANTED. Defendant's deadline to file and serve responsive pleadings is extended to November 22, 2024 in re 16 First MOTION for Extension of Time to File Answer */Responsive Pleadings*. Signed by Magistrate Judge Lindsey R. Vaala on 10/23/2024. (swil) (Entered: 10/24/2024) |
| 11/19/2024 | 18 | NOTICE of Appearance by Andrew Balland on behalf of Gert Jannes Kuiper (Balland, Andrew) (Entered: 11/19/2024) |
| 11/20/2024 | 19 | MOTION to Withdraw as Attorney by Gert Jannes Kuiper. (Kallen, Michelle) (Entered: 11/20/2024) |
| 11/21/2024 | 20 | RESPONSE to Motion re 19 MOTION to Withdraw as Attorney filed by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 11/21/2024) |
| 11/21/2024 | 21 | ORDER granting 19 Motion to Withdraw as Attorney. Attorney Michelle Shane Kallen terminated. Signed by Magistrate Judge Lindsey R. Vaala on 11/21/2024. (dvanm) (Entered: 11/21/2024) |
| 11/22/2024 | 22 | MOTION to Dismiss for Failure to State a Claim , MOTION to Dismiss for Lack of Jurisdiction , MOTION to Stay by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 11/22/2024) |
| 11/22/2024 | 23 | Memorandum in Support re 22 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Stay filed by Mario Adalberto Reyes Mena. (Attachments: # 1 Exhibit Ramos Declaration, # 2 Exhibit El Sal. Const. art. 245, # 3 Exhibit El Sal. Code articles)(He, Kang) (Entered: 11/22/2024) |
| 11/22/2024 | 24 | Waiver of Oral Argument by Mario Adalberto Reyes Mena in re 22 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Stay (He, Kang) Modified text on 11/27/2024 per attorney's clarification (triv). (Entered: 11/22/2024) |
| 11/27/2024 | 25 | Joint MOTION for Extension of Time to File Response/Reply *to Defendants Motion to Dismiss, or Alternatively, Stay* by Gert Jannes Kuiper. (Attachments: # 1 Proposed Order)(Balland, Andrew) (Entered: 11/27/2024) |
| 12/05/2024 | 26 | ORDERED that the Motion (Dkt. 25) is GRANTED; and it is FURTHER ORDERED that the Plaintiff shall file his response in opposition to Defendant's Motion to Dismiss, Or Alternatively, Stay no later than December 20, 2024; and it is FURTHER ORDERED that Defendant shall file his reply to Plaintiff's response no later than January 8, 2025. Signed by District Judge Rossie D. Alston, Jr on 12/5/2024. (dvanm) (Entered: 12/05/2024) |
| 12/17/2024 | 27 | Motion to appear Pro Hac Vice by Christina Isnardi and Certification of Local Counsel Andrew Balland Filing fee $ 75, receipt number AVAEDC–9907325. by Gert Jannes Kuiper. (Balland, Andrew) (Main Document 27 replaced on 12/18/2024) (dvanm, ). (Entered: 12/17/2024) |

JA4

| | | |
|---|---|---|
| 12/20/2024 | 28 | RESPONSE in Opposition re 22 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Stay filed by Gert Jannes Kuiper. (Balland, Andrew) (Entered: 12/20/2024) |
| 01/08/2025 | 29 | **STRICKEN PER RDA CHAMBERS.** Reply to Motion re 22 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Stay filed by Mario Adalberto Reyes Mena. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(He, Kang) Modified on 1/13/2025 (dvanm). (Entered: 01/08/2025) |
| 01/08/2025 | 30 | Reply to Motion re 22 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction MOTION to Stay *(corrected filing)* filed by Mario Adalberto Reyes Mena. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(He, Kang) (Entered: 01/08/2025) |
| 01/15/2025 | 31 | MOTION for Leave to File *Sur−Reply in Opposition to Motion to Dismiss, or Alternatively, Stay (ECF No. 22)* by Gert Jannes Kuiper. (Attachments: # 1 Exhibit A (Proposed Order))(Balland, Andrew) (Entered: 01/15/2025) |
| 01/15/2025 | 32 | Memorandum in Support re 31 MOTION for Leave to File *Sur−Reply in Opposition to Motion to Dismiss, or Alternatively, Stay (ECF No. 22)* filed by Gert Jannes Kuiper. (Attachments: # 1 Exhibit A Sur−Reply, # 2 Exhibit A−1 Pages of the Congressional Record)(Balland, Andrew) (Entered: 01/15/2025) |
| 01/16/2025 | 33 | Waiver of re 31 MOTION for Leave to File *Sur−Reply in Opposition to Motion to Dismiss, or Alternatively, Stay (ECF No. 22)*, 32 Memorandum in Support, */Notice of Waiver of Oral Argument on Plaintiff's Motion for Leave to File a Sur−Reply* by Gert Jannes Kuiper (Balland, Andrew) (Entered: 01/16/2025) |
| 01/16/2025 | 34 | RESPONSE to Motion re 31 MOTION for Leave to File *Sur−Reply in Opposition to Motion to Dismiss, or Alternatively, Stay (ECF No. 22)* filed by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 01/16/2025) |
| 02/19/2025 | 35 | ORDER granting 27 Motion for Pro hac vice Appointed Christina Isnardi for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 2/19/2025. (swil) (Entered: 02/20/2025) |
| 04/25/2025 | 36 | NOTICE of Appearance by Matthew Lloyd Haws on behalf of Gert Jannes Kuiper (Haws, Matthew) (Entered: 04/25/2025) |
| 04/25/2025 | 37 | MOTION to Withdraw as Attorney by Gert Jannes Kuiper. (Attachments: # 1 Proposed Order)(Balland, Andrew) (Entered: 04/25/2025) |
| 04/25/2025 | 38 | ORDERED that Mr. Ballard's motion to withdraw 37 is GRANTED. The Clerk's Office is directed to terminate Mr. Ballard as counsel of record for Plaintiff and remove Mr. Ballard from the list of individuals who receive the notices through the CM/ECF system for this case. Plaintiff shall continue to be represented by other counsel of record at Jenner & Block LLP and the Center for Justice and Accountability, including counsel admitted to practice in thisCourt. Signed by Magistrate Judge Lindsey R. Vaala on 4/25/2025. (dvanm) (Entered: 04/25/2025) |
| 09/10/2025 | 39 | MEMORANDUM OPINION AND ORDER that Defendant's 22 Motion to Dismiss, or alternatively, Stay is DENIED; and it is FURTHER ORDERED that Plaintiffs 31 Motion for Leave to File a Sur−Reply is GRANTED; and it is FURTHER ORDERED that a scheduling order will issue promptly. Signed by District Judge Rossie D. Alston, Jr on 9/10/25. (tarm) (Entered: 09/11/2025) |
| 09/10/2025 | 40 | SCHEDULING ORDER: Initial Pretrial Conference set for 10/8/2025 at 11:00 AM in Alexandria Courtroom 501 before Magistrate Judge Lindsey R. Vaala. Discovery due by 2/13/2026. Motions for Summary Judgment will be due by Friday, February 27, 2026. A final pretrial conference will be set after any motions for summary judgment are resolved. If no party files a motion for summary judgment, then the parties must file a notice or motion with the Court on or before Monday, March 2, 2026, informing the Court that no motion for summary judgment has been filed and that a final pretrial conference should be set. Signed by District Judge Rossie D. Alston, Jr on 9/10/25. (Attachments: # 1 Pretrial Notice, # 2 Magistrate Judge Consent Form)(tarm) (Entered: 09/11/2025) |

| 09/19/2025 | 41 | Consent MOTION for Extension of Time to File Answer by Mario Adalberto Reyes Mena. (Attachments: # 1 Proposed Order Proposed Order)(He, Kang) (Entered: 09/19/2025) |
|---|---|---|
| 09/19/2025 | 42 | NOTICE of Appearance by Caroline Amarant on behalf of Mario Adalberto Reyes Mena (Amarant, Caroline) (Entered: 09/19/2025) |
| 09/19/2025 | 43 | ORDER granting 41 Motion for Extension of Time to Answer. Mario Adalberto Reyes Mena answer due 10/3/2025. Signed by Magistrate Judge Lindsey R. Vaala on 09/19/2025. (dvanm) (Entered: 09/19/2025) |
| 10/01/2025 | 44 | *Rule 26(f) Report and Joint* Discovery Plan by Gert Jannes Kuiper.(Haws, Matthew) (Entered: 10/01/2025) |
| 10/01/2025 | 45 | Motion to appear Pro Hac Vice by Lawrence William McMahon and Certification of Local Counsel Matthew Haws Filing fee $ 75, receipt number AVAEDC–10497353. by Gert Jannes Kuiper. (Haws, Matthew) (Entered: 10/01/2025) |
| 10/03/2025 | 46 | ANSWER to Complaint by Mario Adalberto Reyes Mena.(He, Kang) (Entered: 10/03/2025) |
| 10/08/2025 | 47 | Minute Entry for proceedings held before Magistrate Judge Lindsey R. Vaala:Initial Pretrial Conference held on 10/8/2025 by telephone. Appearance of counsel for plaintiff and defendant. Discovery plan approved. Order to issue. (Tape #FTR.)(nneb) (Entered: 10/09/2025) |
| 10/08/2025 | 48 | Order Rule 16(b) Scheduling Order – Pursuant to the Rule 16(b) Conference it is ordered that the Joint Discovery Plan filed by the parties is approved, as amended herein, and shall control discovery to the extent of its application unless further modified by the Court (see Order for further details). Signed by Magistrate Judge Lindsey R. Vaala on 10/8/2025. (nneb) (Entered: 10/09/2025) |
| 10/08/2025 | 49 | ORDER granting 45 Motion for Pro hac vice Appointed Lawrence William McMahon for Gert Jannes Kuiper. Signed by District Judge Rossie D. Alston, Jr on 10/8/2025. (swil) (Entered: 10/09/2025) |
| 10/09/2025 | 50 | NOTICE OF APPEAL as to 39 Memorandum Opinion, by Mario Adalberto Reyes Mena. Filing fee $ 605, receipt number AVAEDC–10515272. (He, Kang) (Entered: 10/09/2025) |
| 10/10/2025 | 51 | Transmission of Notice of Appeal to US Court of Appeals re 50 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 10/10/2025) |
| 10/15/2025 | 53 | USCA Case Number 25–2232 4CCA, case manager R. Phillips, for 50 Notice of Appeal filed by Mario Adalberto Reyes Mena. (dvanm) (Entered: 10/16/2025) |
| 10/16/2025 | 52 | Joint MOTION for Protective Order by Mario Adalberto Reyes Mena. (Attachments: # 1 Proposed Order)(Amarant, Caroline) (Entered: 10/16/2025) |
| 10/20/2025 | 54 | TRANSCRIPT of proceedings held on 10/8/2025, before Judge L. Vaala, Court Reporter/Transcriber Tonia Harris, Telephone number 703–646–1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/19/2025. Redacted Transcript Deadline set for 12/22/2025. Release of Transcript Restriction set for 1/20/2026.(harris, tonia) (Entered: 10/20/2025)** |
| 10/24/2025 | 55 | MOTION to Stay re 50 Notice of Appeal by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 10/24/2025) |
| 10/24/2025 | 56 | Memorandum in Support re 55 MOTION to Stay re 50 Notice of Appeal filed by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 10/24/2025) |

| 10/24/2025 | 57 | MOTION to Certify an Interlocutory Appeal re 39 Memorandum Opinion, by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 10/24/2025) |
|---|---|---|
| 10/24/2025 | 58 | Memorandum in Support re 57 MOTION to Certify an Interlocutory Appeal re 39 Memorandum Opinion, filed by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 10/24/2025) |
| 10/24/2025 | 59 | Waiver of re 57 MOTION to Certify an Interlocutory Appeal re 39 Memorandum Opinion, , 55 MOTION to Stay re 50 Notice of Appeal *Oral Argument* by Mario Adalberto Reyes Mena (He, Kang) (Entered: 10/24/2025) |
| 10/27/2025 | 60 | PROTECTIVE ORDER – Re Handling and Labeling of Confidential Information. Signed by Magistrate Judge Lindsey R. Vaala on 10/27/2025. SEE ORDER FOR FURTHER DETAILS. (wgar, ) (Entered: 10/27/2025) |
| 11/06/2025 | 61 | RESPONSE in Opposition re 55 MOTION to Stay re 50 Notice of Appeal filed by Gert Jannes Kuiper. (Attachments: # 1 Declaration of Jason P. Hipp)(Haws, Matthew) (Entered: 11/06/2025) |
| 11/07/2025 | 62 | Notice of Hearing Date set for December 3, 2025 re 55 MOTION to Stay re 50 Notice of Appeal (Haws, Matthew) (Entered: 11/07/2025) |
| 11/07/2025 | 63 | RESPONSE in Opposition re 57 MOTION to Certify an Interlocutory Appeal re 39 Memorandum Opinion, filed by Gert Jannes Kuiper. (Haws, Matthew) (Entered: 11/07/2025) |
| 11/10/2025 | | Set Deadline as to 55 MOTION to Stay re 50 Notice of Appeal. Motion Hearing set for 12/3/2025 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston, Jr. (triv) (Entered: 11/10/2025) |
| 11/10/2025 | | *** Motion Hearing deadline terminated – Per RDA's chambers, motion set for 12/03/2025 will be decided on the papers; no oral argument will be heard (tarm, ) (Entered: 11/10/2025) |
| 11/12/2025 | 64 | Reply to Motion re 55 MOTION to Stay re 50 Notice of Appeal filed by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 11/12/2025) |
| 11/13/2025 | 65 | Reply to Motion re 57 MOTION to Certify an Interlocutory Appeal re 39 Memorandum Opinion, filed by Mario Adalberto Reyes Mena. (Attachments: # 1 Exhibit motion, # 2 Exhibit order)(He, Kang) (Entered: 11/13/2025) |
| 11/24/2025 | 66 | Joint MOTION to Expedite *Rulings on Two Pending Motions* by Mario Adalberto Reyes Mena. (He, Kang) (Entered: 11/24/2025) |
| 12/03/2025 | 67 | ORDERED that the Motion to Stay (Dkt. 55) is GRANTED; and it is FURTHER ORDERED that the case is STAYED for the duration of Defendant's appeal noticed on October 9, 2025; and it is FURTHER ORDERED that the Motion to Certify (Dkt. 57) is DENIED WITHOUT PREJUDICE for lack of jurisdiction; and it is FURTHER ORDERED that the Motion to Expedite (Dkt. 66) is DENIED as MOOT. Signed by District Judge Rossie D. Alston, Jr on 12/3/2025. (dvanm) (Entered: 12/03/2025) |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| GERT JANNES KUIPER, | ) |
| Plaintiff, | ) Case No. _____ |
| v. | ) |
| MARIO ADALBERTO REYES MENA, | ) |
| Defendant. | ) |
| | ) |
| | ) JURY TRIAL REQUESTED |

## <u>COMPLAINT</u>

Plaintiff, Gert Jannes Kuiper in his personal capacity, alleges as follows:

### PRELIMINARY STATEMENT

1. On March 17, 1982, four Dutch journalists and their guides headed to guerrilla-controlled territory in Chalatenango, El Salvador to report on the devastating human toll of the country's civil war. They were ambushed and killed en route by a Salvadoran military patrol. The patrol was stationed at the El Paraíso base of the Salvadoran Army, and under the command of Defendant Mario Adalberto Reyes Mena ("Reyes" or "Defendant"). This case arises out of the extrajudicial killing of the four journalists—producer and editor Jan Kuiper, reporter Koos Koster, cameraman Johannes "Joop" Willemsen and sound technician Hans ter Laag (the "Dutch Journalists")—and their guides.

2. The patrol's killing of the Dutch Journalists took place against the backdrop of brutal human rights violations committed against civilians by the Salvadoran military and state

1

JA8

security forces (collectively, "Salvadoran Security Forces") during the civil war that engulfed El Salvador from 1980 until 1992.

3.      More than 75,000 civilians were killed during the conflict. The United Nations-appointed Commission on the Truth for El Salvador ("U.N. Truth Commission")—which was established as part of the 1992 peace agreement between the Salvadoran government and the Farabundo Martí National Liberation Front ("FMLN" for its name in Spanish)—concluded that 85 percent of these killings were carried out by Salvadoran Security Forces and their paramilitary allies.

4.      As part of its repression, the Salvadoran Security Forces regularly intimidated and targeted domestic and foreign journalists whose independent reporting they viewed as a threat. The killing of the Dutch Journalists, which the U.N. Truth Commission highlighted as among the most emblematic crimes committed during the civil war, demonstrated the brutality with which the Salvadoran Security Forces sought to stifle national and international independent media in El Salvador.

5.      In late February 1982, the Dutch Journalists arrived in El Salvador on assignment from Interkerkelijke Omroep Nederland ("IKON"), a Dutch television and radio broadcaster affiliated with the Protestant Church in the Netherlands. The team was led by Kuiper and Koster, who had worked together for years and had previously reported from El Salvador. Salvadoran Security Forces viewed their earlier reports—which included interviewing guerrilla members, documenting human rights abuses by state actors, and reporting on government-supported death squads—as pro-guerrilla, and thus as a threat.

6.      Salvadoran Security Forces surveilled and followed the Dutch Journalists upon their arrival in El Salvador. On March 11, 1982, Koster was arrested and, along with the other

2

JA9

three Dutch Journalists, brought to the headquarters of the Treasury Police—an intelligence agency known for its human rights violations and connections to death squads. The Dutch Journalists were questioned by the head of the Treasury Police about their potential connections to the FMLN.

7.      The next day, a newspaper allied with the Salvadoran Security Forces published a photograph of Koster and his colleagues as they walked through the Treasury Police headquarters' patio, on their way out of the compound. The accompanying article was headlined: "Foreign journalist a contact for subversives."

8.      The photograph circulated broadly in the domestic and international press. Plaintiff, who was then in Spain, read a news report that the Dutch Journalists had been questioned by the Treasury Police and was terrified by the implications for his brother's safety.

9.      On March 17, 1982, days after their questioning at the Treasury Police headquarters, the Dutch Journalists boarded a mini-bus in San Salvador marked with the word "PRENSA" ("Press" in Spanish) and headed for Chalatenango. The Dutch Journalists were accompanied by FMLN guides, including a 12-year-old boy. They had arranged to travel with the guides to areas controlled by the FMLN in order to document the lives of civilians living in those regions.

10.     Defendant was aware of the Dutch Journalists' plans. According to the U.N. Truth Commission's final report, on or around March 16, 1982, Defendant met with other military officers and agreed on a plan to ambush the Dutch Journalists on the basis of intelligence indicating that they would try to enter an area controlled by the FMLN the next day via a route near the El Paraíso military base under Defendant's command.

11.     On the day of the ambush, the Dutch Journalists were dropped off on the side of a road approximately four miles from the El Paraíso base. There, the Dutch Journalists were met by

3

JA10

two or three additional guides. The Dutch Journalists began their journey on foot through the countryside, carrying only their filming equipment. Minutes later, the patrol from the El Paraíso base, which had been lying in wait for the Dutch Journalists, began shooting. Two of the Dutch Journalists were immediately shot and felled. The other two attempted to flee but were soon hit by gunfire from the patrol. Within minutes, the patrol killed all four Dutch Journalists and all but one of their guides, who managed to escape.

12. Plaintiff's brother, Jan Kuiper, was shot twice in the head.

13. At the time of his death, Jan Kuiper was just days away from celebrating his fortieth birthday. Plaintiff had already planned a celebration for his older brother in Amsterdam. Instead, Plaintiff attended his funeral.

14. Jan's death had a profound impact on his family, including on Plaintiff, who had grown increasingly close to Jan as Plaintiff entered adulthood. For years after Jan's killing, Plaintiff avoided the neighborhood in Amsterdam where Jan had lived because it was too painful to revisit spaces he associated with his brother. Jan's death made it difficult for Plaintiff to form full relationships with those around him for fear of also losing them. More than four decades later, Plaintiff still suffers from Jan's tragic murder.

15. In the immediate aftermath of the killings, members of the Salvadoran Security Forces, including Defendant, denied that there was a planned ambush, falsely claiming that guerrillas had shot at the patrol and that the patrol had returned fire, accidentally killing the Dutch Journalists. No credible sources corroborated this account.

16. Efforts at accountability for the killings were futile. The Salvadoran government and its Security Forces stifled any meaningful investigations, let alone prosecutions, of the killings.

17.    In 1992, the Salvadoran government and the FMLN reached a peace agreement, which included the creation of the U.N. Truth Commission to investigate crimes committed during the civil war. The U.N. Truth Commission issued its report and recommendations on March 15, 1993 ("U.N. Truth Commission Report").

18.    Based on its investigation, the U.N. Truth Commission concluded that soldiers acting under Defendant's command surveilled and then killed the Dutch Journalists in a premeditated ambush.

19.    On March 20, 1993, five days after the U.N. Truth Commission Report was made public, the Salvadoran government enacted a blanket amnesty law that shielded perpetrators—both guerrillas and members of the Salvadoran Security Forces, including Defendant—from investigations and prosecutions for human rights abuses ("Amnesty Law").

20.    The Amnesty Law prevented investigations or prosecutions involving civil war-era abuses for more than two decades until July 13, 2016, when the Constitutional Chambers of El Salvador's Supreme Court struck it down as unconstitutional.

21.    In December 2016, the Salvadoran Prosecutor General created the Unit for the Investigation of Crimes Committed during the Armed Conflict (the "Salvadoran Human Rights Unit"). Investigations into crimes committed during the civil war progressed slowly after the Salvadoran Human Rights Unit's establishment, yet Plaintiff maintained a renewed hope that accountability would be possible in El Salvador for his brother's killing.

22.    In November 2022, a Salvadoran court indicted three former officers of the Salvadoran Security Forces, including Defendant, for the killing of the Dutch Journalists.

23.    The other two former officers, the former Minister of Defense, José Guillermo García, and the former head of the Treasury Police, Francisco Antonio Morán, reside in El Salvador and were arrested following the indictments.

24.    Defendant, who now resides in the United States, has avoided arrest by ceasing all travel to El Salvador since the issuance of the 2022 indictment.

25.    In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest,[1] but no action has been taken on the Red Notice.

26.    Plaintiff's hope that the initiation of the criminal trial, along with the INTERPOL Red Notice, would result in Defendant facing justice in El Salvador for his brother's killing has been thwarted by Defendant's cessation of travel to the country of his birth. Nor is there any indication that extradition or removal to El Salvador will be prompt or even possible.

27.    Left with no viable legal recourse in El Salvador, Plaintiff commences this action against Defendant, a U.S. resident, for his responsibility and role in the extrajudicial killing of his brother, Jan Kuiper.

28.    This is an action for compensatory and punitive damages for torts in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) ("TVPA").

29.    Congress enacted the TVPA to provide U.S. citizens and foreign nationals alike the ability to pursue civil remedies in U.S. courts for serious human rights abuses, such as extrajudicial killings, committed abroad where, as here, U.S. courts have personal jurisdiction over the

---

[1]    Red Notice, INTERPOL, https://www.interpol.int/en/How-we-work/Notices/Red-Notices/View-Red-Notices#2022-71798 (last visited October 8, 2024). "A Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action," and "it is based on an arrest warrant or court order issued by the judicial authorities in the requesting country." Red Notices, INTERPOL, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited October 8, 2024).

defendant. The TVPA's civil remedies were designed to contribute to an important goal: to ensure there is no "safe haven in the United States" for those who commit human rights abuses. S. Rep. No. 102-249, at 3 (1991).

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over Plaintiff's claim of extrajudicial killing in accordance with 28 U.S.C. § 1331 because the action arises under a federal cause of action, the TVPA.

31.     The United States District Court for the Eastern District of Virginia is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (c)(1) because Defendant resides in Centreville, Virginia, within this district.

## PARTIES

### *Plaintiff Gert Jannes Kuiper*

32.     Plaintiff Gert Jannes Kuiper is a Dutch citizen residing in the Netherlands.

33.     Plaintiff is the brother of the decedent Jan Kuiper and his closest living direct relative.

34.     Decedent Jan Kuiper was born on March 19, 1942 in the Netherlands and was a Dutch citizen.

35.     Jan Kuiper was known as a dedicated and skilled journalist with a commitment to covering social justice issues, both in the Netherlands and internationally. He began his career as a reporter shortly after his high school graduation, when he began to write stories for his local newspaper. Over the course of his 15-year career in journalism, Jan Kuiper worked for news outlets in the Netherlands and Germany. He began his work at IKON, a Dutch television and radio broadcaster affiliated with the Protestant Church in the Netherlands, in 1976.

36.     Jan Kuiper had extensive experience in Latin America and had traveled to El Salvador on two prior occasions as a reporter and freelancer for IKON. There, he interviewed Marianella García Villas, a well-known Salvadoran politician and human rights activist who was tortured and assassinated by Salvadoran Security Forces in 1983. Jan Kuiper had also reported on human rights abuses in Mexico and in Chile in the years following the military coup by Augusto Pinochet.

### *Defendant Mario Adalberto Reyes Mena*

37.     From 1957 to at least 1986, Defendant Reyes was a member of the Armed Forces of El Salvador.

38.     In March 1982, Defendant was a colonel and the commander of the Fourth Infantry Brigade of the Salvadoran Army (the "Fourth Brigade"), headquartered in El Paraíso, in the Chalatenango department of El Salvador. The Dutch Journalists were killed by a patrol stationed at the El Paraíso base and acting under Defendant's command.

39.     In 1984, Defendant relocated to the United States as a military attaché for the Salvadoran government based in Washington, D.C.

40.     Defendant settled in the United States and currently resides in Centreville, Virginia.

41.     Following his relocation to the United States, Defendant continued to return to El Salvador up until the November 2022 indictment issued against him by Salvadoran authorities.

### STATEMENT OF FACTS

42.     Plaintiff Gert Kuiper, by and through his attorneys, alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

8

**I.     State Violence Against Civilians and Targeting of Independent Media during the Armed Conflict in El Salvador**

43.     From 1980 to 1992, El Salvador was ravaged by a civil war between the Salvadoran government and the FMLN.

44.     In 1992, the Salvadoran government and the FMLN reached a peace agreement. As part of the peace accord, a United Nations-led truth commission was established to investigate the crimes of both sides of the conflict. The U.N. Truth Commission's investigation focused on "serious acts of violence" committed during the civil war, including extrajudicial killings, enforced disappearances, and torture.

45.     In its Report, the U.N. Truth Commission concluded that more than 75,000 civilians were killed and another 8,000 were forcibly disappeared, with the vast majority of these crimes committed by Salvadoran Security Forces and their paramilitary allies.

46.     The U.N. Truth Commission found that Salvadoran Security Forces and their paramilitary allies engaged with impunity in campaigns against civilians, murdering politicians, teachers, union leaders, university students, human rights activists, priests, nuns, journalists, and other notable figures in Salvadoran society. State institutions actively collaborated in or turned a blind eye to these killings.

47.     The Salvadoran Security Forces considered independent media members and their public reporting as a threat.

48.     At the time, independent media coverage of the Salvadoran Security Forces' gross human rights abuses imperiled the support the Salvadoran government received from allied governments.

49.     In the fall of 1981, for example, the U.S. Congress enacted a law requiring that before providing U.S. aid to El Salvador, the President of the United States certify that the

JA16

Salvadoran government was adhering to a series of conditions, including complying with human rights standards, controlling the excesses of its military, and investigating the 1980 rape and murder of four American churchwomen in El Salvador.

50.     Independent media coverage of the Salvadoran Security Forces' human rights abuses also helped to fuel public protests and activism internationally, including in the United States, that were critical of the Salvadoran government.

51.     The Salvadoran Security Forces systematically targeted Salvadoran journalists and news outlets that did not report favorably on the government. Independent media outlets were bombed. Editors and journalists were threatened, attacked, killed, or disappeared until the outlets closed.

52.     For example, the publisher of *El Independiente*, the last independent newspaper in El Salvador, stated that he fled the country "not because of lack of the Salvadoran people's support for idealistic journalism, but because, after the takeover of my office and machinery, after the capture of my employees and perhaps even the eventual disappearance of my family and myself, there would be absolute silence about the facts."

53.     Foreign journalists did not fare much better. The Salvadoran Security Forces viewed foreign journalists, in particular, as siding with the FMLN. According to the Committee to Protect Journalists, in the two years that preceded the Dutch Journalists' killings, 26 journalists—foreign and Salvadoran—had been killed.

54.     In 1980, an American freelance journalist was forcibly disappeared. His mutilated remains were found in 1983, only after his family's congressional representative managed to make the investigation of the journalist's death part of the certification requirements for U.S. aid to El Salvador.

JA17

55. In early March 1982, a Salvadoran Security Forces-affiliated death squad circulated a list of twenty-four names, including fourteen American journalists and a United States Embassy public affairs officer, calling for "death to traitors of Democracy." The death squad called them "pseudo-journalists in the service of international subversion who have been condemned to death by the patriots."

56. The situation grew particularly acute in the lead-up to the March 28, 1982 Constitutional Assembly elections, when hundreds of foreign journalists came to El Salvador to cover the national elections. In the prior month, controversy over the U.S. administration's certification of El Salvador's human rights record and efforts to investigate the forced disappearance of the American freelance journalist, and the rape and murder of four American nuns who were ministering in El Salvador, had resulted in negative press coverage of the Salvadoran government and its Security Forces.

57. With such an extensive contingent of foreign journalists present in the country in the early months of 1982, it became increasingly important for the Security Forces to crack down on independent reporting from El Salvador that might further tarnish the government's image internationally.

58. It was in this heightened climate of repression and threats against independent media that the Dutch Journalists arrived in El Salvador.

**II.  The Salvadoran Security Forces Perceived the Dutch Journalists and their Reporting as a Threat**

59. In February 1982, the Dutch Journalists traveled to El Salvador on assignment for IKON to report on the devastating human toll of the country's civil war, including planned reports from San Salvador, El Salvador's capital, and from FMLN-controlled areas.

11

JA18

60.     Both Kuiper and Koster had previously traveled to El Salvador and published stories critical of the Salvadoran Security Forces.

61.     In 1980, Koster and Kuiper's team produced a documentary on Salvadoran civil defense units and Salvadoran Security Forces-aligned death squads that garnered international attention.

62.     That same year, Koster had interviewed Archbishop Óscar Romero, a leading figure for peace in El Salvador. Shortly after, in March 1980, the Archbishop delivered a sermon over the national radio pleading with the Salvadoran Security Forces to stop the killing and repression of the Salvadoran people. The next day, the Archbishop was assassinated under orders of high-ranking officials from the Salvadoran Security Forces.

63.     On February 24, 1982, the Dutch Journalists arrived in San Salvador from Mexico City and checked in at the Hotel Alameda.

64.     According to a de-classified U.S. diplomatic cable, at the time of the Dutch Journalists' arrival in San Salvador, "it was generally known that the four were making a 16mm film sympathetic to the guerrillas, similar to one they made in 1980."

65.     On or about March 7, 1982, the Dutch Journalists visited Mariona Prison in San Salvador, where political prisoners, principally union leaders, were held. They interviewed political prisoners who were part of the leadership inside the detention center, and documented scars and other physical evidence of torture on the bodies of detainees. The Dutch Journalists sent the footage of the interviews from Mariona Prison back to the Netherlands.

66.     On March 10, 1982, Hotel Alameda staff informed the Dutch Journalists that members of the notorious Treasury Police had been looking for them at the hotel.

12

67.     As detailed by the U.N. Truth Commission, the Treasury Police was an intelligence unit that worked with death squads and was responsible for numerous assassinations, massacres, enforced disappearances, and acts of torture during the civil war. At the height of its power, the Treasury Police consisted of over 2,000 members and was headed by Col. Francisco Antonio Morán.

68.     On the morning of March 11, 1982, about twenty members of the Treasury Police arrived at the Hotel Alameda and arrested Koster for his supposed links to the FMLN. The rest of the Dutch Journalists decided to accompany him to Treasury Police headquarters as a show of solidarity.

69.     At the Treasury Police headquarters, the Dutch Journalists were questioned by the head of the Treasury Police, Col. Morán, who claimed that Koster's contact information was found among the possessions of a captured FMLN member.

70.     The Association of Foreign Correspondents (*Asociación de corresponsales extranjeros*) quickly learned that the Dutch Journalists were being questioned at the Treasury Police headquarters and mobilized to spread news of Koster's arrest.

71.     As detailed in de-classified U.S. diplomatic cables, the United States and Dutch Embassies also engaged with the Salvadoran government to secure Koster's release.

72.     After four hours of questioning, Col. Morán released Koster and his colleagues, once Koster signed a document stating he was not mistreated.

73.     When the Dutch Journalists returned to the Hotel Alameda, they observed that their hotel rooms had been searched while they were detained, though nothing appeared to be missing.

13

74.    Jan Schmeitz, a freelance journalist from the Netherlands who was staying at the same hotel, advised the Dutch Journalists to take their detention by the Treasury Police seriously and to be extremely careful while in El Salvador.

75.    The next day, March 12, 1982, a newspaper aligned with the Salvadoran Security Forces published a photo of Koster and his colleagues—including Jan Kuiper on the far left (see below)—showing them as they walked through the Treasury Police headquarters' patio, on their way out of the compound. The accompanying article, which largely copied a press release issued by the Salvadoran Armed Forces Press Committee, was headlined: "Foreign journalist a contact for subversives."



76.    Foreign and Salvadoran journalists warned the Dutch Journalists that being the focus of a Treasury Police investigation was dangerous and attempted to dissuade them from

continuing their reporting. Some advised them to leave the country immediately given the risks to their safety.

77. The Dutch Journalists decided to press on with their independent reporting.

78. On or about March 15, 1982, the Dutch Journalists finalized their plan to travel from San Salvador to an FMLN-controlled zone in the department of Chalatenango to document the lives of civilians in those areas. On March 16, 1982, Koster borrowed a mini-bus marked with the word "PRENSA" ("Press") from Schmeitz for the planned trip.

**III.   Soldiers Under Defendant's Command Ambushed and Killed the Dutch Journalists**

**A.   Salvadoran Soldiers Stationed at the El Paraíso Base in March 1982 Operated Under Defendant's Command**

79. Salvadoran Security Forces and the FMLN both controlled portions of the department of Chalatenango. Salvadoran Security Forces controlled the area immediately around El Paraíso, whereas the surrounding areas were disputed between the government and the FMLN. The location of the ambush, about 4 miles east of El Paraíso, was not considered safe for Salvadoran Security Forces.



JA22

80.    The Fourth Brigade of the Salvadoran Army was the military unit responsible for Chalatenango and was headquartered at a base in El Paraíso. At the time, units at the El Paraíso base had a designated patrol area near the base given the presence of FMLN forces nearby and the disputed control of the surrounding areas.

81.    In March 1982, Defendant, a colonel in the Salvadoran Army, was the commander of the Fourth Brigade.

82.    In March 1982, Defendant had command over all Salvadoran soldiers stationed at the El Paraíso base, including members of the Fourth Brigade and members of the Atonal Battalion.

83.    In March 1982, members of the Atonal Battalion were stationed at the El Paraíso base while receiving training from American military advisors present at the base.

84.    The Atonal Battalion, still completing its training in early 1982, was one of three Rapid Deployment Infantry Battalions ("BIRI," for its name in Spanish). BIRI were highly trained specialized anti-guerrilla combat units.

85.    Defendant was aware of the Dutch Journalists' plans to travel to Chalatenango on March 17, 1982 to access FMLN-controlled areas. According to the U.N. Truth Commission Report, on or around March 16, 1982, "a meeting was held in which officers of the General Staff of the Fourth Brigade, including its Commander, [Defendant] Colonel Mario A. Reyes Mena, and officers of the Atonal Rapid Deployment Infantry Battalion (BIRI) took part. According to those interviewed, the ambush was planned at that meeting, on the basis of precise intelligence data indicating that the journalists would try to enter the zone controlled by the FMLN via that route the next day."

**B.    The Ambush and Killing of the Dutch Journalists**

86.    On the morning of March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under Defendant's command departed the base to ambush the Dutch Journalists near Santa Rita.

87.    Defendant was present at the El Paraíso base as the patrol departed and when it returned. It was a usual practice for patrols to be in regular radio communication with the base while in the field.

88.    The patrol set up atop two hills overlooking a hollow. The Dutch Journalists were expected to pass through the hollow on their way to FMLN-controlled territory.

89.    Once in position, the patrol waited for the Dutch Journalists to arrive.

90.    The same day, a German journalist, Armin Friedrich Wertz, drove the Dutch Journalists in their borrowed mini-bus marked "PRENSA" to the meeting point in the municipality of Santa Rita, department of Chalatenango, picking up FMLN guides in San Salvador, including a 12-year-old boy.

91.    On the way, Wertz observed that they were being followed by a Cherokee jeep, a vehicle often used by the Salvadoran Armed Forces. The jeep turned off the road just before their last turn to the meeting point.

92.    The meeting point was near the San Salvador-Chalatenango Road, near the turn-off for Santa Rita. The drop-off point was approximately four miles from the El Paraíso base.

93.    At around 5 p.m., the Dutch Journalists stopped on the side of a road. There, they were met by additional guides.

94.    Wertz agreed that he would return to collect the Dutch Journalists on March 21. Thereafter, the Dutch Journalists, all of whom were unarmed, and their guides set off on a path leading to a hollow opposite a hill, walking in single file with the journalists in the middle.

95.    When they reached the hollow—about 250 meters along the path—the group suddenly came under heavy fire from the patrol, deployed on the two hills overlooking the hollow.

96.    The patrol killed all four of the Dutch Journalists.

97.    Two of the Dutch Journalists were immediately struck by the gunfire and fell to the ground. The two other journalists attempted to escape by running towards a nearby riverbed but were shot and killed by members of the patrol.

98.    Jan Kuiper was injured by shrapnel and shot twice in the head.

99.    The patrol killed all but one of the FMLN guides. That sole survivor, Martín, later testified before the Dutch Parliament in May 1982.

100.    In his testimony, Martín described hearing the sound of gunshots coming from two separate directions, and dropping to the ground, rolling, and attempting to cover himself in response. He looked back and saw two of the Dutch Journalists, one in a white shirt and one in a red shirt, lying on the ground and no longer moving.

101.    Once the attack was over, the patrol radioed the El Paraíso base to report back. Defendant dispatched a vehicle to collect the patrol and return them to their base. Upon their return, the patrol celebrated their success and referred to their mission as an "ambush."

C.    Aftermath of the Ambush and Killing of the Dutch Journalists

1.    *The Salvadoran Government and its Security Forces Tried to Cover Up the Truth About the Ambush and the Killing of the Dutch Journalists*

102.    The Salvadoran government and its Security Forces worked to promote a false narrative regarding the ambush, namely that the patrol was already in the area, waiting for a truck

to pick them up by the side of the main road, after spending the day investigating FMLN activity. Salvadoran Security Forces claimed that, as the patrol was waiting for their transport, the soldiers were fired upon by a group of guerrillas. According to this false narrative, a firefight began, and the Dutch Journalists were mistaken for guerrillas and killed in the crossfire.

103.    Consistent with the false narrative, Defendant failed to discipline his subordinates for the killings, refused to admit that the targeted ambush was intentional, and refused to admit his role in its planning.

104.    In the days following the killings, Salvadoran Security Forces sought to intimidate individuals connected to the Dutch Journalists.

105.    In the early morning of March 18, 1982, Treasury Police agents went to Mariona Prison, where the Dutch Journalists had conducted interviews days earlier. The agents ordered all the political prisoners to lay on the floor face down and proceeded to read aloud the names of roughly ten prisoners: the leadership team who had met with the Dutch Journalists. Those whose names were called were then singled out for severe beatings and torture over the next several hours. One prisoner was so severely beaten that his back was permanently injured.

106.    As they were being assaulted, the prisoners were told by a member of the Treasury Police: "we've just killed some Dutch journalist guerrillas and you are going to get the same when you leave." Another of the political prisoners overheard a conversation between two soldiers about the killing of the Dutch Journalists.

107.    Two days after the Dutch Journalists' murders, Schmeitz, their fellow Dutch journalist friend and colleague, received threatening phone calls, demanding that he stop looking into the deaths of his colleagues and stating that there was "a fifth coffin" waiting for him.

19

JA26

Schmeitz also encountered people at the Hotel Alameda, where he had been staying with the Dutch Journalists, who made the same statement to him. He changed hotels that night.

108.    Schmeitz was convinced he was in serious danger after speaking to the Dutch Ambassador, who informed him that El Salvador's President had said that he could not guarantee Schmeitz's safety. Soon after hearing this, Schmeitz received a call from the press officer of the U.S. Embassy, offering an armored vehicle to take him to the airport.

109.    Alarmed that the U.S. Embassy thought him, a Dutch citizen, sufficiently at risk to offer a protected vehicle and assistance in evacuating from El Salvador, Schmeitz quickly packed and left for the airport in the U.S.-provided transport.

2.    *Facts Uncovered by Investigations, Including a Contemporaneous Investigation by U.S. Officials, Belied the False Narrative Advanced by the Salvadoran Government and its Security Forces*

110.    Despite the Salvadoran government and its Security Forces' attempt to cover up the truth, the facts on the ground belied their false narrative.

111.    On March 18 at or around 2:30 a.m., Col. John McKay, then-Assistant Defense Attaché at the U.S. Embassy in San Salvador, received a phone call telling him that foreigners had been killed and their bodies were at the El Paraíso base.

112.    Col. McKay got a helicopter transport from Salvadoran forces stationed at the Central Headquarters ("Cuartel General") in San Salvador.

113.    At the time, Salvadoran forces had UH-1H helicopters, which could be flown at night. Salvadoran pilots carried out night-time operations and had been trained to do so.

114.    Col. McKay arrived at the El Paraíso base around 4 a.m. on March 18. When U.S. military officers visited Salvadoran military facilities, the usual practice was for the commanding officer to meet with the U.S. representative. When he asked to meet with Defendant, the

20

JA27

commander of the Fourth Brigade, he was told that Defendant was unavailable. Defendant's unavailability was contrary to regular practice.

115.    Col. McKay examined the bodies of the Dutch Journalists. Col. McKay saw gunpowder residue on two of the bodies: one was wounded twice in the upper chest, and the other one had a head wound near the bridge of the nose. He turned the head of one of the deceased journalists and saw an exit wound at the back of the head. Based on his prior combat experience, Col. McKay concluded from the wounds that these two Dutch Journalists had been shot from a close range.

116.    Col. McKay returned to San Salvador via helicopter and went directly to the U.S. Ambassador's residence, where he informed him in person of the killings.

117.    The U.S. Government immediately sent its embassy officials to investigate the killings.

118.    Later that same morning, only a few hours after his first visit, Col. McKay returned to El Paraíso to continue his investigation of the killings. At least one additional U.S. government official, a U.S. Embassy political officer, was also present.

119.    The U.S. Embassy in San Salvador sent a (now declassified) cable to the State Department following the second on-site investigation into the killings.

120.    According to the cable, the U.S. investigators examined the bodies of the four Dutch Journalists at the El Paraíso base and concluded that all died from multiple gunshot wounds. The powder burns indicated that the Dutch Journalists were killed at a distance expected to be no greater than 75 meters.

121.    As noted in the cable, U.S. military advisors who were on-site at El Paraíso on March 17 and 18, 1982 reported to the U.S investigators that the Salvadoran soldiers returning

21

JA28

from their mission at around 8 p.m. on the night of March 17 "expressed elation at their success and referred to their mission as an 'ambush.'" One U.S. military advisor noted that the patrol was about three kilometers beyond the normal patrol perimeter, in a solidly guerrilla area, and observed that it was not common for patrols to be out after dark.[2]

122.    The U.S. investigators, including Col. McKay, then headed to the site of the killing, accompanied by Salvadoran soldiers who claimed to have been part of the patrol.

123.    The cable noted that the soldiers offered a "nearly uniform version of the patrol and firefight," which differed from the "information gathered at the site of the encounter."

124.    The soldiers showed the U.S. investigators the spots from which they claimed to have fired and maintained that they did not advance from their original shooting positions. While the U.S. investigators found shell casings in the original locations indicated by the soldiers, they also found "numerous" shell casings in other locations, indicating that the soldiers had advanced toward the Dutch Journalists while firing. A sergeant who led the patrol also acknowledged to the U.S. investigators that he killed two of the journalists at a range of approximately 25 meters as they tried to escape toward a small riverbed.

125.    The cable noted that the U.S. investigators recovered numerous M-60 shell casings from the site of the killing.

126.    M-60s are typically used as crew-serviced weapons and operated by at least two individuals. Their weight and use make them impractical for routine foot patrols; they are better suited for carrying out attacks from stationary positions.

---

[2] On March 17, 1982, sunset in El Salvador was at 6:02 p.m.

127.    The Salvadoran soldiers also claimed to have taken "heavy fire," including grenade fire, from about 20 to 35 guerrillas and showed the hilltops from which they claimed guerrillas had fired. The U.S. investigators examined these locations and found "no extensive evidence of guerrilla fire," including no evidence of any grenade fire in those areas and no evidence that the ground had been disturbed. The cable noted that the soldiers attempted to explain the discrepancy by "insist[ing] that the guerrillas had picked up all of their shells before leaving, even though it was almost dark."

128.    Based on his investigation at the site of the killing and his extensive combat experience, Col. McKay concluded that the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch Journalists had planned to pass, creating a "kill zone" that bore the hallmarks of a classic ambush.

129.    Later, the Dutch government carried out its own investigation into the killing of the Dutch Journalists despite a lack of cooperation from the Salvadoran government. When the Dutch Ambassador requested to interview the sergeant and soldiers who carried out the ambush in the days following the killings, for example, the Salvadoran government refused to provide authorization. The Dutch investigative team visited the site of the killings as well as El Paraíso, accompanied by Col. McKay. Based on the evidence the Dutch mission could gather, the Dutch government similarly concluded that the Salvadoran government and its Security Forces' account of the death of the Dutch Journalists was "unbelievable and contestable."

130.    Following the end of the civil war in 1992, the U.N. Truth Commission was tasked with conducting investigations into serious acts of violence committed during the civil war by both sides. In its final report, issued on March 15, 1993, the U.N. Truth Commission highlighted the

killing of the Dutch Journalists as among the most emblematic crimes committed by state actors during the conflict.

131. Not all emblematic cases discussed by the U.N. Truth Commission name a perpetrator. To identify specific perpetrators, the U.N. Truth Commission's methodology required "overwhelming evidence" linking the perpetrator to that atrocity, including confirmation of the relevant event and perpetrator by multiple credible sources, and gave the alleged perpetrator the opportunity to provide his version of events.

132. After its investigation into the Dutch Journalists' killings, which included interviews with numerous witnesses, the U.N. Truth Commission concluded that "the ambush was set up deliberately to surprise and kill the journalists and their escort; that the decision to ambush them was taken by Colonel Mario A. Reyes Mena, Commander of the Fourth Brigade, with the knowledge of other officers; that no major skirmish preceded or coincided with the shoot-out in which the journalists were killed; and, lastly, that [Defendant] and other soldiers concealed the truth and obstructed the judicial investigation."

3. *Following the Killing of the Dutch Journalists, Salvadoran Security Forces Successfully Repressed Independent Media Coverage During the Remainder of the Civil War*

133. For the foreign journalists remaining in El Salvador, the killing of the Dutch Journalists, along with the subsequent cover-up and broader campaign of intimidation, sent a clear message: stop covering the guerrillas.

134. A few weeks after the killing of the Dutch Journalists, on the day of the Constitutional Assembly elections, a banner hanging in front of a hotel frequented by foreign journalists threatened, "Don't lie, foreign press."

135. The Salvadoran Security Forces' campaign to suppress independent reporting around the upcoming elections bore fruit. For example, in the months that followed the Dutch

Journalists' killings, the percentage of television reports from El Salvador devoted to the FMLN dropped from 30 percent to under 5 percent.

136.    While the Dutch Journalists' murder was among the most brazen attacks on foreign journalists by the Salvadoran Security Forces, it was not the last or only one. The Salvadoran Security Forces' targeting of Salvadoran and foreign journalists continued throughout the civil war.

137.    On March 27, 1983, the Treasury Police detained two American journalists for questioning about being in contact with guerrillas. The journalists were able to contact the U.S. Embassy while being questioned at their apartment and were accompanied by consular officials to the Treasury Police. The journalists were ultimately released after U.S. Embassy intervention.

138.    Salvadoran Security Forces shot at three U.S. journalists in July 1985 while they were crossing a river on foot. The shooting continued even after they identified themselves as members of the press in Spanish. The Salvadoran Security Forces dismissed the attack by claiming the army mistook them for "gringo terrorists," and the colonel in command of the forces that shot at the journalists stated, in his incident report, that he believed "the journalists planned to have a meeting with terrorists."

139.    On March 18 and 19, 1989, the eve and the day of presidential elections, the army was involved in the unprovoked shooting of three journalists, killing two of them. In addition, on March 19, 1989, a Dutch cameraman was gravely injured in crossfire and rushed to the hospital in a press vehicle. While en route to the hospital, the press vehicle was attacked by a Salvadoran air force plane and helicopter, which fired rockets and forced it off the road, delaying the wounded cameraman's arrival to the hospital.

25

140.    All told, the Committee to Protect Journalists reported that at least three dozen journalists were killed during the civil war. Salvadoran authorities did not conduct effective investigations, much less prosecute or convict any of the perpetrators, for any of these attacks.

4. *Decades of Obstacles to Accountability and Extraordinary Circumstances Prevented Plaintiff from Filing this Suit Until Now*

141.    In the immediate aftermath of the killing of the Dutch Journalists, the families of the Dutch Journalists, including Plaintiff, could not learn the truth of what took place, how their family members died, or who was responsible for their deaths.

142.    The Salvadoran government and its Security Forces' cover-up and false narrative about how the killings took place and their threats to witnesses and journalists who sought to shed light on the incident obstructed public knowledge about the killings, including Plaintiff's knowledge.

143.    Although criminal proceedings in the Court of First Instance at El Dulce Nombre de María were initiated following the killing of the Dutch Journalists (the "Initial Criminal Proceedings"), they quickly hit a roadblock when the military refused to make any relevant military personnel available to the investigative judge, Dora del Carmen Gómez de Claros, for questioning. Under the Salvadoran criminal procedure in force at the time, investigations were led by investigative judges.

144.    In 1988, after Judge Claros was forced to flee El Salvador following death threats for her work in this case, the Initial Criminal Proceedings were terminated without any additional information being released to the Dutch Journalists' families.

145.    In 1992, with the end of the civil war and the creation of the U.N. Truth Commission, there appeared, for the first time, a potential opportunity to properly investigate the killings of the Dutch Journalists. In its final report, issued on March 15, 1993, the U.N. Truth

26

Commission found that the Salvadoran government failed to meet its obligation to investigate, bring to trial, and punish guilty parties, as required under international law. The U.N. Truth Commission also stated that the then-President of the Supreme Court of El Salvador "failed to cooperate" with the U.N. Truth Commission's investigation.

146.    On March 20, 1993, days after the U.N. Truth Commission's Report became public, the Salvadoran government enacted the Amnesty Law. The Amnesty Law shielded Salvadoran Security Forces and FMLN forces from prosecution for human rights abuses committed during the civil war and protected offenders from civil liability. It made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible.

147.    Even with the protection of the Amnesty Law, Salvadoran Security Forces continued to block access to key evidence, such as documents, military and security forces personnel information and interviews, related to its involvement in human rights abuses during the civil war, including targeted killings carried out by the Security Forces.

148.    In 2012, the Inter-American Court of Human Rights issued a binding judgment on El Salvador in the case of *El Mozote v. El Salvador*, holding that the provisions of the Amnesty Law that had thus far prevented the investigation, prosecution and, where appropriate, punishment for those responsible for crimes against humanity perpetrated during the civil war resulted in impunity, violated international law, and were incompatible with the American Convention on Human Rights, to which El Salvador is a party.

149.    Notwithstanding this judgment, the Amnesty Law remained in effect until 2016, when the Salvadoran Supreme Court, relying on Inter-American jurisprudence and other international humanitarian law and human rights instruments, declared unconstitutional all the articles of the Amnesty Law that prevented the investigation of crimes against humanity and war

27

crimes committed during the civil war. The Supreme Court held the Amnesty Law to be invalid as to all the cases described in the U.N. Truth Commission, including the killing of the Dutch Journalists.

150.    Following this ruling, in December 2016, the Salvadoran Prosecutor General created the Salvadoran Human Rights Unit to investigate crimes committed during the civil war.

151.    Despite the Supreme Court's ruling, the Salvadoran Security Forces continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders. For example, in the investigation into the December 1981 killing of more than one thousand villagers in the El Mozote Massacre, the Salvadoran military refused to provide access to its archives, despite a court order to do so.

152.    In March 2018, Plaintiff filed a criminal complaint with the Salvadoran Attorney General's Office requesting an investigation of the Dutch Journalists' murders. In response, the Prosecutor's Office began prosecuting the case, and sent the file to a court in Dulce Nombre de María, the Chalatenango municipality where the case was first opened in 1982.

153.    Two Salvadoran human rights organizations, one of which is Plaintiff's legal representative, conducted their own investigation and developed additional evidence.

154.    Plaintiff learned of Defendant's location and presence in Centreville, Virginia in September 2018, when a Dutch television program aired a documentary on the killings that tracked Defendant to his current residence.

155.    On July 16, 2021, Plaintiff, who has standing to be appointed a civil party in the criminal investigation of his brother's murder under Salvadoran law, filed a renewed criminal complaint naming Defendant and two other former officers as responsible for the extrajudicial

killing of Plaintiff's brother, Jan Kuiper. On September 22, 2022, Plaintiff asked the court to order Defendant's arrest. Two weeks later, the Attorney General's Office made the same request.

156.    Under the Salvadoran legal system, civil remedies are available to civil parties after the conclusion of the criminal proceedings.

157.    Because the criminal investigation was initially opened in 1982, it proceeds under the former criminal procedural code, in which a presiding judge leads the investigation as investigative judge.

158.    In November 2022, the court issued an order indicting three former high-ranking officers for the killing of the Dutch Journalists, including Defendant.

159.    Two of these former officers, Gen. José Guillermo García and Col. Francisco Antonio Morán, reside in El Salvador and were arrested following the issuance of the indictments.

160.    Following the indictment, Defendant, who resides in the United States, has avoided arrest in El Salvador by no longer returning to El Salvador. Before his indictment, Defendant regularly traveled to El Salvador.

161.    In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest,[3] but no action has yet been taken on the Red Notice.

162.    Further, no information suggests that extradition or deportation will be prompt or even possible, despite a Salvadoran court order to the Salvadoran executive branch to seek Defendant's extradition.

163.    With no viable legal recourse left for Plaintiff against Defendant in El Salvador, Plaintiff brings the present action in the United States District Court for the Eastern District of

---

[3] *Supra* note 1.

Virginia, where Defendant resides, for his responsibility in the killing of Plaintiff's brother, Jan Kuiper.

**GENERAL ALLEGATIONS**

164. In March 1982, Defendant was a colonel in the Salvadoran Army. At the time, he served as commander of the Fourth Brigade.

165. The acts described herein were inflicted under color of foreign law of the government of El Salvador and were inflicted deliberately and intentionally.

166. Defendant exercised command responsibility over, conspired with, or aided and abetted subordinates in the Salvadoran military to commit acts of extrajudicial killing.

167. At all times relevant to the extrajudicial killing, Defendant was in command of all the soldiers stationed at El Paraíso base, including members of the Fourth Brigade and the Atonal Battalion. As a commanding officer, Defendant had the legal authority and practical ability to exert control over his subordinates, including those who participated in the ambush and killing of the Dutch Journalists.

168. As commanding officer, Defendant knew, or should have known, that the patrol that left the El Paraíso base on March 17, 1982 was on a mission to ambush and kill the Dutch Journalists.

169. Defendant knew, or should have known, that soldiers under his command extrajudicially killed the Dutch Journalists, including Jan Kuiper.

170. As commanding officer, Defendant was under a duty to investigate, prevent, and punish violations of international and Salvadoran law committed by soldiers under his command. Defendant's command included the authority and responsibility to give orders to, and to appoint, remove, and discipline soldiers stationed at the El Paraíso base.

171.    Defendant failed or refused to take all reasonable and necessary measures to prevent the ambush and killing of the Dutch Journalists, or to investigate or punish soldiers under his command for committing such abuses. To the contrary, he encouraged, ordered, and sought to cover up the extrajudicial killing of the Dutch Journalists.

172.    Defendant also conspired with the soldiers under his command and other officers in the Salvadoran military to plan and carry out the ambush, and then to cover up these actions. Defendant conspired and acted in concert with one or more members of the Salvadoran military pursuant to a common plan, design, and scheme to ambush and kill the Dutch Journalists, as a result of which Jan Kuiper was subjected to the violations described herein.

173.    Defendant knowingly joined and participated in carrying out the common plan, design, and scheme. In addition to being personally liable for his own actions, Defendant is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to commit the ambush and killings.

174.    Defendant is also responsible by virtue of having aided and abetted, or otherwise substantially assisted in the ambush and killing of the Dutch Journalists, including Jan Kuiper, and then by covering up the crimes and obstructing an effective investigation into the murders. Defendant participated in the planning of the killings, and falsely claimed the killings were accidental and occurred in an unexpected firefight between the patrol and the FMLN to ensure he and the other officers were not held responsible for the crimes.

175.    At all relevant times, Defendant purposefully intended that his actions would aid, abet, or assist in the commission and cover-up of the killings. Defendant is therefore jointly and severally liable for the wrongful conduct of the persons he aided and abetted.

176.    The killing of Jan Kuiper inflicted severe mental pain and suffering on his family members, including Plaintiff.

177.    The killing of the Dutch Journalists exemplified the brutality with which the Salvadoran Security Forces sought to repress any independent reporting that might shed light on its own human rights abuses or be perceived as sympathetic to the FMLN. The Salvadoran Security Forces' campaign of repression against independent journalism and the Defendant's vital role in killing the Dutch Journalists not only ended the Dutch Journalists' reporting from El Salvador but also stifled the work of other journalists who sought to cover the civil war and its devastating impact on civilians.

## CLAIM FOR RELIEF

### *Extrajudicial Killing of Jan Kuiper in Violation of the Torture Victim Protection Act*

178.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

179.    Defendant's conduct constitutes extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

180.    On March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under the command of Defendant prepared an ambush for the Dutch Journalists and their guides. Later that day, the Dutch Journalists and their guides arrived in Chalatenango and set out on foot along a path into guerrilla-controlled territory. As the path descended between two hills, the patrol opened fire on the group without provocation.

181.    Jan Kuiper died from the gunshot wounds sustained during the ambush.

182.    No regularly constituted court authorized the killing of Jan Kuiper. Jan Kuiper was never sentenced to death for any crime.

183. Defendant and his fellow perpetrators acted under actual or apparent authority, or under color of law, of the government of El Salvador.

184. As pleaded with respect to the ambush and killings, Defendant commanded, conspired with, and/or aided and abetted other members of the Salvadoran military in committing the acts of extrajudicial killing set forth above.

185. The killing of Jan Kuiper inflicted severe mental pain and suffering on his family members, including Plaintiff.

186. As a direct and proximate result of the wrongful killing of Jan Kuiper by soldiers under Defendant's command, Plaintiff has and will continue to suffer from loss of sibling companionship.

187. As a result of the extrajudicial killing of Jan Kuiper, Plaintiff has suffered damages in an amount to be determined at trial.

188. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and exhibited a reckless indifference to the rights of decedent Jan Kuiper and the rights of Plaintiff. Consequently, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendant as follows:

(a) Compensatory damages;

(b) Punitive damages;

(c) Declaratory relief declaring that Defendant is responsible for the extrajudicial killing of Jan Kuiper;

(d) Prejudgment interest as allowed by law;

(e) Reasonable attorneys' fees, costs, and expenses; and,

33

(f)      Such other and further relief as the court may deem just and proper.

Plaintiff requests a trial by jury for the claim for relief and all triable issues.


Dated: October 9, 2024       By:

        /s/ Michelle S. Kallen
MICHELLE S. KALLEN (VSB No. 93286)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Email: MKallen@Jenner.com

JASON P. HIPP (*pro hac vice pending*)
JENNER & BLOCK LLP
1165 6th Avenue
New York, NY 10036
Tel: (212) 891-1600
Email: JHipp@Jenner.com

ZOË HIGGINS REINSTEIN (*pro hac vice pending*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
Email: ZReinstein@Jenner.com

CLARET VARGAS (*pro hac vice pending*)
DANIEL MCLAUGHLIN (*pro hac vice pending*)
CARMEN K. CHEUNG (*pro hac vice pending*)
CENTER FOR JUSTICE & ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444
Email: cvargas@cja.org
dmclaughlin@cja.org
ccheung@cja.org


*Attorneys for Plaintiff Gert Jannes Kuiper*


34
JA41

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| _____ | ) | |
| GERT JANNES KUIPER, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:24-cv-01785-RDA-LRV |
| MARIO ADALBERTO REYES MENA, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, STAY

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7), Defendant

Mario Adalberto Reyes Mena ("Mr. Reyes Mena") moves to dismiss, or alternatively, to stay this

action for the reasons set forth in the accompanying memorandum of law.

WHEREFORE, Defendant asks the Court to grant this motion, dismiss the action with

prejudice (or alternatively, issue a stay), and award any other relief deemed just and appropriate.

Dated: November 22, 2024        Respectfully submitted,

**MARIO ADALBERTO REYES MENA**

*/s/ Kang He*
John D. Wilburn (VSB No. 41411)
Kang He (VSB No. 89237)
Zachary J. Poretz (VSB No. 99508)
**MCGUIREWOODS LLP**
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
Telephone: (703) 712-5000
Facsimile: (703) 712-5268
jwilburn@mcguirewoods.com
khe@mcguirewoods.com
zporetz@mcguirewoods.com

*Counsel for Defendant*

JA42

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 22, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.


*/s/ Kang He*
Kang He (VSB No. 89237)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GERT JANNES KUIPER,      )
     )
    Plaintiff,      )
     )
    v.      )     Civil Action No. 1:24-cv-1785 (RDA/LRV)
     )
MARIO ADALBERTO REYES MENA,      )
     )
    Defendant.      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Dismiss or Stay (Dkt. 22) and Plaintiff's Motion for Sur-Reply (Dkt. 31). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering Plaintiff's Complaint (Dkt. 1), Defendant's Motion, Defendant's Memorandum in Support (Dkt. 23), Plaintiff's Opposition (Dkt. 28), Defendant's Reply (Dkt. 30), Plaintiff's Motion, Plaintiff's Memorandum in Support of its Motion for Sur-Reply (Dkt. 32), and Defendant's Opposition to the Sur-Reply (Dkt. 34), this Court DENIES Defendant's Motion to Dismiss and GRANTS Plaintiff's Motion for Sur-Reply for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background[1]

On March 17, 1982, four Dutch journalists—producer and editor Jan Kuiper, reporter Koos Koster, cameraman Johannes "Joop" Willemsen, and sound technician Hans ter Laag (the "Dutch

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

JA44

Journalists")—and their guides headed to guerrilla-controlled territory in Chalatenango, El Salvador, to report on the devastating human toll of the country's civil war. Dkt. 1 ¶ 1. They were ambushed and killed by a Salvadoran military patrol that was stationed at the El Paraíso base of the Salvadoran Army, and under the command of Defendant Mario Adalberto Reyes Mena ("Reyes" or "Defendant"). *Id.* Plaintiff Gert Jannes Kuiper is a Dutch citizen residing in the Netherlands. *Id.* ¶ 32. Plaintiff is the brother of decedent Jan Kuiper and is his closest living direct relative. *Id.* ¶ 33.

### 1. State Violence Against Civilians and Targeting of Independent Media During the Armed Conflict in El Salvador

As alleged in the Complaint, from 1980 to 1992, El Salvador was ravaged by a civil war between the Salvadoran government and the Farabundo Martí National Liberation Front ("FMLN" for its name in Spanish). *Id.* ¶¶ 3, 43. In 1992, the Salvadoran government and the FMLN reached a peace agreement. *Id.* ¶ 44. As part of the peace accord, a United Nations-led truth commission was established to investigate crimes committed by both sides of the conflict. *Id.* The U.N. Truth Commission's investigation focused on "serious acts of violence" committed during the civil war, including extrajudicial killings, enforced disappearances, and torture. *Id.* In its report, the U.N. Truth Commission concluded that more than 75,000 civilians were killed and another 8,000 were forcible disappeared, with the vast majority of these crimes committed by the Salvadoran military and state security forces (collectively, "Salvadoran Security Forces" or "SSF") and their paramilitary allies. *Id.* ¶ 45. The U.N. Truth Commission found that the SSF and their paramilitary allies engaged with impunity in campaigns against civilians, murdering politicians, teachers, union leaders, university students, human rights activists, priests, nuns, journalists, and other notable figures in Salvadoran society. *Id.* ¶ 46. State institutions actively collaborated in or turned a blind eye to these killings. *Id.*

2

JA45

The SSF considered independent media members and their public reporting as a threat. *Id.* ¶ 47. At the time, independent media coverage of the SSF's gross human rights abuses imperiled the support the Salvadoran government received from allied governments. *Id.* ¶ 48. In the Fall of 1981, for example, the U.S. Congress enacted a law requiring that, before providing U.S. aid to El Salvador, the President of the United States had to certify that the Salvadoran government was adhering to a series of conditions, including complying with human rights standards, controlling the excesses of its military, and investigating the 1980 rape and murder of four American women in El Salvador. *Id.* ¶ 49. Independent media coverage of the SSF's human rights abuses also helped to fuel public protests and activism internationally, including in the United States, that were critical of the Salvadoran government. *Id.* ¶ 50.

The SSF systematically targeted Salvadoran journalists and news outlets that did not report favorably on the government. *Id.* ¶ 51. Independent media outlets were bombed. *Id.* Editors and journalists were threatened, attacked, killed, or disappeared until the outlets closed. *Id.* For example, the publisher of *El Independiente*, the last existing independent newspaper in El Salvador, stated that he fled the country "not because of lack of the Salvadoran people's support for idealistic journalism, but because, after the takeover of my office and machinery, after the capture of my employees and perhaps even the eventual disappearance of my family and myself, there would be absolute silence about the facts." *Id.* ¶ 52.

Foreign journalists did not fare much better. *Id.* ¶ 53. The SSF viewed foreign journalists as siding with the FMLN. *Id.* According to the Committee to Protect Journalists, in the two years that preceded the Dutch Journalists' killings, 26 journalists—foreign and Salvadoran—had been killed. *Id.* In 1980, an American freelance journalist was forcibly disappeared. *Id.* ¶ 54. His mutilated remains were found in 1983, only after his family's congressional representative

3

JA46

managed to make the investigation of the journalist's death part of the certification requirements for U.S. aid to El Salvador. *Id.* In early March 1982, an SSF-affiliated death squad circulated a list of twenty-four names, including fourteen American journalists and a United States Embassy public affairs officer, calling for "death to traitors of Democracy." *Id.* ¶ 55. The death squad called them "pseudo-journalists in the service of international subversion who have been condemned to death by the patriots." *Id.*

The situation grew particularly acute in the lead-up to the March 28, 1982 Constitutional Assembly elections, when hundreds of foreign journalists came to El Salvador to cover the national elections. *Id.* ¶ 56. In the prior month, controversy over the U.S. administration's certification of El Salvador's human rights record and efforts to investigate the forced disappearance of the American freelance journalist, and the rape and murder of four American nuns who were ministering in El Salvador, had resulted in negative press coverage of the Salvadoran government and the SSF. *Id.* With such an extensive contingent of foreign journalists present in the country in the early months of 1982, it became increasingly important for the SSF to crack down on negative independent reporting from El Salvador that might further tarnish the government's image internationally. *Id.* ¶ 57. It was in this heightened climate of repression and threats against independent media that the Dutch Journalists arrived in El Salvador. *Id.* ¶ 58.

*2. The Salvadoran Security Forces Perceived the Dutch Journalists and Their Reporting as a Threat.*

The Complaint asserts that, in February 1982, the Dutch Journalists traveled to El Salvador on assignment from Interkerkelijke Omroep Nederland ("IKON"), a Dutch television and radio broadcast affiliated with the Protestant Church in the Netherlands, to report on the devastating toll of the country's civil war, including planned reports from San Salvador, El Salvador's capital, and from FMLN-controlled areas. *Id.* ¶¶ 5, 59. Both Kuiper and Koster had previously traveled to El

Salvador and published stories critical of the SSF. *Id.* ¶ 60. In 1980, Koster and Kuiper's team produced a documentary on Salvadoran civil defense units and SSF-aligned death squads that garnered international attention. *Id.* ¶ 61. That same year, Koster had interviewed Archbishop Óscar Romero, a leading figure for peace in El Salvador. *Id.* ¶ 62. Shortly after, in March 1980, the Archbishop delivered a sermon over the national radio pleading with the SSF to stop the killing and repression of the Salvadoran people. *Id.* The next day, the Archbishop was assassinated under orders of high-ranking officials from the SSF. *Id.*

On February 24, 1982, the Dutch Journalists arrived in San Salvador and checked in at the Hotel Alameda. *Id.* ¶ 63. According to a de-classified U.S. diplomatic cable, at the time of the Dutch Journalists' arrival in San Salvador, "it was generally known that the four were making a 16mm film sympathetic to the guerrillas, similar to the one they made in 1980." *Id.* ¶ 64. On or about March 7, 1982, the Dutch Journalists visited Mariona Prison in San Salvador, where political prisoners, principally union leaders, were held. *Id.* ¶ 65. They interviewed political prisoners who were part of the leadership inside the detention center, and documented scars and other tangible evidence of torture on the bodies of the detainees. *Id.* The Dutch Journalists sent the footage of the interviews from Mariona Prison back to the Netherlands. *Id.*

On March 10, 1982, Hotel Alameda staff informed the Dutch Journalists that members of the notorious Treasury Police—an intelligence agency known for its human rights violations and connections to death squads—had been looking for them at the hotel. *Id.* ¶¶ 6, 66. On the morning of March 11, 1982, about twenty members of the Treasury Police arrived at the Hotel Alameda and arrested Koster for his supposed links to the FMLN. *Id.* ¶ 68. The remaining Dutch Journalists decided to accompany him to the Treasury Police headquarters as a showing of solidarity. *Id.*

5

JA48

At the Treasury Police headquarters, the Dutch Journalists were questioned by the head of the Treasury Police, Col. Francisco Antonio Morán, who claimed that Koster's contact information was found among the possessions of a captured FMLN member. *Id.* ¶¶ 67, 69. The Association of Foreign Correspondents quickly learned that the Dutch Journalists were being questioned at the Treasury Police headquarters and mobilized to spread news of Koster's arrest. *Id.* ¶ 70. As detailed in declassified U.S. diplomatic cables, the United States and Dutch Embassies also engaged with the Salvadoran government to secure Koster's release. *Id.* ¶ 71. After four hours of questioning, Col. Morán released Koster and his colleagues, once Koster signed a document stating he was not mistreated. *Id.* ¶ 72.

When the Dutch Journalists returned to the Hotel Alameda, they observed that their hotel rooms had been searched while they were detained, though nothing appeared to be missing. *Id.* ¶ 73. Jan Schmeitz, a freelance journalist from the Netherlands who was staying at the same hotel, advised the Dutch Journalists to take their detention by the Treasury Police seriously and to be extremely careful while in El Salvador. *Id.* ¶ 74. The next day, March 12, 1982, a newspaper aligned with the SSF published a photo of Koster and his colleagues—including Jan Kuiper—as they walked through the Treasury Police headquarters' patio on their way out of the compound. *Id.* ¶ 75. The accompanying article, which largely copied a press release issued by the Salvadoran Armed Forces Press Committee, was headlined: "Foreign Journalist a Contact for Subversives." *Id.* Foreign and Salvadoran journalists warned the Dutch Journalists that being the focus of a Treasury Police investigation was dangerous and attempted to dissuade them from continuing their reporting. *Id.* ¶ 76. Some advised them to leave the country immediately given the risks to their safety. *Id.*

6

JA49

The Dutch Journalists decided to press on with their independent reporting. *Id.* ¶ 77. On or about March 15, 1982, the Dutch Journalists finalized their plan to travel from San Salvador to an FMLN-controlled zone in the department of Chalatenango to document the lives of civilians in those areas. *Id.* ¶ 78. On March 16, 1982, Koster borrowed a mini-bus marked with the word "PRENSA" ("Press" in Spanish) from Schmeitz for the planned trip. *Id.*

   3. *Salvadoran Soldiers Stationed at the El Paraíso Base in March 1982 Operated Under Defendant's Command.*

The Complaint further alleges that the SSF and the FMLN both controlled portions of the department of Calatenango. *Id.* ¶ 79. The SSF controlled the area immediately around El Paraíso, whereas the surrounding areas were disputed between the government and the FMLN. *Id.* About four miles east of El Paraíso was not considered safe for the SSF. *Id.* The Fourth Infantry Brigade of the Salvadoran Army (the "Fourth Brigade") was the military unit responsible for Chalatenango and was headquartered at a base in El Paraíso. *Id.* ¶¶ 38, 80.

In March 1982, Defendant, a colonel in the Salvadoran Army, was the commander of the Fourth Brigade. *Id.* ¶ 81. At that time, members of the Atonal Battalion were stationed at the El Paraíso base while receiving training from American military advisors present at the base. *Id.* ¶ 83. The Atonal Battalion was one of the three Rapid Deployment Infantry Battalions ("BIRI" for its name in Spanish), highly trained specialized anti-guerrilla combat units. *Id.* ¶ 84. Defendant had command over all Salvadoran soldiers stationed at the El Paraíso base, including members of the Fourth Brigade and members of the Atonal Battalion. *Id.* ¶ 82.

Defendant was aware of the Dutch Journalists' plans to travel to Chalatenango on March 17, 1982, to access FMLN-controlled areas. *Id.* ¶ 85. According to the U.N. Truth Commission Report, on or around March 16, 1982, "a meeting was held in which officers of the General Staff of the Fourth Brigade, including its Commander, [Defendant] Colonel Mario A. Reyes Mena, and

7

JA50

officers of the Atonal [BIRI] took part." *Id.* The Report continues, "According to those interviewed, [an] ambush was planned at that meeting, on the basis of precise intelligence data indicating that the journalists would try to enter the zone controlled by the FMLN via that route the next day." *Id.*

### 4. *The Ambush and Killing of the Dutch Journalists*

The Complaint asserts that, on the morning of March 17, 1982, a patrol of soldiers stationed at the El Paraíso base and acting under Defendant's command departed the base to ambush the Dutch Journalists near Santa Rita. *Id.* ¶ 86. Defendant was present at the El Paraíso base as the patrol departed and when it returned. *Id.* ¶ 87. It was usual practice for patrols to be in regular radio communication with the base while in the field. *Id.* The patrol set atop two hills overlooking a hollow. *Id.* ¶ 88. The Dutch Journalists were expected to pass through the hollow on their way to FMLN-controlled territory. *Id.* Once in position, the patrol waited for the Dutch Journalists to arrive. *Id.* ¶ 89.

The same day, a German journalist, Armin Friedrich Wertz, drove the Dutch Journalists in their borrowed mini-bus marked "PRENSA" ("Press") to the meeting point in the municipality of Santa Rita, department of Chalatenango, picking up FMLN guides in San Salvador, including a 12-year-old boy. *Id.* ¶ 90. On the way, Wertz observed that they were being followed by a Jeep Cherokee, a vehicle often used by the Salvadoran Armed Forces. *Id.* ¶ 91. The Jeep turned off the road just before their last turn to the meeting point. *Id.* The meeting point was near the San Salvador-Chalatenango Road, near the turn-off for Santa Rita. *Id.* ¶ 92. The drop-off point was approximately four miles from the El Paraíso base. *Id.*

At around 5 p.m., the Dutch Journalists stopped on the side of a road. *Id.* ¶ 93. There, they were met by additional guides. *Id.* Wertz agreed that he would return to collect the Dutch

8

JA51

Journalists on March 21. *Id.* ¶ 94. Thereafter, the Dutch Journalists, all of whom were unarmed, and their guides set off on a path leading to a hollow opposite a hill, walking in a single file with the journalists in the middle. *Id.* When they reached the hollow—about 250 meters along the path—the group suddenly came under heavy fire from the patrol, deployed on the two hills overlooking the hollow. *Id.* ¶ 95.

The patrol killed all four of the Dutch Journalists. *Id.* ¶ 96. Two of the Dutch Journalists were immediately struck by the gunfire and fell to the ground. *Id.* ¶ 97. The other two journalists attempted to escape by running toward a nearby riverbed, but they were shot and killed by members of the patrol. *Id.* Jan Kuiper, Plaintiff's brother, was injured by shrapnel and shot twice in the head. *Id.* ¶ 98.

The patrol killed all but one of the FMLN guides. *Id.* ¶ 99. The sole survivor, Martín, later testified before the Dutch Parliament in May 1982. *Id.* In his testimony, Martín described hearing the sounds of gunshots coming from two separate directions, and dropping to the ground, rolling, and attempting to cover himself in response. *Id.* ¶ 100. He looked back and saw two of the Dutch Journalists, one in a white shirt and one in a red shirt, lying on the ground and no longer moving. *Id.*

Once the attack was over, the patrol radioed the El Paraíso base to report back. *Id.* ¶ 101. Defendant dispatched a vehicle to collect the patrol and return them to their base. *Id.* Upon their return, the patrol celebrated their success and referred to their mission as an "ambush." *Id.*

5. *The Salvadoran Government and its Security Forces Tried to Cover Up the Truth About the Ambush and Killing of the Dutch Journalists.*

The Complaint asserts that the Salvadoran government and the SSF worked to promote a false narrative regarding the ambush, namely that the patrol was already in the area, waiting for a truck to pick them up by the side of the main road, after spending the day investigating FMLN

JA52

activity. *Id.* ¶ 102. The SSF claimed that, as the patrol was waiting for their transport, the soldiers were fired upon by a group of guerrillas. *Id.* According to this false narrative, a firefight began, and the Dutch Journalists were mistaken for guerrillas and killed in the crossfire. *Id.* Consistent with the false narrative, Defendant failed to discipline his subordinates for the killings, refused to admit that the targeted ambush was intentional, and refused to admit his role in its planning. *Id.* ¶ 103.

In the days following the killings, the SSF sought to intimidate individuals connected to the Dutch Journalists. *Id.* ¶ 104. In the early morning of March 18, 1982, Treasury Police agents went to Mariona Prison, where the Dutch Journalists had conducted interviews days earlier. *Id.* ¶ 105. The agents ordered all the political prisoners to lay on the floor face down and proceeded to read aloud the names of roughly ten prisoners: the leadership team who had met with the Dutch Journalists. *Id.* Those whose names were called were then singled out for severe beatings and torture over the next several hours. *Id.* Two days after the Dutch Journalists' murders, Schmeitz, their fellow Dutch journalist friend and colleague, received threatening phone calls, demanding that he stop looking into the deaths of his colleagues and stating that there was "a fifth coffin" waiting for him. *Id.* ¶ 107. Schmeitz was convinced he was in serious danger after speaking to the Dutch Ambassador, who informed him that El Salvador's President had said that he could not guarantee Schmeitz's safety. *Id.* ¶ 108. Soon after hearing this, Schmeitz received a call from the press officer of the U.S. Embassy, offering an armored vehicle to take him to the airport. *Id.*

*6. Facts Uncovered by Investigations, Including a Contemporaneous Investigation by U.S. Officials, Belied the False Narrative Advanced by the Salvadoran Government and its Security Forces.*

The Complaint asserts that, on March 18, 1982 at or around 2:20 a.m., Col. John McKay, then-Assistant Defense Attaché at the U.S. Embassy in San Salvador, received a phone call telling

him that foreigners had been killed and their bodies were at the El Paraíso base. *Id.* ¶ 111. Col. McKay got a helicopter transport from Salvadoran forces stationed at the Central Headquarters in San Salvador. *Id.* ¶ 112. Col. McKay arrived at the El Paraíso base around 4 a.m. on March 18. *Id.* ¶ 114. When U.S. military officers visited Salvadoran military facilities, the usual practice was for the commanding officer to meet with the U.S. representative. *Id.* When Col. McKay asked to meet with Defendant, the commander of the Fourth Brigade, he was told that Defendant was unavailable. *Id.*

Col. McKay examined the bodies of the Dutch Journalists. *Id.* ¶ 115. Col. McKay saw gunpowder residue on two of the bodies: one was wounded twice in the upper chest, and the other one had a head wound near the bridge of the nose. *Id.* He turned the head of one of the deceased journalists and saw an exit wound at the back of the head. *Id.* Based on his prior combat experience, Col. McKay concluded from the wounds that these two Dutch Journalists had been shot from a close range. *Id.* Col. McKay returned to San Salvador and went directly to the U.S. Ambassador's residence, where he informed him in person of the killings. *Id.* ¶ 116. The U.S. Government immediate sent its embassy officials to investigate the killings. *Id.* ¶ 117.

Later that same morning, only a few hours after his first visit, Col. McKay returned to El Paraíso to continue his investigation of the killings with at least one additional U.S. Government official, a U.S. Embassy political officer. *Id.* ¶ 118. The U.S. Embassy sent a (now declassified) cable to the U.S. Department of State following the second on-site investigation into the killings. *Id.* ¶ 119. According to the cable, the U.S. investigators examined the bodies of the four Dutch Journalists at the El Paraíso base and concluded that all died from multiple gunshot wounds. *Id.* ¶ 120. The powder burns indicated that the Dutch Journalists were killed at a distance expected to be no greater than 75 meters. *Id.* As noted in the cable, U.S. military advisors who were on-site

11

JA54

at El Paraíso on March 17 and 18, 1982, reported to the U.S. investigators that the Salvadoran soldiers returning from their mission at around 8 p.m. on the night of March 17 "expressed elation at their success and referred to their mission as an 'ambush.'"  *Id.* ¶ 121.  One U.S. military advisory noted that the patrol was about three kilometers beyond the normal patrol perimeter, in a solidly guerilla area, and observed that it was not common for patrols to be out after dark—sunset was at 6:02 p.m. in El Salvador on March 17, 1982.  *Id.*

The U.S. investigators, including Col. McKay, then headed to the site of the killing, accompanied by Salvadoran soldiers who claimed to have been part of the patrol.  *Id.* ¶ 122.  The cable noted that the soldiers offered a "nearly uniform version of the patrol and firefight," which differed from the "information gathered at the site of the encounter."  *Id.* ¶ 123.  The soldiers showed the U.S. investigators the spots from which they claimed to have fired and maintained that they did not advance from their original shooting positions.  *Id.* ¶ 124.  While the U.S. investigators found shell casings in the original locations indicated by the soldiers, they also found "numerous" shell casings in other locations, indicating that the soldiers had advanced toward the Dutch Journalists while firing.  *Id.*  A sergeant who led the patrol also acknowledged to the U.S. investigators that he killed two of the journalists at a range of approximately 25 meters as they tried to escape toward a small riverbed.  *Id.*

The cable noted that the U.S. investigators recovered numerous M-60 shell casings from the site of the killing.  *Id.* ¶ 125.  The Salvadoran soldiers also claimed to have taken "heavy fire," including grenade fire, from about 20 to 35 guerrillas and showed the hilltops from which they claimed guerrillas had fired.  *Id.* ¶ 127.  The U.S. investigators examined these locations and found "no extensive evidence of guerrilla fire," including no evidence of any grenade fire in those areas and no evidence that the ground had been disturbed.  *Id.*  The cable noted that the soldiers attempted

12

JA55

to explain the discrepancy by "insist[ing] that the guerrillas had picked up all of their shells before leaving, even though it was almost dark." *Id.*  Based on his investigation at the site of the killing and his extensive combat experience, Col. McKay concluded that the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch Journalists had planned to pass, creating a "kill zone" that bore the hallmarks of a classic ambush. *Id.* ¶ 128.

Later, the Dutch government despite a lack of cooperation from the Salvadoran government—carried out its own investigation into the killing of the Dutch Journalists. *Id.* ¶ 129. When the Dutch Ambassador requested to interview the sergeant and soldiers who carried out the ambush in the days following the killings, for example, the Salvadoran government refused to provide authorization. *Id.*  The Dutch investigative team visited the site of the killings as well as El Paraíso, accompanied by Col. McKay. *Id.*  Based on the evidence the Dutch mission could gather, the Dutch government similarly concluded that the Salvadoran government and its Security Forces' account of the death of the Dutch Journalists was "unbelievable and contestable." *Id.*

Following the end of the civil war in 1992, the U.N. Truth Commission was tasked with conducting investigations into serious acts of violence committed during the civil war by both sides. *Id.* ¶ 130.  In its final report, issued on March 15, 1993, the U.N. Truth Commission highlighted the killing of the Dutch Journalists as among the most emblematic crimes committed by state actors during the conflict. *Id.*  Not all emblematic cases discussed by the U.N. Truth Commission name a perpetrator. *Id.* ¶ 131.  To identify specific perpetrators, the U.N. Truth Commission's methodology required "overwhelming evidence" linking the perpetrator to that atrocity, including confirmation of the relevant event and perpetrator by multiple credible sources, and gave the alleged perpetrator the opportunity to provide his version of events. *Id.*  After its investigation into the Dutch Journalists' killings, which included interviews with numerous

witnesses, the U.N. Truth Commission concluded that "the ambush was set up deliberately to surprise and kill the journalists and their escort; that the decision to ambush them was taken by Colonel Mario A. Reyes Mena, Commander of the Fourth Brigade, with the knowledge of other officers; that no major skirmish preceded or coincided with the shoot-out in which the journalists were killed; and, lastly, that [Defendant] and other soldiers concealed the truth and obstructed the judicial investigation." *Id.* ¶ 132.

For the foreign journalists remaining in El Salvador, the killing of the Dutch Journalists, along with the subsequent cover-up and broader campaign of intimidation, sent a clear message: stop covering the guerrillas. *Id.* ¶ 133.

While the Dutch Journalists' murder was among the most brazen attacks on foreign journalists by the SSF, it was not the last or only one. *Id.* ¶ 136. The SSF's targeting of Salvadoran and foreign journalists continued throughout the civil war. *Id.*

*7. Decades of Obstacles to Accountability and Extraordinary Circumstances Prevented Plaintiff from Filing this Suit until Now.*

The Complaint further alleges that, in the immediate aftermath of the killing of the Dutch Journalists, the families of the Dutch Journalists, including Plaintiff, could not learn the truth of what took place, how their family members died, or who was responsible for their deaths. *Id.* ¶ 141. The Salvadoran government and its Security Forces' cover-up and false narrative about how the killings took place and their threats to witnesses and journalists who sought to shed light on the incident obstructed public knowledge and Plaintiff's knowledge about the killings. *Id.* ¶ 142. Although criminal proceedings in the Court of First Instance at El Dulce Nombre de María were initiated following the killing of the Dutch Journalists (the "Initial Criminal Proceedings"), they quickly hit a roadblock when the military refused to make any relevant military personnel

available to the investigative judge, Dora del Carmen Gómez de Claros, for questioning. *Id.* ¶ 143. Under the Salvadoran criminal procedure laws in force at the time, investigations were led by investigative judges. *Id.* In 1988, after Judge Claros was forced to flee El Salvador following death threats for her work in this case, the Initial Criminal Proceedings were terminated without any additional information being released to the Dutch Journalists' families. *Id.* ¶ 144.

In 1992, with the end of the civil war and the creation of the U.N. Truth Commission, there appeared, for the first time, a potential opportunity to properly investigate the killings of the Dutch Journalists. *Id.* ¶ 145. In its final report, issued on March 15, 1993, the U.N. Truth Commission found that the Salvadoran government failed to meet its obligation to investigate, bring to trial, and punish guilty parties, as required under international law. *Id.* The U.N. Truth Commission also stated that the then-President of the Supreme Court of El Salvador "failed to cooperate" with the U.N. Truth Commission's investigation. *Id.* On March 20, 1993, days after the U.N. Truth Commission's Report became public, the Salvadoran government enacted the Amnesty Law. *Id.* ¶ 146. The Amnesty Law shielded the SSF and FMLN forces from prosecution for human rights abuses committed during the civil war and protected offenders from civil liability. *Id.* It made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible. *Id.* Even with the protection of the Amnesty Law, the SSF continued to block access to key evidence, such as documents, military and security forces personnel information and interviews, related to its involvement in human rights abuses during the civil war, including targeted killings carried out by the SSF. *Id.* ¶ 147.

In 2012, the Inter-American Court of Human Rights issued a binding judgment on El Salvador in the case of *El Mozote v. El Salvador*, holding that the provisions of the Amnesty Law that had thus far prevented the investigation, prosecution and punishment of those responsible for

15

JA58

crimes against humanity perpetrated during the civil war were handled with impunity, violated international law, and were incompatible with the American Convention on Human Rights, to which El Salvador is a party. *Id.* ¶ 148. Notwithstanding this judgment, the Amnesty Law remained in effect until 2016, when the Salvadoran Supreme Court, relying on Inter-American jurisprudence and other international humanitarian law and human rights instruments, declared unconstitutional all the articles of the Amnesty Law that prevented the investigation of crimes against humanity and war crimes committed during the civil war. *Id.* ¶ 149. The Salvadoran Supreme Court held the Amnesty Law to be invalid as to all the cases described in the U.N. Truth Commission, including the killing of the Dutch Journalists. *Id.* Following this ruling, in December 2016, the Salvadoran Prosecutor General created the Salvadoran Human Rights Unit to investigate crimes committed during the civil war. *Id.* ¶ 150.

Despite the Salvadoran Supreme Court's ruling, the SSF continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders. *Id.* ¶ 151. For example, in the investigation into the December 1981 killing of more than one thousand villagers in the El Mozote Massacre, the Salvadoran military refused to provide access to its archives, despite a court order to do so. *Id.*

In March 2018, Plaintiff filed a criminal complaint with the Salvadoran Attorney General's Office requesting an investigation of the Dutch Journalists' murders. *Id.* ¶ 152. In response, the Prosecutor's Office began prosecuting the case, and sent the file to a court in Dulce Nombre de María, the Chalatenango municipality where the case was first opened in 1982. *Id.* Two Salvadoran human rights organizations, one of which is Plaintiff's legal representative, conducted their own investigation and developed additional evidence. *Id.* ¶ 153.

16

JA59

In September 2018, Plaintiff learned of Defendant's location and presence in Centreville, Virginia, when a Dutch television program aired a documentary on the killings that tracked Defendant to his current residence. *Id.* ¶ 154. In 1984, Defendant had relocated to the United States as a military attaché for the Salvadoran government based in Washington, D.C. *Id.* ¶ 39.

On July 16, 2021, Plaintiff filed a renewed criminal complaint in El Salvador naming Defendant and two other former officers as responsible for the extrajudicial killing of Plaintiff's brother, Jan Kuiper. *Id.* ¶ 155. On September 22, 2022, Plaintiff asked the court to order Defendant's arrest. *Id.* Two weeks later, the Salvadoran Attorney General's Office made the same request. *Id.* In November 2022, the court issued an order indicting three former high-ranking officers for the killing of the Dutch Journalists, including Defendant. *Id.* ¶ 158. Two of these former officers, Gen. José Guillermo García and Col. Francisco Antonio Morán, reside in El Salvador and were arrested following the issuance of the indictments. *Id.* ¶ 159. Following the indictment, Defendant, who resides in the United States, has avoided arrest in El Salvador by no longer returning to El Salvador. *Id.* ¶ 160. Before being indicted, Defendant regularly traveled to El Salvador. *Id.*

In 2023, pursuant to a request by the judiciary in El Salvador, INTERPOL issued a Red Notice for Defendant's provisional arrest, but no action has yet been taken on the Red Notice. *Id.* ¶ 161. Further, no information suggests that extradition or deportation will be prompt or even possible, despite a Salvadoran court order to the Salvadoran executive branch to seek Defendant's extradition. *Id.* ¶ 162.

### B. Procedural Background

On October 9, 2024, Plaintiff filed his Complaint in this Court, alleging Defendant violated the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992)

(codified at 28 U.S.C. § 1350 note). Dkt. 1. On November 22, 2024, Defendant filed a Motion to Dismiss, or, Alternatively, Stay. Dkt. 22. After receiving an extension, Dkt. 26, Plaintiff filed his Opposition on December 20, 2024, Dkt. 28. On January 8, 2025, Defendant filed his Reply. Dkt. 30. On January 15, 2025, Plaintiff filed a Motion for Leave to File Sur-Reply. Dkt. 31. On January 16, 2025, Defendant filed his Opposition to the Motion for Leave to File Sur-Reply. Dkt. 34.

## II. LEGAL STANDARD

### A. Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the Court lacks jurisdiction over the subject matter of the action. A district court must dismiss an action over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3). In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is proper. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

There are two ways in which a defendant may prevail on a 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based." *Adams*, 697 F.2d at 1219. Under this method of attack, all facts as alleged by the plaintiff are assumed to be true. *Id.* Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). In such a case, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the

18

JA61

jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.3d 884, 891 (3d Cir. 1977).

### B. Rule 12(b)(6) Standard

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

19

JA62

C.  Rule 12(b)(7) Standard

Under Federal Rule of Civil Procedure 12(b)(7), a party may move for dismissal "for failure to join a party under Rule 19." *Id.*  When faced with a Rule 12(b)(7) motion to dismiss, the court engages in a two-step inquiry.  First, it must determine whether the absent party is required under Rule 19 because complete relief could not be provided without that party's involvement in the case, or because the absent party claims an interest in the action such that the result of the case could impede that party's ability to protect its interest or impose double or inconsistent obligations. Fed. R. Civ. P. 19(a)(1); *Owens–Illinois, Inc. v. Meade,* 186 F.3d 435, 440 (4th Cir.1999).  Second, "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

### III.  ANALYSIS

In his Motion, Defendant makes several arguments for dismissal of the instant action: (1) the Court lacks subject matter jurisdiction because Defendant has foreign sovereign immunity; (2) the TVPA claim is barred by the ten-year statute of limitations; (3) the TVPA may not be applied retroactively; (4) Plaintiff lacks standing; and (5) Plaintiff has not exhausted his remedies in El Salvador.  In the alternative, Defendant argues that, absent dismissal, the Court should issue a stay.  The Court will address each argument in turn.

A.  Plaintiff's Claim is Not Barred by the FSIA or Common Law Immunity.

Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's TVPA claim because he is immune from suit (1) under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604 *et seq.*, and (2) pursuant to conduct-based immunity under the common law.

20

Dkt. 23 at 6-17.  Both of these arguments are foreclosed by Supreme Court and/or Fourth Circuit precedent.

    *1.  Defendant Is Not Entitled to Immunity Under the Foreign Sovereign Immunities Act.*

As the Fourth Circuit has explained, "FSIA—based on its text, purpose and history—governs only foreign state sovereign immunity, not the immunity of individual officials." *Yousuf v. Samantar*, 699 F.3d 763, 767 (4th Cir. 2012) (citing *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("Reading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted.")).  Thus, "the common law, not the FSIA, governs the claims to immunity of individual foreign officials." *Id.* (citing *Samantar*, 560 U.S. at 325 ("[W]e think this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the [FSIA] defines that term.")).  Accordingly, as an individual foreign official, Defendant is not entitled to immunity under the FSIA.

However, the Supreme Court has noted two related avenues that might provide for the dismissal of a case based on the FSIA immunity of the relevant foreign state: (1) where the foreign state is the real party in interest; and (2) where the foreign state itself—or a political subdivision, agency, or instrumentality thereof—is a required party warranting dismissal under Federal Rule of Civil Procedure 12(b)(7).  *Samantar*, 560 U.S. at 324-25.  Defendant here raises each of these arguments, and the Court will address them in turn.

    a.  El Salvador Is Not the Real Party in Interest.

This nation's Supreme Court has noted that "it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the

JA64

state is the real party in interest." *Samantar*, 560 U.S. at 325 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (citation omitted))). Defendant argues that, because Plaintiff alleges that Defendant "was acting in his official capacity as an officer of the Salvadoran military, and that his alleged conduct was then authorized by the Salvadoran government," El Salvador is the real party in interest. Dkt. 30 at 8; *see also* Dkt. 23 at 13-15. The Court disagrees for two independent reasons.

*First*, as noted above, the Supreme Court only identified this avenue as potentially available in "actions against an official *in his official capacity*" and cited its precedent distinguishing official-capacity suits (in which the government entity is the real party in interest) from personal-capacity suits (in which it is not) in 42 U.S.C. § 1983 actions. *Samantar*, 560 U.S. at 325 (emphasis added) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In the Fourth Circuit, "when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995). In his Opposition, Plaintiff specifically stated that he is "suing Defendant in his personal capacity for his role in the ambush that targeted and killed the Dutch Journalists, and seeks damages from Defendant's 'own pockets.'" Dkt. 28 at 15 (quoting *Samantar*, 560 U.S. at 325). Unlike many official capacity claims, here the caption of the Complaint does not list Defendant's former title or relationship to El Salvador. Dkt. 1 at 1. The Complaint also seeks damages from Defendant personally, rather than from El Salvador. Dkt. 1 ¶ 173 ("In addition to being *personally liable* for his own actions, Defendant is *jointly and severally liable* for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to commit

22

JA65

the ambush and killings."). Accordingly, El Salvador is not the real party in interest in this case. *See Samantar*, 560 U.S. at 325 ("And we think this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the [FSIA] defines that term.").

The non-binding, out-of-circuit cases Defendant cites regarding *official capacity* claims are, thus, inapposite and distinguishable. *See Qandah v. Johor Corp.*, 2021 WL 5446767, at *6 (6th Cir. Nov. 22, 2021) (holding that the individual defendant was sued in his *official capacity* because the "complaint's caption states that [plaintiff] is suing [the individual defendant] "as CEO of [the state-owned corporation defendant]," plaintiff alleged that the individual defendant's relevant actions were done "on behalf of" the state-owned corporation defendant, plaintiff "almost exclusively" referred to the individual and state-owned corporation defendants collectively, and plaintiff "made only a general demand for damages without specifying the source"); *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013) (holding a case based on a breach of contract between the plaintiff and the Kenyan government was in all respects a suit against the Kenyan government in part because the individual defendants were sued in their official capacities and damages were sought from the Kenyan government, not the individual defendants), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014); *Li v. Li*, 2023 WL 2784872, at *4 (D.D.C. Apr. 5, 2023) (holding the Chinese state was the real party in interest where each named individual defendant was sued in his official capacity, there were no non-conclusory allegations that any individual defendant personally ordered, participated in, or profited from the underlying offense, the complaint focused on "an alleged longstanding Chinese policy," and there was no indication that plaintiffs sought damages directly from the individual defendants), *aff'd*, 2024 WL 4601521 (D.C. Cir. Oct. 29, 2024); *Strange v. Islamic Republic of Iran*, 2016 U.S. Dist. LEXIS 200878, at *13-14 (D.D.C.

May 6, 2016) (holding that claims against former president of Iran, Mahmoud Ahmadinejad, and supreme leader of Iran, Ali Hosseini Khamenei, were "in effect no more than claims against the foreign state itself" because the plaintiffs alleged that Ahmadinejad and Khamenei were acting in their "official capacities," Defendant Iran had acted through them, and "for all intents and purposes, *Defendant Khamenei is the Iranian government*" (emphasis original)); *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 72 (D.D.C. 2013) (holding Defendant Iran was the "real party in interest" because plaintiffs had made clear that they were suing Khamenei and Ahmadinejad for acts taken "in their official capacity" on behalf of Iran, the plaintiffs asserted personal jurisdiction over Khamenei and Ahmadinejad on the basis of "the regime['s] contacts with the United States," and plaintiffs' allegations centered on "official policies"), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015).  These cases, which are out-of-circuit, do not guide the Court's analysis here, where Plaintiff's factual allegations, claims, and damages sought are substantially different from those in the cases cited by Defendant.

*Second*, even if this action would otherwise be interpreted as a suit against Defendant in his official capacity, the Fourth Circuit has held that certain acts, even if committed under color of law and in the course of employment with a foreign Sovereign, are "by definition, acts that are not officially authorized by the Sovereign."  *Yousuf*, 699 F.3d at 776.  These acts are violations of *jus cogens* norms, which are "peremptory norm[s] of general international law [that are] accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."  *Id.* (quoting *Vienna Convention on the Law of Treaties* art. 53, May 23, 1969, 1155 U.N.T.S. 331); *see also Siderman de Blake,* 965 F.2d at 718 ("International law does not recognize an act that violates jus cogens as a sovereign act."); *Paul v.*

24

JA67

*Avril,* 812 F. Supp. 207, 212 (S.D. Fla. 1993) ("[A]cts ... [of torture, cruel, inhuman and degrading treatment, and arbitrary detention in violation of customary international law] hardly qualify as official public acts.").  The Fourth Circuit has held that "summary execution" is "among these universally agreed-upon norms."  *Yousuf,* 699 F.3d at 775 (citing Evan J. Criddle & Evan Fox–Decent, *A Fiduciary Theory of Jus Cogens,* 34 Yale J. Int'l L. 331, 331 (2009) (explaining that "jus cogens . . . include[s], at a minimum, the prohibitions against genocide; slavery or slave trade; *murder or disappearance of individuals*; torture or other cruel, inhuman, or degrading treatment or punishment; prolonged arbitrary detention" (emphasis added)); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, *summary execution*, genocide and slavery." (emphasis added)); *Restatement (Third) of Foreign Relations Law* § 702 and cmt. n (identifying *murder*, torture and "prolonged arbitrary detention" as *jus cogens* violations)).  Accordingly, Defendant's alleged extrajudicial killing in this case is a *jus cogens* violation, and, although alleged to have been done under color of law and in the course of employment with El Salvador, is legally treated as not having been officially authorized by El Salvador.  *See Warfaa v. Ali*, 33 F. Supp. 3d 653, 663 (E.D. Va. 2014) ("The Fourth Circuit then held that a foreign official exceeds the scope of his authority any time he engages in an act that violates *jus cogens* norms.  Because plaintiff alleges that defendant did exactly that, defendant's acts could not have been sanctioned by a foreign sovereign notwithstanding his position in the Somali National Army."), *aff'd,* 811 F.3d 653 (4th Cir. 2016); *id.* ("[P]rohibitions against extrajudicial killing and torture are foundational international norms, meaning that no state . . .

may condone such acts."). Thus, El Salvador is not the real party in interest and the Motion will be denied in this regard.

> b. El Salvador Is Not an "Absent Required Party" Warranting Dismissal.

The Supreme Court has also noted that, in some cases, "[e]ven when a plaintiff names only a foreign official, it may be the case that the foreign state itself, its political subdivision, or an agency or instrumentality is a required party, because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest.'" *Samantar*, 560 U.S. at 324 (quoting Fed. R. Civ. P. 19(a)(1)(B)). "If this is the case, and the entity is immune from suit under the FSIA, the district court may have to dismiss the suit . . . ." *Id.* at 324-25 (citing *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) ("[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.")).

In *Pimentel*, the case cited by the Supreme Court, involved an interpleader action to determine the proper ownership of funds that had been misappropriated by the former president of the Republic of the Philippines. *Pimentel*, 553 U.S. at 858-60. The Republic of the Philippines, a state-run Philippine Commission, creditors, and human rights victims with a court judgment each laid claim to the funds. *Id.* The Republic of the Philippines and the Philippine Commission asserted sovereign immunity under the FSIA and moved to dismiss the suit under Rule 19(b). *Id.* at 859. The purpose of an interpleader action "is to resolve in one proceeding all claims to a res." *In re Republic of Philippines*, 309 F.3d 1143, 1153 (9th Cir. 2002), *rev'd on other grounds sub nom. Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). Thus, "[w]ithout all significant claimants in an interpleader action, its purpose is materially frustrated." *Id.* Accordingly, it was

26

JA69

uncontested that the Republic of the Philippines and the Philippine Commission were required parties. *Pimentel*, 553 U.S. at 863-64.

Here, however, El Salvador is not a required party. Defendant argues that El Salvador has an "interest" in this action because Plaintiff "alleges crimes and a cover-up committed by its government through 'state actors.'" Dkt. 23 at 9-10. However, as discussed *supra*, Plaintiff is suing Defendant in his personal capacity and is seeking damages only from Defendant's own personal resources, and thus whether liability extends to El Salvador itself is not at issue and beyond the scope of Plaintiff's claim. Moreover, if Defendant is found to have committed the *jus cogens* violation alleged, legally this violation is treated as not having been officially authorized by El Salvador. Additionally, this alleged general "interest" is not of the same type as the direct claim over the disputed funds in *Pimentel*, and Plaintiff cites no other cases on this issue. Dkt. 23 at 15-17.

Indeed, the Fourth Circuit has explained that its prior decisions finding a "necessary party" under Rule 19(a) "involve a situation where the contracts or obligations of the 'necessary' party were being interpreted or were otherwise directly at issue." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 951 (4th Cir. 2020) (citing *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 434 (4th Cir. 2014) (determining third parties "actively contesting their liability in state court" under a contract and entitled to insurance by the defendants for construction defects like those alleged had "a natural interest in any adjudication of the terms of [the] contract"); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 552-53 (4th Cir. 2006) (deeming necessary and indispensable the third party whose preferential hiring policy dictated the defendant casino operator's conduct, where the court would be deciding the legality of the policy); *Nat'l Union Fire Ins. Co. v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 251 (4th Cir. 2000) (indicating that the court's decision would "necessarily

require it to interpret the notice provisions of the policy and other agreements" between the plaintiff and the absent party)).  That is not the situation here.  Thus, under Fourth Circuit precedent, El Salvador is not a required party here.  Accordingly, this action will not be dismissed on that basis.

### 2. Defendant Is Not Entitled to Common Law Conduct-Based Immunity.

With regard to Defendant's argument that he is entitled to common-law conduct-based immunity, in *Yousuf*, the Fourth Circuit expressly held that, "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity."  *Yousuf*, 699 F.3d at 777; *see also Warfaa*, 811 F.3d at 661-62 (holding in context of TVPA claim that *Yousuf* forecloses a former military official's claim of conduct-based immunity for *jus cogens* violations).  As discussed *supra*, the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*.  Accordingly, Defendant is not entitled to conduct-based official immunity under the common law.  *Yousuf*, 699 F.3d at 778 ("Because this case involves acts that violated *jus cogens norms,* including torture, extrajudicial killings and prolonged arbitrary imprisonment of politically and ethnically disfavored groups, we conclude that Samantar is not entitled to conduct-based official immunity under the common law, which in this area incorporates international law.").

Defendant attempts to distinguish *Yousuf* by noting that the defendant there was a former official of a state "with no currently recognized government."  *Id.* at 767.  As the *Yousuf* decision makes apparent, however, the Fourth Circuit's holding was made independently of the State Department's suggestion on non-immunity, which had noted there was no recognized government in Somalia to assert or waive the defendant's immunity at the time of the lawsuit.  *Id.* at 778 ("Because this case involves acts that violated *jus cogens* norms, including . . . extrajudicial killings

28

JA71

. . . we conclude that Samantar is not entitled to conduct-based official immunity under the common law, which in this area incorporates international law. *Moreover,* the [State Department's suggestion on non-immunity] has supplied us with *additional reasons to support this conclusion.*" (emphases added)). Thus, *Yousuf* governs this case, and Defendant is not entitled to common-law conduct-based official immunity. Accordingly, Defendant's Motion will also be denied in this regard.

### B. Plaintiff's Claim Is Not Barred by the Ten-Year Statute of Limitations.

Defendant further argues that Plaintiff's TVPA claim is barred by the statute of limitations. As a preliminary matter, the Court notes that, as a general rule, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A 12(b)(6) motion to dismiss, which tests the sufficiency of the complaint, "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's complaint is time-barred." *Id.* Indeed, "these defenses are more properly reserved for consideration on a motion for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Only in "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" may a defendant raise—and the Court consider—a statute of limitations defense at the motion to dismiss stage. *Goodman*, 494 F.3d at 464. When the facts necessary to establish the time bar are not apparent on the face of the complaint, however, the Court should allow the suit to proceed to discovery. *See Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (reversing the district court's dismissal and remanding for discovery when Plaintiff pleaded facts sufficient to support equitable tolling of the statute of limitations).

In this case, Plaintiff has sued Defendant under the TVPA.  Under the TVPA, a plaintiff has ten years from the date a cause of action arises to bring suit for extrajudicial killing or torture.  28 U.S.C. § 1350 note ("No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.").  The alleged extrajudicial killing giving rise to Plaintiff's claims occurred on March 17, 1982.  Dkt. 1 ¶ 1.  Plaintiff did not file suit until October 9, 2024.  Accordingly, the dispositive question is whether the doctrine of equitable tolling permits Plaintiff's claims to go forward notwithstanding the delay.

Judges in this District and elsewhere have held that equitable tolling is available for TVPA claims.  *Warfaa*, 33 F. Supp. 3d at 664 (collecting cases).  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005).  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."  *Holland v. Florida*, 560 U.S. 631, 653 (2010) (cleaned up).  Application of the doctrine to permit an otherwise time-barred case to proceed is appropriate when "extraordinary circumstances beyond [a plaintiff's] control prevented him from complying with the statutory time limit."  *Spencer v. Sutton,* 239 F.3d 626, 630 (4th Cir. 2001) (internal quotation marks omitted) (quoting *Harris v. Hutchinson,* 209 F.3d 325, 330 (4th Cir. 2000)).

Here, Plaintiff has alleged that his brother was killed during a civil war that did not end until 1992.  Dkt. 1 ¶¶ 1-2.  And the Complaint specifically alleges that pervasive violence, repression and threats to investigators, judges, and potential witnesses, and the Salvadoran security forces' cover-up, prevented an effective investigation of human rights abuses committed by Salvadoran security forces during the civil war.  Dkt. ¶¶ 2-4, 15-19, 141-144.  "There is a consensus

among the federal courts that civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' for purposes of tolling the TVPA's limitations period." *Warfaa*, 33 F. Supp. 3d at 664; *see also Chavez*, 559 F.3d at 493-94 (citing fear of retaliation and absence of an effective justice system in El Salvador as bases for equitable tolling); *Arce*, 434 F.3d at 1262-63 (same). Accordingly, at this stage, Plaintiff has alleged sufficient facts to support the tolling of the statue of limitations at least through the end of the civil war in 1992.

After the civil war, Plaintiff alleges that he continued to be unable to access information to support his claim because the Salvadoran Amnesty Law that was effective from 1993 to 2016 "made domestic investigations and prosecutions for crimes committed in the context of the armed conflict impossible." Dkt. 1 ¶¶ 145-146; *see also id.* ¶ 148 (citing Inter-American Court of Human Rights judgment in *El Mozote v. El Salvador* that held that the Amnesty Law had thus far prevented "the *investigation*, prosecution and, where appropriate, punishment" of those responsible) (emphasis added). And Plaintiff specifically alleges that, "[e]ven with the protection of the Amnesty Law, Salvadoran Security Forces *continued to block access to key evidence . . .* [of] its involvement in human rights abuses during the civil war, including targeted killings carried out by the Security Forces." Dkt. 1 ¶ 146 (emphasis added). The Fourth Circuit has recognized that "regimes committing egregious human rights violations don't ordinarily foster legal systems in which those abuses can be redressed, so permitting tolling until claimants have the ability to both *compile evidence supporting their claims* and pursue claims without fear of reprisal falls within the purpose of equitable tolling specifically and the TVPA more generally." *Warfaa*, 1 F.4th at 295 (emphasis added); *see also Camps v. Bravo*, No. 1:20-CV-24294, 2023 WL 11959805, at *10 (S.D. Fla. June 30, 2023) (noting that continuing impediments to accountability even after the military regime left power, including the enactment of amnesty laws, were factors in warranting

31

JA74

tolling).  Thus, Plaintiff has also alleged sufficient facts at this stage to support the tolling of the statute of limitations from 1993 until 2016.[2]

As to reasonable diligence, Plaintiff alleges that, soon after the 2016 Supreme Court decision invalidating the Amnesty Law, and the Salvadoran Human Rights Unit was created to investigate crimes committed during the civil war, Plaintiff filed a criminal complaint in El Salvador that ultimately led to the indictment of three former military officers, including Defendant.  Dkt. 1 ¶¶ 150-159.  Plaintiff alleges that, although Defendant had regularly traveled to El Salvador prior to his indictment, after the indictment, Defendant "has avoided arrest in El Salvador by no longer returning to El Salvador."  *Id.* ¶ 160.  Plaintiff also alleges that in 2023, INTERPOL issued a Red Notice for Defendant's provisional arrest, but no action has yet been taken, and no information suggests that extradition or deportation will be prompt or even possible.  Dkt. 1 ¶¶ 160-162.  Accordingly, Plaintiff has sufficiently pleaded reasonable diligence at this stage when he filed the instant action in October 2024.

Because the foregoing allegations support the possible tolling of the statute of limitations, the Court therefore finds that the facts on the face of the Amended Complaint do not conclusively establish a time bar such that dismissal at this stage would be warranted.  Accordingly, the Court will deny the Motion to Dismiss on this ground.

---

[2] Plaintiff has further alleged that, even after 2016, "Salvadoran Security Forces continued to block access to evidence and to obstruct any investigations into its abuses during the civil war, even in the face of court orders."  Dkt. 1 ¶ 151.  And Plaintiff alleges that he did not become aware of Defendant's presence in Virginia until September 2018 when a Dutch investigative journalist located Defendant at his current residence.  Dkt. 1 ¶ 154.  Because Plaintiff has alleged sufficient facts to support equitable tolling through 2016 on other grounds, the Court does not reach these additional bases at this stage.

C.  The TVPA Applies Retroactively.

Defendant also argues that the TVPA does not apply retroactively to conduct before its enactment in 1992.  This argument is not well taken, however, as numerous courts faced with this question have found precisely the opposite—including judges in this District. In *Warfaa v. Ali*, U.S. District Judge Leonie M. Brinkema rejected this argument and held that the TVPA granted jurisdiction for conduct occurring in 1987.  33 F. Supp. 3d at 666 ("Defendant responds that the offending acts are beyond the reach of the TVPA because they were committed before the TVPA was enacted in 1991. This line of argument has been considered and rejected by several courts on the grounds that extrajudicial killing and torture have clearly contravened established international law for decades." (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) (upholding jury verdict in favor of plaintiff who brought TVPA claims based on offending acts which occurred in 1973)).  Indeed, the TVPA has consistently been applied to conduct occurring before 1992.  *See, e.g.*, *Samantar*, 699 F.3d at 766 (extrajudicial killings, torture, and arbitrary detention committed prior to January 1991); *Chavez*, 559 F.3d at 493-94 (extrajudicial killings committed during the El Salvador civil war, between 1980 and 1983); *Arce*, 434 F.3d at 1256 (same, between 1979 and 1983); *Cabello*, 402 F.3d at 1148 (extrajudicial killing committed in 1973); *Hilao*, 103 F.3d at 773 (conduct between 1965 and 1981); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1195 (S.D.N.Y. 1996) (conduct committed between 1986 and June 1991) ("Under the principles enunciated in *Landgraf*, the retroactive application of the TVPA is entirely proper."); *Bidegain v. Vega*, No. 22-CV-60338-RAR, 2024 WL 3537482, at *8 (S.D. Fla. June 18, 2024) (extrajudicial killing and

torture committed in 1985).  This Court declines to depart from this precedent, and Defendant's Motion will be denied on this ground.

### D.  Plaintiff Has Sufficiently Alleged Standing.

Defendants also argue that Plaintiff, as decedent's brother, lacks standing to pursue his TVPA claim.  The TVPA identifies two categories of plaintiffs for claims based on an extrajudicial killing: (i) "the individual's legal representative," or (ii) "any person who may be a claimant in an action for wrongful death."  28 U.S.C. § 1350, note, § 2(a)(2).  The term "legal representative" is limited to "the executor or executrix of the decedent's estate."  S. Rep. No. 102-249, at 7.  Plaintiff does not allege that he is the executor of his brother's estate.  Accordingly, the issue before the Court is whether Plaintiff is a person who may be a claimant in an action for wrongful death.

The TVPA does not identify which persons may be a claimant in an action for wrongful death.  Thus, to determine whether a plaintiff would be a proper wrongful death claimant, courts first look to state law to determine whether a plaintiff is a proper wrongful death claimant under the TVPA.  *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1349 (11th Cir. 2011).  If state law would provide the plaintiff no remedy, then a court may then apply foreign law that would recognize the plaintiff's claim.  *Id.* at 1349 & n.12.

The Court therefore must first determine whether Plaintiff is a proper wrongful death claimant under Virginia law.  "Although the TVPA instructs courts to look to 'state law' to determine the parties' status as wrongful death claimants, it does not specify whether a court should apply the state's 'whole law,' including its choice-of-law provisions, or only its substantive 'internal law.'"  *Id.* at 1349.  Although the parties dispute this issue, the Court does not need to

JA77

resolve which approach to apply in this case because, ultimately, under either framework, the law of El Salvador ultimately applies. *See id.*

Assuming Virginia's whole law applies, Virginia follows the *lex loci delicti* rule for its choice-of-law analysis. *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 487 (E.D. Va. 2003) (citing *Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 5 (1993) (explaining that the Court would continue to adhere to the *lex loci delicti*, or place of the wrong, standard that had been "the settled rule in Virginia"). Under this rule, "the law of the place of the wrong determines the substantive issues of tort liability." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993). The standing provision of Virginia's wrongful death statute has been treated by another court in this District as substantive law. *See Jones v. Prince George's Cnty., Md.*, 541 F. Supp. 2d 761, 766 n.10 (D. Md. 2008) (analyzing Virginia law on standing and right to recover damages after following *lex loci delicti*), *aff'd,* 355 F. App'x 724 (4th Cir. 2009). Accordingly, under this interpretation, the law of El Salvador applies.

Similarly, assuming only Virginia's internal law applies, the only person who would be able to file a wrongful death lawsuit on behalf of the decedent is "the personal representative of such deceased person." Code of Va. § 8.01-50(C). A "personal representative" under Virginia law does not include a decedent's sibling, unless that sibling is the executor or administrator of the decedent's estate. *Id.* § 1-234. Because this would leave Plaintiff without a remedy, the Court then turns again to the law of El Salvador. *See Baloco*, 640 F.3d at 1349 n.12 ("We reach the same result applying Alabama's substantive law. First, we would find that the Children are not proper wrongful death complainants under Alabama's internal law. Thus, the Children would find themselves with 'no remedy whatsoever' under Anglo–American law. . . . [W]e would then determine whether the Children possessed a remedy under foreign law, which in this case the

parties concede to be that of Colombia."); *see also Cabello*, 157 F. Supp. 2d at 1356-58 (applying Chilean law where Florida wrongful death statute only allowed claims by estate representative and finding that under Chilean law, siblings had standing as wrongful death claimants). Accordingly, under either analysis, the Court must look to Plaintiff's ability to bring a claim under Salvadoran law.

It is undisputed that Plaintiff has standing in El Salvador to seek compensation for the alleged wrongful death of his brother. Dkt. 1 ¶¶ 155-56; Dkt. 23 at 30-31; Dkt. 23-3 at 3 (Crim. Code art. 70 (El Sal.), providing that "heirs" of injured parties may bring civil claims within criminal actions); Dkt. 28 at 31; Dkt. 30 at 15. Accordingly, Plaintiff has sufficiently alleged standing, and the Motion will be denied on this ground.

E. Defendant's Exhaustion of Remedies Defense Is Not Ripe for Consideration.

Finally, Defendant argues that this Court should dismiss Plaintiff's Complaint because Plaintiff has not exhausted his remedies in El Salvador. The exhaustion requirement under the TVPA can be satisfied by showing that "foreign remedies are unobtainable, ineffective, inadequate, or obviously futile." *Xuncax*, 886 F. Supp. at 178 (quoting S. Rep. No. 102-249, 10); *see also Jean*, 431 F.3d at 782 (stating a plaintiff can satisfy the exhaustion requirement "by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile").

The TVPA exhaustion requirement "is an affirmative defense, requiring the defendant to bear the burden of proof," a burden which is considered "substantial." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005). And a plaintiff does not need "to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc). As explained

36

JA79

*supra*, only in the "relatively rare circumstances" when "all facts necessary to the affirmative defense clearly appear on the face of the complaint" may an affirmative defense, such as exhaustion, be considered in a motion filed under Rule 12(b)(6). *L.N.P. v. Kijakazi*, 64 F.4th 577, 586 (4th Cir. 2023). Moreover, "to succeed in these rare circumstances, the defendant must show that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint." *Id.* (brackets in the original).

Additionally, with regard to the TVPA specifically, courts have held that, "[i]n most instances, initiation of litigation under the TVPA 'will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred.'" *Boniface v. Viliena*, 338 F. Supp. 3d 50, 65 (D. Mass 2018) (quoting *Jean*, 431 F.3d at 781-82). To the extent there is any doubt surrounding this issue, "both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs." *Id.* (citing *Enahoro v. Abubakar*, 408 F.3d 877, 892 (7th Cir. 2005)).

Here, while Defendant argues in his Opposition that he is being tried in *absentia* in El Salvador and that, if one of the criminal defendants in El Salvador is found guilty, Plaintiff would theoretically be subsequently able to seek civil damages from the Salvadoran government there, Dkt. 23 at 32, Defendant has not shown that Plaintiff's potential responses to this affirmative defense—that any potential remedies in El Salvador are, for example, ineffective, unduly prolonged, inadequate, or obviously futile—are foreclosed by the allegations in the Complaint. Considering the stage of the litigation and the guidance from other courts cited above, this Court

37

JA80

finds that deferral of consideration of exhaustion is appropriate at this time. *See Boniface*, 338 F. Supp. 3d at 66 (collecting cases deferring decision on exhaustion to a later stage).[3]

### F.  The Court Declines to Issue a Stay.

Defendant also argues in the alternative that this Court should stay this case pending the outcome of the criminal proceedings in El Salvador.  A party seeking a stay "must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Inds., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).  A court should consider three factors when considering a stay: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; [and,] (3) potential prejudice to the non-moving party." *Gibbs v. Plain Green, LLC*, 331 F. Supp. 3d 518, 525 (E.D. Va. 2018) (internal citations omitted).

Defendant argues first that "[t]here is no need for this action to be litigated, when Plaintiff may receive the damages he seeks in this action through proceedings in El Salvador, which are already underway," and raises Defendant's age and chronic physical health problems as a reason to avoid a "duplicative effort."  Dkt. 23 at 33.  As addressed above, it is still a live issue in this case whether any potential remedies in El Salvador, including the criminal case, are ineffective, unduly prolonged, inadequate, or obviously futile.  Accordingly, the Court is not persuaded by this argument.

Defendant next argues that he would be prejudiced if this action proceeds because he will be forced to decide whether to invoke his right to remain silent, which may permit an adverse inference and prejudice his defense, or risk any statements made in this lawsuit being used against

---

[3] It appears that, at this stage, Plaintiff has at least plausibly alleged that obtaining relief is "unduly prolonged" where he filed a criminal complaint in 2018. *See Jean*, 431 F.3d at 782.

him in the Salvadoran criminal action. Dkt. 23 at 33-34. The Fourth Circuit has held, however, that the Fifth Amendment right to remain silent does not apply when a defendant fears the risk of prosecution by a foreign government. *Snider v. Seung Lee*, 584 F.3d 193, 201 (4th Cir. 2009) ("In [*United States v. Balsys*, 524 U.S. 666 (1998)]*,* the defendant declined to answer a question about his activities during World War II for fear of prosecution by Lithuania or Israel. The Supreme Court held "that concern with foreign prosecution is beyond the scope of the Self-incrimination Clause." *Id.* at 669. In reaching its holding, the Supreme Court stated that even though the defendant's fear of prosecution by a foreign nation might be reasonable, the criminal prosecution *by a foreign government* was nonetheless not subject to U.S. constitutional guarantees. *Id.* at 672-74."). Thus, the Court is also unpersuaded by this argument.

On the other side, the potential prejudice to Plaintiff by a stay of an indefinite length is significant. *See Simpson v. LLAB Trucking, Inc.*, 2022 WL 2614876, at *3 (E.D. Va. Jan. 26, 2022) ("[T]his court has found potential delays of four to six months to be 'significant' and therefore prejudicial to a non-moving party as well as instances where the expected delay is not entirely concrete.") (collecting cases); *Sehler v. Prospect Mortg., LLC*, 2013 WL 5184216, at *3 (E.D. Va. Sept. 16, 2013) (finding a potential delay of four to six months to be "significant" and therefore prejudicial to the non-moving party). Indeed, the very things that Defendant points to—his age and health—counsel against staying this case for an indeterminate length of time.

Accordingly, Defendant has not met his burden, and his request for a stay pending resolution of the criminal case in El Salvador will be denied.

*** 

Accordingly, it is hereby ORDERED that Defendant's Motion to Dismiss, or Alternatively, Stay (Dkt. 22) is DENIED; and it is

JA82

FURTHER ORDERED that Plaintiff's Motion for Leave to File a Sur-Reply (Dkt. 31) is GRANTED; and it is

FURTHER ORDERED that a scheduling order will issue promptly.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 10, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge

40

JA83

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| _____ ) | |
| GERT JANNES KUIPER, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 1:24-cv-01785-RDA-LRV |
| MARIO ADALBERTO REYES MENA, ) | |
| ) | |
| *Defendant.* ) | |
| _____ ) | |

## <u>NOTICE OF APPEAL UNDER THE COLLATERAL ORDER DOCTRINE</u>

Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), notice is hereby given that Defendant Mario Adalberto Reyes Mena ("Mr. Reyes Mena") hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Memorandum Opinion and Order entered in this action on September 10, 2025 (Dkt. 39).[1] The issues being appealed, through this notice, pertain to the district court's ruling on subject matter jurisdiction and foreign sovereign immunity, including immunity under the Foreign Sovereign Immunities Act and immunity under the common law. The jurisdictional basis for this appeal is the collateral order doctrine. *See, e.g.*, *Yousuf v. Samantar*, 699 F.3d 763, 768 n.1 (4th Cir. 2012); *France.com, Inc. v. French Republic*, 992 F.3d 248, 251 (4th Cir. 2021); *Eckert Int'l v. Gov't of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994).

---

[1] Defendant intends to file a motion to certify an interlocutory appeal on the issue of whether the TVPA has an impermissible retroactive effect, as well as a motion to stay the district court proceedings pending the appeals.

1

JA84

Dated: October 9, 2025

Respectfully submitted,

**MARIO ADALBERTO REYES MENA**

*/s/ Kang He*
John D. Wilburn (VSB No. 41411)
Kang He (VSB No. 89237)
Caroline G. Amarant (VSB No. 100562)
**MCGUIREWOODS LLP**
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
Telephone: (703) 712-5000
Facsimile:  (703) 712-5268
jwilburn@mcguirewoods.com
khe@mcguirewoods.com
camarant@mcguirewoods.com

*Counsel for Defendant*

2

JA85

## CERTIFICATE OF SERVICE

I hereby certify that, on October 9, 2025, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will serve a copy on all counsel of record.

*/s/ Kang He*
Kang He (VSB No. 89237)

3

JA86

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

/s/ *Jonathan Y. Ellis*
Jonathan Y. Ellis