No. 25-2232

In the

# United States Court of Appeals
## For the Fourth Circuit

---

GERT JANNES KUIPER,

*Plaintiff-Appellee,*

v.

MARIO ADALBERTO REYES MENA,

*Defendant-Appellant.*

---

On Appeal from the U.S. District Court for the
Eastern District of Virginia
Honorable Rossie D. Alston, Jr. Case No. 1:24-cv-01785-RDA-LRV

---

### RESPONSE BRIEF FOR PLAINTIFF-APPELLEE

---

Jason P. Hipp
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
JHipp@jenner.com
AGrainer@jenner.com

Daniel McLaughlin
Claret Vargas
CENTER FOR JUSTICE &
ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444
DMclaughlin@cja.org
CVargas@cja.org

*Counsel for Plaintiff-Appellee*
[Additional counsel listed on inside cover]

Lawrence W. McMahon
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LMcMahon@jenner.com

Justin J. Gillette
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
JGillette@jenner.com

Peter C. Welch
JENNER & BLOCK LLP
515 Flower Street
Suite 330
Los Angeles, CA 90071
Tel: (213) 239-5100
PWelch@jenner.com

*Counsel for Plaintiff-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.    Does party/amicus have any parent corporations?                              YES      NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      YES      NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                          YES    NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)       YES    NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                              YES    NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?              YES    NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................iii

**STATEMENT OF THE ISSUE**.................................................1

**STATEMENT OF THE CASE** ...............................................1

    A.    The Dutch Journalists Were Killed In A Planned Ambush.................................................................................4

    B.    Appellant's Role in the Planning and Execution of the Ambush..................................................................................5

    C.    Frustration of Justice and Salvadoran Proceedings. .............8

    D.    Procedural Background. ......................................................10

**STANDARD OF REVIEW**.......................................................11

**SUMMARY OF ARGUMENT** .................................................11

**ARGUMENT**............................................................................13

**I.**    **This Court's Precedent Compels The Conclusion That Appellant Cannot Claim Immunity For The *Jus Cogens* Violation Alleged Here.** ...........................................13

    A.    *Samantar* Is Controlling In This Circuit and Forecloses Appellant's Immunity Defense.............................................13

    B.    The *Jus Cogens* Holding In *Samantar* Applies To All Foreign Governments. .........................................................18

**II.**   **Even Setting *Samantar* and *Warfaa* Aside, Appellant Is Not Entitled to Conduct-Based Immunity.**.........................23

    A.    Appellant's Acts Were Not Performed in An Official Capacity...............................................................................24

B.    This Suit Is Against Appellant In His Personal Capacity and Would Not Enforce A Rule of Law Against El Salvador. .................................................................................. 31

III.  *Samantar* and *Warfaa* Were Correctly Decided and There Is No Basis To Overrule Them Through *En Banc* Review. ........................................................................... 34

A.    International Law Provides No Basis to Reconsider *Samantar* and *Warfaa*. ...................................................... 34

B.    Other Domestic Authority Reinforces *Samantar*. ............... 38

1.    The TVPA—Not the FSIA—Expresses Congress's View on Conduct-Based Foreign-Official Immunity and it Supports *Samantar*. .......................... 39

2.    This Court's Approach to *Jus Cogens* and Foreign-Official Immunity Is Consistent with That of Other Federal Courts. ................................................ 41

3.    The Executive Has Not Suggested Immunity in This Case, and Executive Branch Policy Supports the Denial of Immunity Here. .................................... 43

CONCLUSION ....................................................................................... 46

STATEMENT REGARDING ORAL ARGUMENT ........................... 47

CERTIFICATE OF COMPLIANCE ................................................... 49

ii

# TABLE OF AUTHORITIES

**CASES**

*Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006) .......................................29

*Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011) ........................... 15, 40

*Cass. Ass. Plé.*, 25 juillet 2025, n°24-84.071, D. 2025, ¶ 33 (Fr.)
.................................................................................................37

*Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) ..................................29

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) ..................................29

*Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004)...............30

*Doe 1 v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018)..............................27

*Does 1-5 v. Obiano*, 138 F.4th 955 (5th Cir. 2025) ............................ 28, 42

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ................ 15, 24, 26, 28, 42

*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir.
2002) ......................................................................................30

*Fang v. Jiang*, [2007] NZAR 420 ...........................................................35

*Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021) ...............41

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ................... 25, 28, 42

*Free and Sovereign State of Chihuahua v. Duarte Jaquez*, No.
EP-20-CV-00086-DCG, 2020 WL 3977672 (W.D. Tex. July
14, 2020) .............................................................................25-26

*Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247 (D.D.C.
2011) ......................................................................................27

*In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108 (4th
Cir. 1987) ................................................................................25

*Grayson O Co. v. Adagir International LLC*, 856 F.3d 307 (4th Cir. 2017) .................................................................. 16, 39

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ................................ 23, 40

*Jones v. Saudi Arabia*, [2006] UKHL 26 ................................................ 35

*Jurisdictional Immunities of the State (Ger. v. It.)*, 2012 I.C.J. 99 ....................................................................................... 35

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019) ........................ 28, 31, 32

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) ........................................ 26

*Regina v. Bartle ex parte Pinochet*, 38 I.L.M. 581 (H.L. 1999) ......... 35-37

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ..................... 22

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ................................. 16, 39, 42

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ..................................... 41

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992) ................................................................................ 19

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024) ........................... 18

*Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014) ............................... 20

*Warfaa v. Ali*, 811 F.3d 653 (4th Cir. 2016) .................................. *passim*

*WhatsApp Inc. v. NSO Group Technologies Ltd.*, 472 F. Supp. 3d 649 (N.D. Cal. 2020) .......................................................... 31

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ........................ *passim*

**STATUTES**

28 U.S.C. § 1350 note ........................................... 10, 15, 23, 28

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 102-367 (1991) ................................................... 15

iv

S. Rep. No. 102-249 (1991) ........................................................ 2, 15, 29

**OTHER AUTHORITIES**

Amicus Brief of the United States, *Yousuf v. Samantar*, No.
11-1479 (4th Cir. Oct. 24, 2011) ........................................... 45

Amicus Curiae, *Matar v. Dichter*, No. 07-2579-cv, 2007 WL
6931924 (2d Cir. Dec. 19, 2007) ........................................... 45

Daniele Amoroso & Riccardo Pavoni, Stergiopoulos v. Iran,
117 Am. J. Int'l L. 315 (2023) .............................................. 36

Andrea Bianchi, Ferrini v. Federal Republic of Germany, 99
Am. J. Int'l L. 242 (2005) ..................................................... 36

Curtis A. Bradley & Laurence R. Helfer, *International Law &
the U.S. Common Law of Foreign Official Immunity*, 2010
Sup. Ct. Rev. 213 (2010) ...................................................36-37

International Bar Association, *Report of the Task Force on
Extraterritorial Jurisdiction* (2009) ...................................... 38

Roman A. Kolodkin (Special Rapporteur), *Second Rep. on
Immunity of State Officials from Foreign Criminal
Jurisdiction*, Int'l Law Comm'n, U.N. Doc. A/CN.4/631
(June 10, 2010) ..................................................................... 37

Restatement (Second) of Foreign Relations Law § 66(f)
(1965) ...............................................................13-14, 16, 24

Restatement (Third) of Foreign Relations Law § 702 & cmt. n
(1987) ..................................................................................... 16

Statement of Interest and Suggestion of Immunity of and by
the United States of America, *Giraldo v. Drummond Co.,
Inc.*, No. 10mc00764 (JDB), (D.D.C. Mar. 31, 2011) .....................27-28

U.N. GAOR, Immunity of State Officials from Foreign
Criminal Jurisdiction, Int'l Law Comm'n, U.N. Doc.
A/CN.4/L.1017 (May 13, 2025) ............................................ 36

Vienna Convention on the Law of Treaties art. 53.................................19

Thomas Weatherall, *Jus Cogens and Sovereign Immunity: Reconciling Divergence in Contemporary Jurisprudence*, 46 Geo. J. Int'l L. 1151 (2015) ..............................................................38

## STATEMENT OF THE ISSUE

Whether the district court correctly held that Appellant Mario Adalberto Reyes Mena is not entitled to conduct-based foreign-official immunity for his role in a *jus cogens* violation—the extrajudicial killing of a journalist—in a federal suit for damages brought against him in his personal capacity under the Torture Victim Protection Act, where binding precedent from this Court forecloses such immunity, and where the foreign government he previously served has not ratified his actions, but has instead prosecuted him for the same conduct.

## STATEMENT OF THE CASE

This is a case about the individual civil liability of Appellant, a former Salvadoran military officer now residing in Virginia and a naturalized U.S. citizen, for the extrajudicial killing of a journalist, brought under a federal statute, the Torture Victim Protection Act ("TVPA"). The TVPA ensures that foreign officials responsible for extrajudicial killing or torture "will no longer have a safe haven in the United States" by providing victims of such human rights abuses a remedy in federal court. S. Rep. No. 102-249, at 3 (1991). This is precisely the kind of case contemplated by the TVPA.

1

Appellant sought dismissal of the TVPA claim before the district court, arguing *inter alia* that he was entitled to immunity as a former foreign official under the Foreign Sovereign Immunities Act ("FSIA") and under common law conduct-based foreign-official immunity. The district court denied Appellant's motion to dismiss in full and rejected his immunity arguments. On appeal, Appellant has forsaken his argument under the FSIA but maintains that he is immune from suit at common law pursuant to conduct-based foreign-official immunity.

Binding precedent of this Court requires affirmance of the district court's well-reasoned opinion, which applied this Court's controlling law. JA64–72. This Court has held—twice—that conduct-based foreign-official immunity is categorically unavailable as a defense against claims for violations of *jus cogens* norms, including extrajudicial killing, as alleged here. *See Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012); *Warfaa v. Ali*, 811 F.3d 653, 658-61 (4th Cir. 2016).

Even setting aside the *jus cogens* violation, Appellant also lacks entitlement to conduct-based foreign-official immunity under the controlling test. Under the common law, conduct-based immunity is only available to foreign officials who satisfy three requirements: (1) they

2

must be public ministers, officials, or agents of a foreign state; (2) their acts must have been performed in an official capacity; and (3) the effect of exercising jurisdiction must be to enforce a rule of law against the state itself. Appellant does not meet the second and third requirements, and the Court can affirm on that independent basis. Appellant fails the second requirement because his acts were not performed in an official capacity, as evidenced by El Salvador seeking his arrest and prosecution for the conduct at issue. Appellant fails the third requirement because this suit was brought against him in his personal capacity and seeks only to collect from his own assets, so it would not enforce a rule of law against El Salvador.

Appellant also spends much of his brief arguing that *Samantar* and *Warfaa* were not correctly decided, referencing inapposite and unpersuasive authority from other courts. But the Court should reject Appellant's effort to convince this Court to abandon its precedent and his suggestion for *en banc* review. The law here is settled, there is no good reason to depart from it, and this case—where even the foreign official's own former government disavows his conduct, and the former official is

3

ineligible for conduct-based immunity for other reasons—would be a poor vehicle to reconsider this precedent.

For these reasons, this Court should affirm and allow the district court to carry forward with this case.

### A.    The Dutch Journalists Were Killed In A Planned Ambush.

From 1980 to 1992, El Salvador was ravaged by a civil war between the Salvadoran government and the Farabundo Martí National Liberation Front ("FMLN"). JA45. Appellee's brother Jan Kuiper, a respected journalist, was covering the civil war in El Salvador. JA8, JA10. Kuiper and his colleagues, Koos Koster, Johannes "Joop" Willemsen, and Hans ter Laag ("the Dutch Journalists"), arrived in El Salvador in late February 1982 on assignment from Dutch television and radio broadcaster Interkerkelijke Omroep Nederland ("IKON"). JA8–9. The Dutch Journalists planned to cover the devastation of the war, reporting from San Salvador, El Salvador's capital, and from areas controlled by the FMLN. JA8, JA47. The Salvadoran security forces perceived the Dutch Journalists and their reporting as a threat. JA47–48.

At the time that the Dutch Journalists were in El Salvador, and

4

long before he later relocated to Virginia and became a naturalized U.S. citizen, Appellant was a colonel in the Salvadoran army, with command over the Fourth Brigade. JA15, JA23; Answer ¶ 27, *Kuiper v. Reyes Mena*, No. 24-cv-1785 (E.D. Va. Oct. 3, 2025), ECF No. 46. Appellant oversaw the El Paraíso military base, in the Department of Chalatenango, where the Fourth Brigade was stationed. JA15. On March 17, 1982, the Dutch Journalists traveled to Chalatenango, near the El Paraíso military base, heading to FMLN-controlled territory. JA8. The same day, a military patrol under Appellant's command was strategically stationed atop two hills overlooking a hollow where the Dutch Journalists were expected to pass on their way to their planned field-reporting site, awaiting their arrival. JA24, JA51. As the Dutch Journalists passed through the hollow, unarmed, *en route* to their reporting destination, the patrol targeted them with heavy fire, killing all four Dutch Journalists. JA8, JA10–11, JA25, JA51–52. Jan Kuiper, Appellee's brother, was shot twice in the head. JA25, JA52.

## B. Appellant's Role in the Planning and Execution of the Ambush.

Investigations confirmed Appellant's role in the extrajudicial killing of Appellee's brother and that the killings were premeditated. As

5

part of the 1992 peace agreement between the Salvadoran government and the FMLN, the United Nations established the U.N. Truth Commission for El Salvador ("U.N. Truth Commission"), which concluded in its final report that "the decision to ambush" the Dutch Journalists, including Kuiper, "was taken by Colonel Mario A. Reyes Mena." JA9, JA12, JA31, JA45. The U.N. Truth Commission investigated "serious acts of violence" committed during the civil war, including extrajudicial killings, forced disappearances, and torture, and it conducted an investigation of the killings of the Dutch Journalists. JA16, JA30, JA33–34, JA45, JA56. The U.N. Truth Commission established that Appellant was aware of the Dutch Journalists' plans to travel to Chalatenango and had met with other military officers to plan an ambush targeting the Dutch Journalists using soldiers under his command. JA10, 23, JA50–51. The U.N. Truth Commission found that Appellant used intelligence regarding the Dutch Journalists' anticipated movements to plan the ambush. JA23, JA51. In addition to Appellant's planning meeting, JA23, JA50–51, the U.N. Truth Commission found that the Dutch Journalists' mini-bus marked "PRENSA" ("press" in Spanish) had been followed by a vehicle used by the Salvadoran Armed Forces while *en route* to El

6

Paraíso, JA24, JA51.  JA28–29, JA54–55.  On March 15, 1993, the U.N. Truth Commission published its final report, the U.N. Truth Commission Report ("Truth Commission Report").  JA30, 33–34, 56.  The Truth Commission Report concluded that the decision to ambush the Dutch Journalists had been Appellant's.  JA31.

The U.S. government likewise found evidence that the Dutch Journalists had been ambushed.  JA28–30, 54–55.  After learning of the attack that killed the Dutch Journalists, the U.S. government promptly sent embassy officials to investigate.  JA28, JA53–54.  The U.S. embassy investigative report indicated that Salvadoran soldiers who participated in the killing "expressed elation at their success and referred to their mission as an 'ambush,'" that the patrol was three kilometers beyond the normal patrol perimeter, and that shell casings found at the scene indicated that the soldiers had advanced towards the Dutch Journalists while firing.  JA29, JA55. The found shell casings were for weapons that would be impractical for routine foot patrols.  JA29.  U.S. investigators who visited the site of the ambush shortly after the killing concluded "the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch Journalists had planned to pass, creating a 'kill

7

zone' that bore the hallmarks of a classic ambush," JA30, JA56, and found "no extensive evidence of guerilla fire"—contrary to the Salvadoran forces' "nearly uniform" version of events, who claimed that the Dutch Journalists had been caught in a skirmish between Salvadoran and guerilla forces. JA31, JA55, JA57.

## C.    Frustration of Justice and Salvadoran Proceedings.

In the immediate aftermath of the killings, the Salvadoran government and its security forces worked to promote a cover-up, JA33, JA38, JA52, and failed to heed the Dutch government's call for a full investigation.    JA34, JA56, JA58. The early promise of judicial proceedings investigating the killings was cut short when the Salvadoran judge assigned to the investigation was forced to flee the country following death threats related to her work on the case. JA33, JA57–58. The Dutch government eventually carried out its own investigation, which found the Salvadoran version of events to be "unbelievable and contestable." JA56.

In 1993, less than a week after the publication of the Truth Commission Report, which detailed Appellant's role in the killings, the Salvadoran government enacted an Amnesty Law that shielded

perpetrators, including Appellant, from investigation and prosecution for human rights abuses during the civil war. JA12, JA34, JA58. The Amnesty Law remained in effect for more than two decades, until El Salvador's Supreme Court struck it down as unconstitutional in 2016. JA34–35, JA59.

In 2022, the Salvadoran Attorney General sought Appellant's arrest for his role in the extrajudicial killings of the Dutch Journalists. JA36, 60. In November 2022, a Salvadoran court indicted three former officers of the Salvadoran Security Forces, including Appellant, for the killing of the Dutch Journalists. JA36, JA60. Appellant remained in the United States throughout the proceedings. JA36. In 2023, the Salvadoran judiciary requested that INTERPOL issue a Red Notice for Appellant's provisional arrest pending extradition or similar legal action, which to date has not been executed. JA 36, JA60. In July 2025, during the pendency of Appellant's motion to dismiss in the district court, a Salvadoran jury convicted and sentenced Appellant *in absentia* for the killings of the Dutch Journalists. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for a Stay Pending the Interlocutory Appeal at 1, *Kuiper v. Reyes Mena*, No. 24-cv-1785 (E.D. Va. Nov. 6, 2025), ECF No. 61. Appellant, who

9

remains in the United States, has avoided arrest in El Salvador by no longer returning to El Salvador, a country he regularly traveled to prior to his indictment. JA 36.

## D.     Procedural Background.

Appellee commenced this action in the Eastern District of Virginia on October 9, 2024, asserting an extrajudicial killing claim under the TVPA, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), and seeking damages from Appellant in his personal capacity.  JA39, JA60.  On November 22, 2024, Appellant filed a Motion to Dismiss, or, Alternatively, Stay, asserting numerous bases for dismissal, including immunity under the FSIA, conduct-based foreign-official immunity, failure to exhaust local remedies, statute of limitations, the TVPA's purported lack of retroactivity, and the failure to join El Salvador as a necessary party.  *See* JA61.  The district court denied Appellant's motion to dismiss in its entirety on September 10, 2025.  JA44.

On October 9, 2025, Appellant noticed a collateral order appeal on an issue of sovereign immunity before this Court, leading to the instant appeal.  Pursuant to his appeal before this Court, on November 12, 2025,

10

Appellant moved to stay the district court proceedings, which the court granted on December 3, 2025.  JA7.  The stay remains in effect pending the outcome of this appeal.

## STANDARD OF REVIEW

The Court reviews de novo the district court's finding on conduct-based foreign-official immunity. *See Warfaa*, 811 F.3d at 658.

## SUMMARY OF ARGUMENT

Appellant asserts, in the district court and now on appeal, that conduct-based foreign-official immunity protects him from Appellee's suit under the TVPA for a *jus* cogens violation—the extrajudicial killing of Appellee's brother.

The district court's judgment denying Appellant conduct-based foreign-official immunity should be affirmed on any of three independent grounds.

***First,*** this Court's binding precedent forecloses Appellant's immunity defense. In both *Yousuf v. Samantar* and *Warfaa v. Ali*, this Court held that *jus cogens* violations—including extrajudicial killings like the one alleged here—cannot qualify as "official acts" for purposes of conduct-based foreign-official immunity. Because no sovereign may

11

legitimately condone such acts, they cannot be attributed to the state, and so an official's claim to immunity for such acts necessarily fails. Appellant does not dispute that extrajudicial killing is a *jus cogens* violation or that Appellee adequately pleaded one. *Samantar* and *Warfaa* therefore compel affirmance.

***Second***, even setting aside this Court's approach to *jus cogens* violations, Appellant cannot satisfy two of the three elements of common law conduct-based foreign-official immunity. Such immunity requires that the official's acts be performed in an "official capacity"—which in turn requires the foreign state to adopt and embrace the conduct as its own. El Salvador has done the opposite: it has prosecuted Appellant *in absentia* and issued an INTERPOL Red Notice for his arrest for the same conduct alleged here. Nor can Appellant satisfy the requirement that this suit would enforce a rule of law against El Salvador. Appellee seeks damages from Appellant personally, not from El Salvador's treasury. Appellant, moreover, is a long-term U.S. resident and naturalized U.S. citizen who relocated to Virginia decades ago and remains subject to the jurisdiction of U.S. courts. Under these circumstances, exercising jurisdiction enforces no rule against El Salvador—it holds accountable a

Virginia resident whom El Salvador itself has prosecuted.

**Finally,** this Court should decline Appellant's invitation to reconsider *Samantar* and *Warfaa en banc*. None of the authorities that Appellant invokes supports overruling this Court's precedent—particularly in a case where the foreign state has affirmatively disavowed the defendant's conduct and the decision may be affirmed on multiple independent grounds.

## ARGUMENT

**I.    This Court's Precedent Compels The Conclusion That Appellant Cannot Claim Immunity For The *Jus Cogens* Violation Alleged Here.**

**A. *Samantar* Is Controlling In This Circuit and Forecloses Appellant's Immunity Defense.**

Under controlling Fourth Circuit precedent, "foreign official immunity [cannot] be claimed for *jus cogens* violations[.]" *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016) (quoting *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012)). This rule requires affirmance.

Only an "official act"—an act attributable to a foreign state—can qualify for conduct-based foreign-official immunity. *See* Restatement (Second) of Foreign Relations Law § 66(f) (1965) (extending conduct-

13

based immunity to foreign officials only if "the effect of exercising jurisdiction would be to enforce a rule of law against the state").

A *jus cogens* violation, by definition, cannot be such an "official" act. *Samantar*, 699 F.3d at 776 ("[*J*]*us cogens* violations are, by definition, acts that are not official authorized by the Sovereign."); *see also id.* at 777 ("'[B]ecause no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's duties.'" (quoting S. Rep. No. 102-249, at 8 (1991)). For conduct to rise to a *jus cogens* violation, it must derogate from "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted[.]" *Id.* at 775 (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331).

To be sure, a *jus cogens* violation may be "official" in the sense that an individual committed it "under color of law," "in the course of the foreign official's employment by the Sovereign," or "in an official capacity." *Id.* at 775. But a *jus cogens* violation cannot be a "legitimate official act" attributable to a sovereign. *Id.* at 776–77. And so "*jus cogens*

14

violations . . . do not merit foreign official immunity."[1] *Id.* at 776.

*Samantar* found further support for its conclusion that foreign officials lacked conduct-based immunity for *jus cogens* violations in the TVPA. *Id.* at 777. The TVPA creates a cause of action against any "individual" who, "under actual or apparent authority, or color of law, of any foreign nation," subjects another person to torture or extrajudicial killing. 28 U.S.C. § 1350 note; *see Aziz v. Alcolac, Inc.*, 658 F.3d 388, 392–93 (4th Cir. 2011). The legislative history confirms that Congress intended the TVPA to facilitate suits for certain *jus cogens* violations. S. Rep. No. 102-249, at 8 (1991) ("[B]ecause no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's duties."); H.R. Rep. No. 102-367, at 5 (1991) ("[Foreign officials] should not be able

---

[1] The so-called *jus cogens* "exception" is not an exception at all. It is a special application of the general rule that foreign officials are immune only for "official" acts. *Samantar*, 699 F.3d at 775–76. It does not carve out a class of otherwise-immune acts for which immunity is nonetheless denied. *Id.* Rather, it recognizes that acts violating *jus cogens* norms fall outside the scope of "official" acts in the first place. *Id.*; *see also Doğan v. Barak*, 932 F.3d 888, 897 (9th Cir. 2019) ("Thus, the court in [*Samantar*] had no occasion to consider whether *jus cogens* violations should be an exception to foreign official immunity because . . . the defendant was never given immunity in the first place.").

15

to avoid liability by claiming that the tortious conduct was a sovereign act."). In sum, as this Court observed in *Samantar*, "in enacting the TVPA, Congress essentially created an express private right of action for individuals victimized by torture and extrajudicial killing that constitute violations of *jus cogens* norms." 699 F.3d at 777.

*Samantar* controls this case. Extrajudicial killing is among the most fundamental *jus cogens* violations. *Samantar*, 699 F.3d at 775 ("summary execution" is "among these universally agreed-upon norms."); *see also* Restatement (Third) of Foreign Relations Law § 702 & cmt. n (1987) (identifying murder as a *jus cogens* violation).[2]

---

[2] Conduct-based foreign official immunity is a common-law doctrine distinct from sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), which governs only foreign *states* and their agencies and instrumentalities, while individual foreign official immunity is governed by the common law. *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010). Unlike status-based foreign-official immunity, which shields sitting heads of state and diplomats regardless of the conduct alleged, conduct-based immunity is available only to officials who satisfy three requirements: (1) they must be public ministers, officials, or agents of a foreign state; (2) their acts must have been performed in an official capacity; and (3) the effect of exercising jurisdiction must be to enforce a rule of law against the state itself. Restatement (Second) of Foreign Relations Law § 66(f). Because the district court correctly rejected Appellant's arguments under the FSIA—an argument Appellant waived by not raising in his appeal brief, *see Grayson O Co. v. Adagir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)—and because there is no allegation the Appellant was ever the head of state or a diplomat of El Salvador, only

16

Here, Appellee adequately pleaded that Appellant, a former military official, is responsible for an extrajudicial killing—the extrajudicial killing of his brother, Jan Kuiper. JA36–37 ¶¶ 164–170. Appellant does not dispute that extrajudicial killing qualifies as a *jus cogens* violation. *See* Op. Br. at 22 (acknowledging that *jus cogens* norms include "torture, summary execution, and genocide"). Nor does he dispute that Appellee adequately pled an extrajudicial killing. *See id.* at 10, 23 (reciting district court's finding that "the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*" without contesting the characterization). Thus, under this Court's binding precedent, Appellant is not entitled to foreign-official immunity, as the district court here correctly concluded.

*Warfaa* dispels any argument to the contrary. *Warfaa* reaffirmed *Samantar*, concluding that "*Samantar* forecloses [a former military official's] claim to foreign official immunity" for *jus cogens* violations. 811 F.3d at 661. In *Warfaa*, as here, the foreign-official defendant did "not contest that the misdeeds alleged in the complaint violate *jus*

conduct-based foreign-official immunity is at issue. As discussed herein as a distinct ground to affirm, he does not meet its requirements. *See* Part II, *infra*.

*cogens* norms." *Id.* Rather, the foreign official in *Warfaa* argued, as Appellant does now, that "*jus cogens* violations deserve immunity." *Id.* In rejecting this argument, the Court recognized that extending immunity to a *jus cogens* violation would require it to reconsider *Samantar*. *Id.* This Court declined to do so, explaining that one panel's decision "is binding, not only upon the district court, but also upon another panel of this court—unless and until it is reconsidered *en banc*." *Id.* (quoting *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 642 (4th Cir. 1975)); *see, e.g., United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2756 (2025). Despite the obvious parallels, Appellant's opening brief scarcely acknowledges *Warfaa*, much less explains how this panel could revisit *Samantar*'s holding when *Warfaa* held it could not. This panel should follow *Warfaa* and decline Appellant's invitation to revisit whether *jus cogens* violations merit conduct-based foreign-official immunity.

> **B.    The *Jus Cogens* Holding In *Samantar* Applies To All Foreign Governments.**

Appellant attempts to avoid this Court's controlling holding in *Samantar* with an immaterial factual distinction, but this effort fails. Picking on the fact that the defendant in *Samantar* came from Somalia,

which lacked a government recognized by the United States, Appellant misconstrues *Samantar*'s holding to apply only where the defendant served an unrecognized government. Op. Br. at 39–41. That matters, according to Appellant, because the United States owes no comity to unrecognized governments but does owe comity to recognized governments, such as El Salvador. Op. Br. at 2, 42. And, Appellant continues, exercising jurisdiction over him would offend El Salvador. This argument fails for three reasons.

**First**, *jus cogens* norms are universal—that is their whole point. Vienna Convention on the Law of Treaties art. 53 (describing a *jus cogens* norm as "a norm accepted and recognized by the international community of States *as a whole* as a norm from which no derogation is permitted" (emphasis added)). This Court acknowledges that *jus cogens* norms are "universally agreed upon." *Samantar*, 699 F.3d at 775. As universal norms, they apply to all government officials, regardless of whether their government is recognized.[3]

---

[3] Indeed, the Nuremberg prosecutions, which form the historical foundation of *jus cogens*, applied to officials of a regime that was, at the time of the acts, the recognized government of Germany. *See generally Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 715 (9th Cir. 1992) ("The universal and fundamental rights of human beings identified by

19

***Second***, nothing in the reasoning of *Samantar* or *Warfaa* suggest that their *jus cogens* holding relied on the fact that Somalia lacked a recognized government. To the contrary, *Samantar* stated that "*officials from other countries* are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." 699 F.3d at 777 (emphasis added). *Warfaa* reaffirmed this conclusion. *See* 811 F.3d at 661; *see also Warfaa v. Ali*, 33 F. Supp. 3d 653, 663 (E.D. Va. 2014) (holding that "*no state*—Somalia included— may condone [extrajudicial killing.]"), *aff'd*, 811 F.3d 653 (4th Cir. 2016) (emphasis added).

Appellant points out that in *Samantar*, the United States issued a suggestion of non-immunity, relying in part on Somalia's lack of a recognized government. *See* Op. Br. at 2, 40–41 (discussing *Samantar* 699 F.3d at 777–78). But the suggestion of non-immunity was not the basis of this Court's conclusion, which instead stated:

> Because this case involves acts that violated *jus cogens* norms, including torture, extrajudicial killings and prolonged arbitrary imprisonment of politically and ethnically disfavored groups, we conclude that Samantar is not entitled to conduct-based official immunity under the common law.

Nuremberg . . . are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*.")

20

*Samantar*, 699 F.3d at 778. Only after reaching that conclusion did the Court observe that the State Department's suggestion of non-immunity "supplied us with *additional* reasons to support this conclusion." *Id.* (emphasis added). As the district court in this case correctly recognized, "the Fourth Circuit's holding was made independently of the State Department's suggestion on non-immunity." JA71.

***Third***, the suit against Appellant does not offend comity. Appellant contends that comity to El Salvador—including its "comity interest in using its courts" to resolve this dispute—compels an exception to the rule that *jus cogens* violations do not entitle a foreign official to immunity. *See* Op. Br. at 2, 13, 22, 42. This argument fails at every turn.

To begin, comity concerns are diminished in the conduct-based foreign-official immunity context, which does "not involve any act of recognition for which the Executive Branch is constitutionally empowered; rather, [such questions] simply involve matters about the scope of defendant's official duties." *Samantar*, 699 F.3d at 773. Nor would exercising jurisdiction offend comity here. There is no evidence that El Salvador has requested immunity from the State Department, and the State Department has not filed a suggestion of immunity on

21

Appellant's behalf. To the contrary, El Salvador has sought Appellant's arrest and prosecuted him for the killing of the Dutch Journalists.

Appellant cites no authority compelling an exception to ordinary foreign-official immunity principles because of comity, and his reliance on *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), does not help. That case addressed whether the Republic of the Philippines was a required party under Federal Rule of Civil Procedure 19 in an interpleader action to determine ownership of assets stolen by Ferdinand Marcos. *Id.* at 854–55. The Supreme Court's discussion of comity arose in the context of analyzing prejudice to the Philippines—which had asserted sovereign immunity to avoid being joined as a party—if the suit proceeded without it. *Id.* at 866. Critically, *Pimentel* involved claims *by* the foreign sovereign to disputed property, not claims *against* a former official whom the sovereign was actively prosecuting. Nothing in *Pimentel* suggests that a former official may invoke his government's interest in using its own courts as a basis for immunity, particularly when Appellant refuses to submit to the jurisdiction of the Salvadoran courts.

In asking this Court to defer to Salvadoran proceedings, Appellant

is dressing a TVPA exhaustion defense in the garb of immunity. He contends that "U.S. courts should not attempt to supersede" the Salvadoran criminal proceedings and should instead allow El Salvador to resolve the claims through its own judicial system. Op. Br. at 13. But this argument—that Appellee should be required to pursue his remedies in El Salvador before proceeding in U.S. courts—smacks of the TVPA's exhaustion requirement, 28 U.S.C. § 1350 note § 2(b), not the doctrine of foreign-official immunity. *See Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265–66 (2018). The district court properly declined to resolve the exhaustion question at the motion-to-dismiss stage, and that ruling is not before this Court. JA 79–81. Appellant cannot repackage an exhaustion argument as an immunity defense.

The Court should follow its controlling precedent and affirm on the basis that Appellant is not entitled to conduct-based immunity for a *jus cogens* violation.

## II.   Even Setting *Samantar* and *Warfaa* Aside, Appellant Is Not Entitled to Conduct-Based Immunity.

Had this Court never decided *Samantar* or *Warfaa*, Appellant still could not claim conduct-based foreign-official immunity. Under the common law, conduct-based immunity is only available to foreign officials

23

who satisfy three requirements: (1) they must be public ministers, officials, or agents of a foreign state; (2) their acts must have been performed in an official capacity; and (3) the effect of exercising jurisdiction must be to enforce a rule of law against the state itself. Restatement (Second) of Foreign Relations Law § 66(f). Appellant fails to meet the second and third requirements, as the district court correctly found. *See* JA65–67 (holding that this is not an official-capacity suit), JA69–71 (holding that this suit is not against El Salvador).

## A.      Appellant's Acts Were Not Performed in An Official Capacity.

The second element of conduct-based immunity requires that the official's acts be "performed in [an] official capacity." Restatement (Second) of Foreign Relations Law § 66(f). This inquiry turns on whether the foreign state "acknowledges and embraces" the official's conduct—or disavows it. *Doğan v. Barak*, 932 F.3d 888, 892 (9th Cir. 2019). El Salvador has done the latter. Far from embracing Appellant's alleged conduct, El Salvador has prosecuted him for it—demonstrating in the clearest possible terms that the extrajudicial killings at issue were not "official" acts that it adopts or accepts. Consistently, the district court concluded that this suit was against Appellant in his personal capacity.

24

JA65–67.

This Court has recognized that conduct-based foreign-official immunity "ultimately belongs" to the foreign state, not to the individual official. *Samantar*, 699 F.3d at 767, 777 (quoting the State Department's Statement of Interest (SOI) suggestion of non-immunity); *see also id.* at 774 ("[C]onduct-based immunity for a foreign official derives from the immunity of the State." (citing Hazel Fox, The Law of State Immunity 455 (2d ed. 2008))); *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1111 (4th Cir. 1987) ("[Foreign official immunity] is primarily an attribute of state sovereignty, not an individual right."). Because immunity is an attribute of state sovereignty, only the foreign state can determine whether a former official's conduct qualifies as "official" for immunity purposes. When a state affirmatively disavows an official's conduct, it forecloses any claim that the conduct was performed in an "official capacity." *See, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (doubting that an "action by a state official in violation of the Constitution and laws of the [that state], and wholly unratified by that nation's government, could properly be characterized as an act of state"); *Free and Sovereign State of Chihuahua v. Duarte Jaquez*, No. EP-20-CV-

25

00086-DCG, 2020 WL 3977672, at *6 (W.D. Tex. July 14, 2020) (denying conduct-based foreign-official immunity at least in part because the foreign sovereign criminally indicted the official). That disavowal has occurred here, in the form of a criminal indictment, a prosecution *in absentia* and an INTERPOL Red Notice for his arrest. *See* Statement of the Case § C, *supra*.

These actions establish that El Salvador has definitively rejected any characterization of the alleged extrajudicial killings as legitimate governmental acts.

The contrast with cases granting immunity on which Appellant relies could not be sharper. They all involve a foreign state that affirmatively ratified the defendant's conduct and requested immunity on his behalf. *See Matar v. Dichter*, 563 F.3d 9, 11, 14 (2d Cir. 2009) (granting immunity where Israel filed a suggestion of immunity and "declar[ed] the defendant's acts as official); *Doğan*, 932 F.3d at 891, 897–98 (same). Both cases involved Israeli military operations where Israel immediately ratified the officials' conduct, requested immunity through diplomatic channels, and the State Department filed suggestions of immunity on their behalf. *Matar*, 563 F.3d at 11; *Doğan*, 932 F.3d at 891–

26

92.

The district court cases that Appellant cites follow the same pattern. In *Doe 1 v. Buratai*, Nigerian officials were sued for allegedly ordering military forces to shoot peaceful pro-Biafran protesters. 318 F. Supp. 3d 218, 222–23 (D.D.C. 2018). The Nigerian government transmitted a diplomatic note to the State Department "categorically disput[ing] the Plaintiffs' claims," asserting that the defendants were "being sued with respect to their authorized official actions," and requesting immunity on their behalf. *Id.* at 224–25. The court explicitly relied on the fact that "the Nigerian government authorized and ratified the defendants' alleged actions." *Id.* at 232. In *Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd* 493 F. App'x 106 (D.C. Cir. 2012), plaintiffs sought to depose former Colombian President Álvaro Uribe regarding his alleged collaboration with paramilitary death squads. The State Department filed a suggestion of immunity on Uribe's behalf based on head-of-state immunity, at the request of the Colombian government. *See id.* at 248; Statement of Interest and Suggestion of Immunity of and by the United States of America at 5, *Giraldo v. Drummond Co., Inc.*, No. 10mc00764 (JDB), (D.D.C. Mar. 31, 2011), ECF

No. 13 (explaining that Colombian government, through its ambassador to the United States, requested head-of-state immunity for Uribe). None of these cases involved a foreign state that disavowed the alleged conduct.

In cases where, as here, the foreign state has *not* ratified the conduct, all courts' reasoning supports denying immunity. *See, e.g.*, *Doğan*, 932 F.3d at 895 (observing that "in the great majority of cases, an official sued under the TVPA would never receive common-law immunity in the first place" because "foreign states would generally disavow conduct that violates the TVPA because no state officially condones such actions"); *Filartiga*, 630 F.2d at 889; *Does 1-5 v. Obiano*, 138 F.4th 955, 961 (5th Cir. 2025) ("[A] foreign official would not enjoy immunity if his government disavowed his conduct" (citations omitted)).

Appellant's contrary position would render the TVPA a dead letter. The statute requires a showing that the defendant acted "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note, § 2(a). If acting under color of law both establishes TVPA liability *and* provides a complete defense through immunity, no TVPA claim could ever succeed against a former foreign official. *See Lewis v. Mutond*, 918 F.3d 142, 148 (D.C. Cir. 2019) (Srinivasan, J., concurring)

(concluding that the TVPA "displaces any common-law, conduct-based immunity that might otherwise apply"); *id.* at 150 (Randolph, J., concurring in the judgment) (concluding that common-law foreign-official immunity "must give way" to the TVPA); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1282 (N.D. Cal. 2004) ("The mere fact that acts were conducted under color of law or authority, which may form the basis of state liability by attribution, is not sufficient to clothe the [foreign] official with sovereign immunity."). As the TVPA's legislative history confirms, Congress understood that "no state officially condones torture or extrajudicial killings," and therefore "few such acts, if any, would fall under the rubric of 'official actions'" warranting immunity. S. Rep. No. 102-249, at 8 (1991). The statute thus reflects Congress's expectation that foreign states would generally disavow such conduct—exactly as El Salvador has done here.

Indeed, U.S. courts have for decades exercised jurisdiction under the TVPA to hold foreign officials, including former Salvadoran military officials, responsible for extrajudicial killings. *See, e.g., Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) (upholding judgment against El Salvador's former Vice-Minister of Defense); *Arce v. Garcia*, 434 F.3d

1254 (11th Cir. 2006) (upholding judgment against two former Salvadoran Ministers of Defense, including Guillermo García, who was Appellant's co-defendant in the criminal trial in El Salvador); *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir. 2002) (same, against a former Minister of Defense and former Director of the Salvadoran National Guard); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004) (granting judgment against former captain in Salvadoran Air Force for the killing of Archbishop Romero). The TVPA was designed precisely for cases like this one.

At bottom, a former official cannot cloak conduct as "official capacity" conduct when the sovereign itself disavows it. Yet Appellant seeks exactly that; he asks this Court to wrap an extrajudicial killing in El Salvador's flag despite El Salvador's determination that his conduct was criminal. Because El Salvador has affirmatively disavowed Appellant's conduct, he cannot satisfy the second element of conduct-based immunity, and this Court could affirm on that basis alone.

30

**B.      This Suit Is Against Appellant In His Personal Capacity and Would Not Enforce A Rule of Law Against El Salvador.**

Appellant also cannot establish conduct-based foreign-official immunity because Appellee seeks damages from him personally, not from El Salvador. The third element of conduct-based immunity requires that "the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Samantar*, 699 F.3d at 769 (quoting Restatement (Second) of Foreign Relations Law § 66(f)). As the D.C. Circuit explained in *Lewis v. Mutond*, this element "considers whether the remedies sought by Plaintiff serve to enforce a rule of law against" the foreign state—not whether the underlying conduct was governmental in nature. 918 F.3d at 146. The element is satisfied only "when a judgment against the official would bind (or be enforceable against) the foreign state" or when the plaintiff "seeks to draw on the [foreign state's] treasury or force the state to take specific action." *Id.* at 146–47; *see also WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 665 (N.D. Cal. 2020), *aff'd*, 17 F.4th 930 (9th Cir. 2021) (declining a grant of immunity because a judgment would not bind a foreign state).

31

Appellee's suit satisfies neither condition, as the district court correctly found. JA65–67, JA69–71. He has sued Appellant in his personal capacity and seeks damages from Appellant's personal assets— not from El Salvador's treasury. JA65. Under *Lewis*, that is dispositive: "In cases like this one, in which the plaintiff pursues an individual-capacity claim seeking relief against an official in a personal capacity, exercising jurisdiction does not enforce a rule against the foreign state." 918 F.3d at 147.

Appellant argues that a judgment against him would nonetheless "condemn the legality of El Salvador's conduct" during its civil war. Op. Br. at 11. But the *Lewis* court rejected this exact argument. When defendants there argued that compelling foreign officials to defend themselves in U.S. courts constituted "enforcing a rule of law" against the foreign state, the court held that "these collateral effects are too attenuated to be equated with the direct fiscal impacts on the foreign state that are contemplated by the Restatement." 918 F.3d at 147. Here, too, whatever reputational effects this suit might have on El Salvador are "collateral"—they do not make El Salvador the "real, substantial party in interest." *Id.* (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).

32

Additionally, this argument is a thinly veiled attempt to again assert that comity protects Appellant. Appellee's suit cannot be construed as "enforcing a rule of law" against El Salvador where El Salvador has itself condemned Appellant's conduct as unlawful.

Bolstering the fact that this suit would not enforce a rule of law against El Salvador is that Appellant has subjected himself to U.S. jurisdiction through decades of voluntary residence in this country. As this Court recognized in *Samantar,* a defendant's status as a long-term U.S. resident "add[s] substantial weight in favor of denying immunity" because it creates "a binding tie to the United States and its court system." 699 F.3d at 777-78. Appellant relocated to the United States in 1984 and has remained here ever since, settling in Centreville, Virginia, and becoming a naturalized U.S. citizen. JA15. He thus appears before this Court not as El Salvador's representative, but as a long-term U.S. resident and naturalized U.S. citizen answerable for his own alleged misconduct. Under these circumstances, exercising jurisdiction enforces no rule against El Salvador—it seeks to hold accountable a Virginia resident whom El Salvador itself has prosecuted *in absentia.*

33

Because Appellee seeks only personal damages from Appellant, a long-term U.S. resident and naturalized citizen, this Court can also affirm on the ground that the third element of conduct-based immunity is not satisfied.

### III. *Samantar* and *Warfaa* Were Correctly Decided and There Is No Basis To Overrule Them Through *En Banc* Review.

Under the prior-panel-precedent rule, this panel is bound by *Samantar* and *Warfaa* and "cannot overrule a decision issued by another panel" absent intervening authority from the Supreme Court or this Court sitting *en banc*. *Warfaa*, 811 F.3d at 661–62. Unable to escape this Court's binding precedent, Appellant calls for *Samantar* to be overruled *en banc*, Op. Br. at 43–44, while ignoring *Warfaa*. But none of the authorities provided by Appellant suggest that these cases were wrongly decided.

### A. International Law Provides No Basis to Reconsider *Samantar* and *Warfaa*.

Appellant invokes foreign and international authority to claim that a "blanket exception" to foreign sovereign immunity in civil suits runs contrary to international law. Op. Br. at 1, 23–27. Appellant's attempt

34

to use these authorities to argue that *Samantar* should be overruled *en banc* fails on multiple fronts.

As a threshold matter, *Samantar* and *Warfaa* bind this Court, not the rulings of foreign jurisdictions. *See Warfaa*, 811 F.3d at 661. Furthermore, *Samantar* itself already considered many of the sources Appellant now invokes in concluding that former foreign officials cannot claim conduct-based immunity for *jus cogens* violations. *Samantar*, 699 F.3d at 776 (considering *Jones v. Saudi Arabia*, [2006] UKHL 26; and *Regina v. Bartle ex parte Pinochet*, 38 I.L.M. 581 (H.L. 1999) ["*Pinochet 3*"]). These and all other cases are readily distinguishable because they involve different legal instruments, domestic immunity statutes, or sovereign-versus-sovereign disputes inapplicable here. *See Pinochet 3*, 38 I.L.M. at 590-95 (invoking the Convention Against Torture, not at issue here); *Jones*, [2006] UKHL 26 ¶¶ 80-89 (same, and interpreting the U.K.'s domestic immunity statute); *Fang v. Jiang*, [2007] NZAR 420 ¶¶ 19-22 (discussing New Zealand's lack of a domestic statute codifying exceptions to state immunity); *Jurisdictional Immunities of the State (Ger. v. It.)*, 2012 I.C.J. 99, ¶ 1 (involving one sovereign state suing another, not—as here—an individual sued in his personal capacity whose home state has

declined to assert immunity on his behalf).

Appellant attempts to portray *Samantar* as deviating from international law. Op Br. at 23–27. That is not the case. Numerous nations have refused to grant immunity for *jus cogens* violations—a pattern of state practice that undercuts any claim that international law uniformly requires immunity in these circumstances. [4] Further, as Appellant concedes, additional jurisdictions refuse to grant conduct-based foreign-official immunity in criminal proceedings involving *jus cogens* violations. Op. Br. at 25 (citing Curtis A. Bradley & Laurence R. Helfer, *Int'l Law & the U.S. Common Law of Foreign Official Immunity*, 2010 Sup. Ct. Rev. 213, 240-41 (2010); U.N. GAOR, Immunity of State Officials from Foreign Criminal Jurisdiction, Int'l Law Comm'n, U.N. Doc. A/CN.4/L.1017 (May 13, 2025)); *see also Pinochet 3*, 38 I.L.M. at 594-

---

[4] For example, Italian courts have persistently denied immunity for serious human rights violations. *See* Andrea Bianchi, Ferrini v. Federal Republic of Germany, 99 Am. J. Int'l L. 242 (2005) (analyzing *Ferrini v. Repubblica Federale di Germania*, Cass., Sez. Un. Civ., 11 marzo 2004); Daniele Amoroso & Riccardo Pavoni, Stergiopoulos v. Iran, 117 Am. J. Int'l L. 315, 316–18 (2023) ("Italian jurisprudence has long championed a human rights limitation to state immunity.") (analyzing *Stergiopoulos v. Iran*, Order No. 39391/2021, 105 Rivista di diritto internazionale 620 (2022)). Brazil, South Korea, and Ukraine likewise deny immunity for *jus cogens* violations. *See id.* at 318 & nn.22–24 (collecting cases).

95 (no criminal immunity for *jus cogens* violations); *Cass. Ass. Plé.*, 25 juillet 2025, n°24-84.071, D. 2025, ¶ 33 (Fr.), https://www.courdecassation.fr/files/files/Communiqu%C3%A9s/Immunit%C3%A9%20chefs%20d%27Etats%20%C3%A9trangers/Ruling_n%C2%B01_25_July_2025.pdf (holding that the "principle of functional immunity from jurisdiction in criminal matters cannot be invoked" for *jus cogens* violations). Appellant attempts to distinguish this established international practice from civil cases like this one. Op. Br. at 26. But a sharp civil-criminal distinction conflicts with the legal systems of many other countries—for example, those where civil and criminal proceedings are not neatly divided. *See* Roman A. Kolodkin (Special Rapporteur), *Second Rep. on Immunity of State Officials from Foreign Criminal Jurisdiction*, Int'l Law Comm'n, U.N. Doc. A/CN.4/631, at 66 & n.153 (June 10, 2010) (observing that in the context of *jus cogens* violations "the two types of jurisdiction exercised are very close" and that "[i]f a peremptory norm prevails over immunity, then immunity from which jurisdiction—civil or criminal—is of no account"). Contrary to Appellant's assertion, there is no international consensus that civil and criminal proceedings be absolutely distinguishable in the context of *jus cogens*

37

violations—and there can be no such consensus where twenty-plus nations maintain blended proceedings.[5]

In sum, this Court's approach to *jus cogens* violations is not an international outlier.

## B.    Other Domestic Authority Reinforces *Samantar.*

Appellant's remaining arguments for *Samantar*'s reversal invoke domestic legal authority—Congress, the federal judiciary, and the Executive Branch. None of these sources supports *en banc* review. To the contrary, each confirms that foreign officials are not entitled to conduct-based immunity for *jus cogens* violations when, as here, the foreign state has disavowed the official's conduct.

---

[5] At least twenty-four civil law countries—including France, Germany, Italy, Spain, and the Netherlands—"allow civil claims to be made in the course of criminal proceedings in order for the victim to recover damages." International Bar Association, *Report of the Task Force on Extraterritorial Jurisdiction* 120–21 (2009).  As one commentator has observed, "[d]ivergence between immunities applicable to criminal and civil proceedings for *jus cogens* violations would produce the absurd result of immunizing State officials from such civil proceedings brought in conjunction with criminal charges for which no such immunity would apply." Thomas Weatherall, *Jus Cogens and Sovereign Immunity: Reconciling Divergence in Contemporary Jurisprudence*, 46 Geo. J. Int'l L. 1151, 1200 (2015).

38

### 1. The TVPA—Not the FSIA—Expresses Congress's View on Conduct-Based Foreign-Official Immunity and it Supports *Samantar*.

Appellant incorrectly argues that Congress rejected this Court's approach to *jus cogens* when Congress enacted the FSIA. Op. Br. at 29–32. The FSIA's list of enumerated exceptions does omit a "blanket *jus cogens* exception." *Id.* at 31. Appellant characterizes this omission as "strong evidence that no such exception exists . . . (at common law) for the officials acting on their behalf." *Id.* But it is evidence of no such thing.

Appellant's reliance on the FSIA is misplaced for the simple reason that the FSIA applies only to sovereign states, not to individual officials. *Samantar*, 560 U.S. at 310 n.3 ("[T]he FSIA does not govern whether an individual foreign official enjoys immunity from suit."); *accord* JA64 ("[A]s an individual foreign official, Defendant is not entitled to immunity under the FSIA."). Appellant appears to concede as much given that he has now waived his argument that he is immune pursuant to the FSIA. Op. Br. at 30–32 (analogizing to the FSIA, but declining to argue that Appellant gains immunity under it); *see Grayson*, 856 F.3d at 316 ("A party waives an argument by failing to present it in [his] opening brief or by failing to develop [his] argument even if [his] brief takes a passing shot

39

at the issue.") (internal quotation marks omitted). The FSIA's enumerated exceptions—and its silence on *jus cogens*—thus tell us nothing about whether individual officials like Appellant may claim immunity for torture or extrajudicial killing. Op. Br. at 29–31.

In contrast, the TVPA, which Appellant ignores in his opening brief, speaks directly to Congress's intent as to individual foreign officials. Like the FSIA, Congress intended the TVPA to codify existing international law. *Samantar*, 699 F.3d at 777 ("The TVPA thus recognizes … that the law of nations is incorporated into the law of the United States and that a violation of the international law of human rights is … *ipso facto* a violation of U.S. domestic law.") (citing *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105 (2d Cir. 2000)). But unlike the FSIA, the TVPA applies to individual foreign officials. *See Jesner*, 584 U.S. at 266; *Aziz*, 658 F.3d at 392–94 (holding that the TVPA applies to individuals, not corporate entities). As explained above, *see* Section I.A, *supra*, and as this Court observed in *Samantar*, "in enacting the TVPA, Congress essentially created an express private right of action for individuals victimized by torture and extrajudicial killing that constitute violations of *jus cogens* norms." 699 F.3d at 777. This Court's approach to *jus cogens*

in *Samantar* comports with Congress's intent as to the immunity of foreign officials.

### 2. This Court's Approach to *Jus Cogens* and Foreign-Official Immunity Is Consistent with That of Other Federal Courts.

Appellant contends that the "judicial branch" has rejected this Court's approach to *jus cogens* violations and conduct-based foreign-official immunity. Op. Br. at 32–37. Properly understood, however, there is no split among federal courts over whether officials may claim immunity for *jus cogens* violations that their home state disavows.

Appellant's reliance on Supreme Court precedent is misplaced. He contends that in *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993), and *Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021), the Court held that even egregious human rights violations—torture in *Nelson*, Nazi-era genocide in *Philipp*—remain "sovereign acts" entitled to FSIA immunity. Op. Br. at 32–33. From this, he reasons that conduct that qualifies as a sovereign act when the state is sued cannot "suddenly lose its sovereign nature when the officials who acted under the State's authorization are sued instead." *Id.* at 33–34. Again, he conflates *state* immunity under the FSIA with conduct-based *official* immunity under

41

the common law—two distinct doctrines with different sources and different rules. *See* Op. Br. at 32–33. As the Supreme Court made clear in *Samantar*, the FSIA does not apply here because it governs only foreign states, not individual officials, whose immunity is governed by "the common law." 560 U.S. at 325. And the common law treats individual officials differently: apart from heads of state (entitled to status-based immunity), other officials' immunity derives from and depends upon the foreign state's willingness to extend it. *See Samantar*, 699 F.3d at 774–75. Where, as here, the foreign state has not claimed immunity for the official's conduct, the sovereignty principles animating *Nelson* and *Philipp* do not apply.

The decisions of other Circuits confirm this understanding. As noted above, all federal courts agree that foreign officials are not entitled to immunity for *jus cogens* conduct that their home state disavows or fails to adopt or ratify as its own. *See Filartiga*, 630 F.2d at 889 (denying immunity where Paraguay disavowed torture committed by former police official); *Obiano*, 138 F.4th at 961 ("[A] foreign official would not enjoy immunity if his government disavowed his conduct"); *Doğan*, 932 F.3d at 895–96 (recognizing that the TVPA "operate[s] to impose liability on

foreign officials who engaged in torture or extrajudicial killings" when the foreign government "disavows" the official's conduct). The Ninth Circuit case on which Appellant relies most heavily (*Doğan*) distinguished *Samantar* on precisely this basis. 932 F.3d at 897 ("[The Fourth Circuit in *Samantar*] did not have occasion to consider whether [its *jus cogens* holding] should be the case where the foreign sovereign has ratified the defendant's conduct and the State Department files a Suggestion of Immunity on his behalf."). Put simply, because El Salvador disavows Appellant's conduct through criminal prosecution, any circuit's approach would achieve the same outcome here: no immunity.

> **3.     The Executive Has Not Suggested Immunity in This Case, and Executive Branch Policy Supports the Denial of Immunity Here.**

Appellant argues that the Executive Branch "has voiced strong opposition to a general *jus cogens* exception" and that courts should defer to this position. Op. Br. at 27–29. He points to amicus briefs filed by the United States in *Matar v. Dichter* and *Doğan v. Barak*, in which the government urged courts to reject a categorical rule according to which *jus cogens* allegations automatically defeat immunity. *Id.* at 28. These briefs establish "principles" that, according to Appellant, courts should

apply even when the Executive does not appear, including that "customary international law does not recognize any *jus cogens* exception to foreign official immunity." *Id.* From this, Appellant reasons that courts should decline to recognize any *jus cogens*-based limitation on immunity. *Id.* at 27–29. This argument fares no better than Appellant's others.

To begin, the Executive's policy preferences—expressed in amicus briefs filed in other circuits—cannot override this Court's binding precedent. The very authorities Appellant invokes were available to this Court when it decided *Samantar* in 2012 and *Warfaa* in 2016. This Court considered the Executive's views and nonetheless held that "officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Samantar*, 699 F.3d at 777. Whatever weight the Executive's general preferences might carry in a case of first impression, they cannot supply a basis for overruling circuit precedent. *See Warfaa*, 811 F.3d at 661–62.

Even if the Executive opposes a "blanket" *jus cogens* exception, that says nothing about whether it would support immunity in this case. The amicus briefs Appellant cites do not argue that immunity is categorically

44

warranted whenever a plaintiff alleges a *jus cogens* violation. To the contrary, they confirm that the Executive "retains the prerogative to inform the courts that it declines to recognize immunity in a particular case." Amicus Curiae, *Matar v. Dichter*, No. 07-2579-cv, 2007 WL 6931924, at *21 n.9 (2d Cir. Dec. 19, 2007). In this case, there is no indication that the Executive supports Appellant's claim to immunity. If anything, two principles that the Executive espouses support denying him immunity.

*First,* when (as here) no foreign government seeks immunity for a defendant, that silence weighs against immunity. Indeed, the Executive took that position in *Samantar* itself. *See* Amicus Br. of the United States at 2, *Yousuf v. Samantar*, No. 11-1479 (4th Cir. Oct. 24, 2011), ECF No. 43. Here, the State Department has filed no suggestion of immunity, and there is no indication that El Salvador has requested one. Whatever concerns the Executive has expressed about a "blanket" *jus cogens* exception, those concerns do not apply where—as here—the defendant's own state does not assert immunity on behalf of the former officer. *See* Section III.A, *supra*.

*Second,* again in *Samantar*, the State Department emphasized

45

that "U.S. residents like Samantar who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents." *Samantar*, 699 F.3d at 777–78. The same logic applies with even greater force here. Appellant relocated to the United States in 1984 and has resided in Virginia for over four decades, becoming a naturalized U.S. citizen. Having enjoyed the protections of U.S. law for so long, he should not now be heard to claim that U.S. courts lack authority to adjudicate claims against him. The Executive's own articulated principles thus favor accountability, not immunity.

* * *

In all events, even if this Court were inclined to reconsider its approach to *jus cogens* and conduct-based foreign-official immunity, *en banc* review would be unwarranted here. The judgment below may be affirmed on either of two independent grounds that do not require the Court to reach the broader doctrinal question Appellant raises. *See* Parts I & II, *supra*. Because the Court may affirm without revisiting *Samantar* or *Warfaa*, this case presents no occasion for *en banc* review.

**CONCLUSION**

Appellee Gert Kuiper respectfully requests that the Court follow

46

the binding law of this circuit and affirm, reject Appellant's invitation to reconsider the decisions of two panels *en banc*, and promptly return the mandate to the district court to permit this case to proceed.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. Appellee submits that oral argument is not necessary because binding circuit precedent compels affirmance. If the Court desires oral argument, Appellee welcomes the opportunity to be heard.

Dated: January 20, 2026

Respectfully submitted,

/s/ *Jason P. Hipp*

Jason P. Hipp
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
JHipp@jenner.com

Lawrence W. McMahon
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LMcMahon@jenner.com

47

Justin J. Gillette
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
JGillette@jenner.com

Peter C. Welch
JENNER & BLOCK LLP
515 Flower Street
Suite 330
Los Angeles, CA 90071
Tel: (213) 239-5100
PWelch@jenner.com

Daniel McLaughlin
Claret Vargas
CENTER FOR JUSTICE &
ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444
DMclaughlin@cja.org
CVargas@cja.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,226 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/Jason P. Hipp*

Jason P. Hipp

49

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, I electronically filed the foregoing Appellee's-Plaintiff's Response Brief with the Clerk of this Court using the CM/ECF System, which will send a notification of electronic filing to all counsel of record who are registered CM/ECF users.

*/s/Jason P. Hipp*

Jason P. Hipp